1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3               CASE NO. 23-CIV-6252            ORIGINAL

4

5

6                 MARSHALL KRIMSKY,

7                     Plaintiff

8

9                       V.

10

11       WESTROCK COMPANY AND WESTROCK SERVICES, LLC,

12                   Defendants.

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  MARSHALL KRIMSKY

24   DATE:      JULY 24, 2024

25   REPORTER:  ESTHER HEATH



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 2

```
 1              APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF, MARSHALL KRIMSKY:
 4   Frances Codd Slusary, Esquire
 5   Goddard Law PLLC
 6   39 Broadway
 7   Suite 1540
 8   New York, New York 10006
 9   Telephone No.: (646) 964-1178
10   E-mail: frances@goddardlawnyc.com
11
12   ON BEHALF OF THE DEFENDANTS, PIZZAROTTI, LLC, IGNAZIO
13   CAMPOCCIA, MICHAEL BUTTA, AND GUN LEE:
14   Janice Sued Agresti, Esquire
15   Cozen O'Connor
16   3 World Trade Center
17   175 Greenwich Street
18   New York, New York 10007
19   Telephone No.: (212) 883-4927
20   E-mail: jagresti@cozen.com
21
22
23
24
25
```

Page 4

```
 1                    INDEX
 2                                              Page
 3   PROCEEDINGS                                  6
 4   DIRECT EXAMINATION BY MS. AGRESTI            8
 5
 6                  EXHIBITS
 7   Exhibit                                     Page
 8   A - E-mails From Nickie Parker to Marshall    29
 9       Krimsky - Westrock 0147-0157
10   B - Equal Employment Opportunity Commission   32
11       Complaint Dated June 2023
12   C - Amended Equal Employment Opportunity      34
13       Commission Complaint
14   D - Graphics Business Manager Job Description  62
15       Westrock 001-002
16   E - Transcript Report of Marshall Krimsky     78
17       Westrock 0206
18   F - Series Of Personnel-Related Documents     83
19       Westrock 0207-0217
20
21
22
23
24
25
```

Page 3

```
 1          APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANTS, WESTROCK COMPANY AND
 4   WESTROCK SERVICES:
 5   Janice Sued Agresti, Esquire
 6   Cozen O'Connor
 7   3 World Trade Center
 8   175 Greenwich Street
 9   55th Floor
10   New York, NY 10007
11   Telephone No.: (212) 453-3978
12   E-mail: jagresti@cozen.com
13
14   AND
15
16   PII/Confidential
17   In House Counsel for Smurfit Westrock
18   1000 Abernathy Road NE
19   Atlanta, Georgia 30328
20   PII/Confidential
21
22   (Appeared via videoconference)
23
24   Also Present: Carli Grossman, Videographer
25
```

Page 5

```
 1                  STIPULATION
 2
 3   The VIDEO deposition of MARSHALL KRIMSKY was taken at
 4   COZEN O'CONNOR, 3 WORLD TRADE CENTER, 175 GREENWICH
 5   STREET, 55TH FLOOR, NEW YORK, NEW YORK 10007, on
 6   WEDNESDAY the 24th day of JULY 2024 at 10:23 a.m. (ET);
 7   said deposition was taken pursuant to the FEDERAL Rules
 8   of Civil Procedure.
 9
10   It is agreed that ESTHER HEATH, being a Notary Public
11   and Court Reporter for the state of NEW YORK, may swear
12   the witness and that the reading and signing of the
13   completed transcript by the witness is not waived.
14
15
16
17
18
19
20
21
22
23
24
25
```



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 6

```
                    PROCEEDINGS
 1
 2
 3      THE VIDEOGRAPHER:  All right.  Good morning.
 4  My name is Carli Grossman.  I'm the videographer
 5  today.  And Esther Heath is our court reporter.
 6  Today is the 24th day of July 2024.  The time is
 7  10:20 am. Eastern.  We are at the offices of Cozen
 8  O'Connor to take the deposition of Marshall Krimsky
 9  in the matter of Marshall Krimsky against WestRock
10  Company and WestRock Services, LLC, pending in the
11  United States District Court, Southern District of
12  New York, case number 23-CIV-6525 JPC [sic].  Will
13  Counsel identify themselves for the record?
14      MS. SLUSARZ:  Sure.  Frances Codd Slusarz of
15  Goddard Law for the plaintiff.
16      MS. AGRESTI:  And Janice Sued Agresti for Cozen
17  O'Connor, representing WestRock Company and WestRock
18  Services, LLC.
19      THE VIDEOGRAPHER:  Thank you very much.  All
20  right.
21      MS. AGRESTI:  And the case number is -- ends
22  6252.  Is that what you said?
23      THE VIDEOGRAPHER:  Yeah.  6525.
24      MS. AGRESTI:  6252.
25      THE VIDEOGRAPHER:  Oh, sorry.  Yes.  Correct.
```

Page 7

```
 1      MS. AGRESTI:  Okay.
 2      THE VIDEOGRAPHER:  Apologies.  And Mr. Krimsky,
 3  can you please raise your right hand for the court
 4  reporter?
 5      THE WITNESS:  Hi.
 6      THE REPORTER:  Do you solemnly swear or affirm
 7  that the testimony you're about to give in this
 8  matter will be the truth, the whole truth, and
 9  nothing but the truth?
10      THE WITNESS:  Yes.
11      THE REPORTER:  Thank you.  And would you state
12  and spell your full name?
13      THE WITNESS:  Marshall Krimsky,
14  M-A-R-S-H-A-L-L, K-R-I-M-S-K-Y.
15      THE REPORTER:  Thank you.  You may begin.
16      MS. AGRESTI:  Before we get started, do you
17  want to chat about stipulations?
18      MS. SLUSARZ:  Oh, sure.
19      MS. AGRESTI:  Would you like -- I guess, what
20  did you have in mind?
21      MS. SLUSARZ:  Well --
22      MS. AGRESTI:  Do you want to do --
23      MS. SLUSARZ:  Reserving all --
24      MS. AGRESTI:  Objections are to form.
25      MS. SLUSARZ:  Thank you.
```

Page 8

```
 1      MS. AGRESTI:  Reserving all others.  And then
 2  would you like him to read and sign?
 3      MS. SLUSARZ:  Yes, please.
 4      MS. AGRESTI:  Okay.
 5      MS. SLUSARZ:  That just means you'll get a copy
 6  of the deposition transcript and you'll review it
 7  and make any corrections, misspellings, that kind of
 8  thing.
 9      THE WITNESS:  Okay.
10      MS. SLUSARZ:  And sign it.
11      MS. AGRESTI:  I just like to get that out of
12  the way in the beginning, because everyone tends to
13  forget at the end.  So --
14      MS. SLUSARZ:  Yeah.
15              DIRECT EXAMINATION
16  BY MS. AGRESTI:
17      Q.  Okay.  Good morning, Mr. Krimsky.
18      A.  Good morning.
19      Q.  Please state your full name for the record,
20  which I believe you already did, but --
21      A.  Marshall Krimsky.
22      Q.  You'll see that there's a court reporter who's
23  taking down what you're saying.  And for that reason, we
24  just need you to give verbal responses to my questions,
25  so yes or no as opposed to nodding of the head or
```

Page 9

```
 1  uh-huh.  Does that make sense?  Or shoulder shrugs --
 2      A.  Yes.  Yes.
 3      Q.  Okay.
 4      A.  It does.
 5      Q.  We also have a videographer here who is
 6  recording as you speak, so just wanted to let you know
 7  that.  If you need a break at any time, please feel free
 8  to let me know, and we're happy to take a break.  The
 9  only thing that I ask is that if there's a question
10  that's pending, that you answer the question and then we
11  take the break.
12      A.  Gotcha.
13      Q.  If you need any clarification on any question
14  or if you don't understand what I'm asking, you can
15  absolutely ask me to clarify.  It's not a test, so --
16      A.  Thank you.
17      Q.  -- if you need me to do that, I'm happy to do
18  that.  Please don't guess.  If you don't know, don't
19  guess.
20      A.  Say, I don't know.
21      Q.  Yes.  Exactly.  Before we begin -- and these
22  are not necessarily anything specific.  It's something
23  that we need to ask everyone before we get started in
24  any deposition.
25          Are you aware of any mental impairment that
```

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 10

1  would have an impact on your memory or ability to give
2  truthful testimony today?
3      A.   No.
4      Q.   Are you on any medications that would affect
5  your memory or ability to give truthful testimony today?
6      A.   No.
7      Q.   Is there any reason that you can think of that
8  would impact your ability to give truthful testimony
9  here today?
10      A.   No.
11      Q.   Okay.  What did you do to prepare for today's
12  deposition?
13      A.   I read over the deposition that we sent you.
14      Q.   I'm sorry.  You read over the --
15      A.   Whatever they sent us.  What did you send us?
16  I forget.
17      Q.   It's whatever you remember.  So --
18      A.   I don't even know what it's called.  I read
19  the papers that we filed against you guys.
20      Q.   Got it.  Did you look at any other documents?
21      A.   No.
22      Q.   Okay.  How long did you prepare for?
23      A.   About an hour.
24      Q.   Okay.  Did you speak with anyone about this
25  case other than your attorneys?

Page 11

1      A.   That I was coming here?  Yes.
2      Q.   Who is that?
3      A.   My wife.  Oh, my girlfriend, my children, and
4  a few friends.
5      Q.   And prior -- and aside from being here today,
6  have you spoken to anyone about this case that's not
7  your lawyers?
8      A.   Yes.  I just told you.  My girlfriend, my
9  friends, and -- and my children.
10      Q.   And what have you told them?
11      A.   That I have a case against WestRock, because
12  I'm old and they treated me poorly.
13      Q.   Have you ever been deposed before?
14      A.   No.
15      Q.   Have you ever sued or been sued before?
16      A.   No.
17      Q.   Have you ever had -- have you ever declared
18  for bankruptcy?
19      A.   No.
20      Q.   Have you ever gone through divorce
21  proceedings?
22      A.   Yes.
23      Q.   Was it one time?
24      A.   Yes.
25      Q.   And when was that?

Page 12

1      A.   2000, I believe.  2001.
2      Q.   Okay.  Who do you live with today?
3      A.   My girlfriend.
4      Q.   Anyone else?
5      A.   Nope.  No.
6      Q.   And where do you currently reside?
7      A.   235 East 57th Street, New York.
8      Q.   Do you have any other residences?
9      A.   Me personally, no.
10      Q.   Do you have any other properties?
11      A.   Me personally, no.
12      Q.   What do you mean when you say "me personally"?
13      A.   Well, my girlfriend does.
14      Q.   Understood.  Do you sometimes reside at your
15  girlfriend's other properties?
16      A.   Yes.
17      Q.   And where are those properties?
18      A.   Remsenburg, New York.
19          THE REPORTER:  Did you say Remsenburg?
20          THE WITNESS:  Yes.
21  BY MS. AGRESTI:
22      Q.   Is that in upstate New York?
23      A.   No.
24      Q.   Where is that?
25      A.   Long Island.

Page 13

1      Q.   How often do you reside at the Long Island
2  property?
3      A.   Once every few weeks.
4      Q.   When did you begin spending some time at the
5  Long Island residence?
6      A.   About seven years ago.
7      Q.   Okay.  And has the time -- let me rephrase.
8  You stated you go once every few weeks.
9          How often -- or how long do you stay when you
10  are there?
11      A.   One or two days.
12      Q.   Okay.  And that has always been the case for
13  the past seven years?
14      A.   No.
15      Q.   So talk --
16      A.   Just -- just recently.
17      Q.   Okay.
18      A.   Over the few years, if I go out there, it's on
19  the weekends.
20      Q.   Okay.  Did you ever spend more than a couple
21  of days every few weeks --
22      A.   No.
23      Q.   -- at the long island residence?
24      A.   No.
25      Q.   Okay.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    MS. SLUSARZ: Let her finish the question
2  before you answer --
3        THE WITNESS: Sorry.
4        MS. SLUSARZ: It's just
5        THE WITNESS: Yep.
6  BY MS. AGRESTI:
7        Q.  Tell me about your tenure with WestRock. When
8  did you begin working for them?
9        A.  Well, I worked -- they took over the company I
10 was working for in -- I'm trying to think -- around
11 2002. I'm sorry. Around 2006. The company I worked
12 for was acquired.
13       Q.  And what company was that?
14       A.  Schiffenhaus Packaging.
15       Q.  Were you an at-will employee with
16 Schiffenhaus --
17       A.  Yes.
18       Q.  -- Packaging?
19       A.  Yes.
20       Q.  And are you and have you always been an
21 at-will employee with WestRock?
22       A.  Yes.
23       Q.  And what was your role when WestRock acquired
24 your prior employer?
25       A.  A commission salesman.

1        Q.  And as a commission salesman, what are your
2  roles and duties? What are your duties?
3        A.  To bring in sales and make sure the order is
4  correct.
5        Q.  And how do you bring in sales?
6        A.  By going to the customer and seeing what their
7  needs are.
8        THE REPORTER: Can you speak up more?
9        THE WITNESS: Sure. See what their needs are.
10       THE REPORTER: Thank you.
11 BY MS. AGRESTI:
12       Q.  And you were a commission salesman until when?
13       A.  Until 2022. I believe that's the date.
14       Q.  Okay. Okay. So we'll talk more about when
15 your role changed shortly. When was your employment
16 with WestRock terminated?
17       A.  June 6th, 2024.
18       Q.  And have you been looking for new work since
19 then?
20       A.  I am not sure how to answer that. No. I have
21 not been actively looking, no.
22       Q.  Okay. So let's talk about when your role
23 changed. What were the circumstances of that change?
24       A.  Can you explain that question again?
25       Q.  Yes. You said your role changed from

1  commission salesperson or salesman into a new role?
2        A.  Right.
3        Q.  What -- how did that happen?
4        A.  They took my -- they said I'm no longer a
5  commission salesman and now I'll be a customer service
6  person.
7        Q.  Okay.
8        A.  And we still want you to handle all your
9  accounts and handle more accounts.
10       Q.  Okay. So --
11       A.  With a base salary and no commission.
12       Q.  Okay. So let's backtrack a little bit here.
13 In 2019, was -- who were you reporting to in 2019?
14       A.  I believe it was Mark Van der Kloet.
15       Q.  And prior to reporting to Mark Van der Kloet,
16 who did you report to?
17       A.  Peter Brandt.
18       Q.  Okay. Why did that change happen, reporting
19 from Peter Brandt to Mark Van der Kloet?
20       A.  When they closed the factory in Newark while I
21 was working.
22       Q.  So WestRock closed the factory in Newark that
23 you were working at?
24       A.  That's correct.
25       Q.  Okay. When that factory in Newark closed,

1  what impact did that have on the company, if you know?
2        A.  On the whole company? I have no idea.
3        Q.  What impact did that have -- are you -- let me
4  rephrase.
5        Are you aware whether or not any individuals
6  were let go as part of that closure?
7        A.  Yes. They were.
8        Q.  Do you know if the company had a
9  reorganization as part of that closure?
10       A.  I'm pretty sure they did.
11       Q.  Okay. Were you impacted in that
12 reorganization?
13       A.  Yes.
14       Q.  I'm sorry. If you can just --
15       A.  Yes.
16       Q.  I know it's hard to do that, but just wait for
17 my question to finish.
18       A.  I'm sorry.
19       Q.  Only because they're trying to transcribe us.
20 And so it's hard when we're speaking over. So were you
21 impacted as part of that reorganization?
22       A.  Yes.
23       Q.  Okay. How were you impacted?
24       A.  Well, they weren't making boxes in Newark
25 anymore, and I wasn't sure where they were going to make

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1 the boxes for my customer.
2    Q.    You say customer?
3    A.    Yes.
4    Q.    What customer are you referring to?
5    A.    Campbell Soup.
6    Q.    Okay.  So what happened in that period in
7 time?  Were they able to accommodate Campbell Soup?
8    A.    No.
9    Q.    Okay.  And so was Campbell Soup a lost account
10 because of that?
11   A.    Yes.
12   Q.    Okay.  So at that time when you were now
13 reporting to Mark Van der Kloet, did your team change?
14   A.    What team?  I never had a team.
15   Q.    Did your role change?
16   A.    Yes.
17   Q.    Tell me about that.
18   A.    Now I'm a customer service person.
19   Q.    And that was as part of the reorganization?
20   A.    I would imagine so.  Yes.
21   Q.    And when you took on this new role as a
22 customer service -- what was that last part you said?
23   A.    Person.
24   Q.    Okay.  When you took on a new role under Mark
25 Van der Kloet, were you informed that there would be a

1 compensation change?
2    A.    Yes and no.
3    Q.    What do you mean by that?
4    A.    He said, we're going to keep you whole.  I
5 gave him all my commission statements.  After a month or
6 two and not getting paid at all, he told me he couldn't
7 figure out my commissions, even though I gave him
8 WestRock paperwork showing my commissions.
9    Q.    And what did you understand that to mean, that
10 we will keep you whole?
11   A.    Well, they wasn't paying me -- well, they were
12 paying me commission, but they couldn't figure out my
13 commission.  So they said they'd pay me the same thing
14 as the prior year.
15        THE REPORTER:  As what?
16        THE WITNESS:  The prior year.  The year before.
17 BY MS. AGRESTI:
18   Q.    And do you know what that amount was?
19   A.    It was roughly -- yes, I do.
20   Q.    What was it?
21   A.    Roughly, 560, $560,000.
22   Q.    Per year?
23   A.    Yes.
24   Q.    And did he say anything about an eventual
25 change in your compensation?

1    A.    Yes.  He said it would go -- we'd speak every
2 few months and it would go up and down accordingly.  If
3 I sold more, I'd make more.  If I sold less, I'd make
4 less.
5    Q.    Did he tell you that receiving commission --
6 so let me backtrack, actually.  Were you receiving
7 commission when you were changed to reporting to Mark
8 Van der Kloet?
9    A.    I believe so.  Yes.
10   Q.    Is that how they phrased it, commission?
11   A.    Yes.
12   Q.    Did they say that -- but you said they
13 couldn't figure out your commissions?
14   A.    Right.
15   Q.    So can you explain that to me?
16   A.    I -- they couldn't explain it to me.
17   Q.    So --
18   A.    No, I can't explain it to you.
19   Q.    So your understanding is that you were still
20 receiving commissions, or were you receiving pay in --
21 in -- that would be the equivalent amount of what your
22 prior commissions were?
23   A.    Yes and no.  I would've made more, I think, if
24 I was on a real commission, but he says he couldn't
25 figure it out, even though I gave him paperwork in black

1 and white.
2    Q.    But there wasn't a commission plan that the
3 company was, at that point in time, following, correct?
4    A.    I'm not sure.  I'm not sure what the company
5 was doing.  I know all the people in Newark were getting
6 commissions and they're still getting commissions.
7    Q.    Who are those people?
8    A.    All the salespeople in Newark that I worked
9 with.
10   Q.    To this day?
11   A.    Yes.
12   Q.    Okay.  Are they in the same division as you
13 today?
14   A.    No.
15   Q.    Okay.  Did Mark Van der Kloet ever tell you
16 that he would continue to pay you prior commission
17 amounts until they could figure out a new salary?
18   A.    No.
19   Q.    Did Mark Van der Kloet ever tell you, we will,
20 quote unquote, keep you whole until your salary
21 eventually will decrease?
22   A.    He said it would go up or down accordingly,
23 based on my sales.
24   Q.    Did, at any point, Mark Van der Kloet tell you
25 that your rate of the, you know, kind of, freezing your

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 22

1  commissions, if you will, would continue until a new
2  plan was resolved?
3      A.  I don't recall that, no.
4      Q.  Okay.  Did Mark Van der Kloet eventually
5  separate from employment with the company?
6      A.  Yes.
7      Q.  Okay.  After Mark Van der Kloet separated from
8  employment with the company, who did you report to?
9      A.  That's a good question.  I think it was
10 Nickie Parker.  Yes, it was.
11     Q.  Did you at any point report to David Steel?
12     A.  Yes.
13     Q.  Was that before or after Nickie Parker?
14     A.  That was after.  Well, I think David Steel
15 reported to Nickie Parker.
16     Q.  Okay.  When you were transferred to Mark Van
17 der Kloet's team -- earlier I said the word team.  I was
18 referring to the graphic solutions sales team.  Does
19 that sound correct to you?
20     A.  Yes.
21     Q.  Okay.  And prior to that, you had worked as a
22 sales representative in the corrugated division; is that
23 right?
24     A.  That's correct.
25     Q.  Prior to reporting to Mark Van der Kloet, did

Page 23

1  you have any interactions with him?
2      A.  Yes.
3      Q.  What were those interactions?
4      A.  I would see him once every five years when he
5  came to Newark for a visit.
6      Q.  Do you know how old Mark Van der Kloet was?
7      A.  No.
8      Q.  Was he over 40?
9      A.  Yes.
10     Q.  Okay.
11     A.  Probably over 60.
12     Q.  Okay.  What is your birthdate?
13     A.  Confidential 1954.
14     Q.  And how old are you today?
15     A.  70 today.
16     Q.  So your compensation structure, did it
17 eventually change?
18     A.  Yes.
19     Q.  When?
20     A.  In 2022.
21     Q.  Who informed you of that change?
22     A.  David Steel.
23     Q.  And what did David Steel say?
24     A.  He said, we're changing your plan.  You're no
25 more a commission salesman.  You're going to be business

Page 24

1  unit manager, making 70 percent less in salary and
2  handling what I've been handling all along and more
3  accounts.
4      Q.  Were those his words or that's your summary?
5      A.  That's my summary.
6      Q.  Do you remember his specific words?
7      A.  No.
8      Q.  Were you informed that your base salary would
9  be increasing?
10     A.  No.  It decreased by 70 percent.
11     Q.  Your base salary?  Or are you referring to
12 commissions?
13     A.  My base compensation.
14     Q.  Right.  Did that increase?
15     A.  It decreased by 70 percent.
16     Q.  Do you recall what number?
17     A.  145.
18     Q.  So your new base salary was 145,000?
19     A.  That's correct.
20     Q.  Do you know what your prior base salary was?
21     A.  I didn't get a prior salary.  I was a
22 commission salesman.
23     Q.  Okay.  So that's what I was asking.  Is -- the
24 base salary has increased?
25     A.  Yes.  Okay.

Page 25

1      Q.  Were you eligible for any bonuses as part of
2  your new salary?
3      A.  Yes.
4      Q.  Do you know what that number is?
5      A.  No.  Oh, I think I do.  I think I made a
6  $14,000 bonus.
7      Q.  Okay.  And were you eligible for commissions
8  as part of the new salary?
9      A.  No.
10     Q.  What is your understanding of why your
11 compensation structure changed?
12     A.  Because they thought I was too old to continue
13 on.
14     Q.  Did anyone ever say those words to you?
15     A.  No.  They said, if you don't like it, quit.
16 And they also said, I hope you saved enough money over
17 the years.
18     Q.  Who said, if you don't like it, quit?
19     A.  David Steel must have said it 20 times.
20     Q.  And who said --
21     A.  And Nickie Parker said it a few times.
22     Q.  The if you don't like it, quit?
23     A.  Yes.
24     Q.  And who said, I hope you saved enough money?
25     A.  Nickie Parker.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606


CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    Q.   Okay.  But did they ever refer to your age in
2  these conversations?
3    A.   No.
4    Q.   Did they ever refer to an alleged disability
5  or disability status?
6    A.   Not to my face.
7    Q.   What do you mean by that?
8    A.   They've never said it to me personally.
9    Q.   Okay.  So what facts do you have that support
10 the notion that your change in compensation was due to
11 age?
12   A.   That's how I felt they, you know -- I'm just
13 too old.  There's nobody else older than me in the
14 company or as a salesperson.
15   Q.   But do you have any specific facts to support
16 that?
17   A.   No.  No.
18   Q.   Do you have any documents that would support
19 that?
20   A.   No.
21   Q.   What basis do you have for believing that your
22 compensation structure was changed due to your
23 disability status?
24   A.   Well, they thought I was too old to work, I
25 think.  After I was sick, I told them I can't, you know

1  -- when I was sick, they lost all my accounts but one,
2  which was Campbell Soup.
3    Q.   Who was they?
4    A.   The company, WestRock.
5    Q.   Okay.  But going back here to Nickie Parker,
6  and David Steel, and Mark Van der Kloet, did any of them
7  ever refer to your disability status?
8    A.   No.
9    Q.   Did any of them ever say or do anything that
10 would suggest that your disability status had something
11 to do with your change in compensation?
12   A.   I don't think so.  No.
13   Q.   Did anyone at the company?  I -- before I said
14 -- I said specific names.  Has anyone at the company
15 ever given you a -- have ever said a statement or done
16 anything to suggest that your age was a part of a
17 decision related to your employment?
18   A.   No.
19   Q.   Has anyone at the company ever done or said
20 something to suggest that your disability status had a
21 bearing on any decision related to your employment?
22   A.   I'm not sure.
23   Q.   What do you mean by that?
24   A.   Well, I think they thought I was too sick to
25 run around and get more work.

1    Q.   And what basis do you have for that?
2    A.   Just the way they treated me.  They lost all
3  my accounts.  They probably thought I was going to die
4  when I had stage 4 pancreatic cancer.  So they let all
5  my other accounts go to other places, and they just
6  focused on one account, my big account.
7    Q.   And when was this?
8    A.   This was -- I was sick in 2014 with stage 4
9  pancreatic cancer.
10   Q.   Did that have -- was David Steel, Nickie
11 Parker, or Mark Van der Kloet, or Tammie Siracusa any of
12 the individuals involved in the 2014 situation with your
13 clients?
14        MS. SLUSARZ:  Objection.  You can answer.
15        THE WITNESS:  I'm sorry?
16        MS. AGRESTI:  You may answer.
17        THE WITNESS:  I'm not sure.  I don't -- I think
18   the only one employed there was -- that I knew was
19   Mark Van der Kloet.
20 BY MS. AGRESTI:
21   Q.   But did he have any say or any impact on
22 whether or not your clients were serviced in 2014?
23   A.   I have no idea.
24   Q.   Were any words ever used that would suggest
25 that your disability had anything to do with your change

1  in compensation?
2    A.   I have no idea.  No.  I have not heard.
3    Q.   So that's a no?
4    A.   Yes.
5    Q.   In September, 2002 -- '22 -- pardon -- do you
6  recall receiving an e-mail from Nickie Parker,
7  discussing your new compensation structure?
8    A.   No.
9    Q.   Okay.  Bear with me a second.  I'm just
10 getting a document out of --
11   A.   Can I go to the men's room while you're doing
12 that?
13   Q.   Absolutely.
14   A.   I'm going to take this off.  Oh, sorry.
15        MS. AGRESTI:  We'll take a five-minute break.
16        THE VIDEOGRAPHER:  We're off the record at
17   10:50.
18        (OFF THE RECORD)
19        THE VIDEOGRAPHER:  Back on record.  The time is
20   10:52.
21        MS. AGRESTI:  Thank you.  So I've just handed
22   you what's been pre-marked as Exhibit A, WestRock A.
23   And it is a collection of documents that have been
24   previously produced.
25        (EXHIBIT A MARKED FOR IDENTIFICATION)

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    MS. SLUSARZ:  Don't write on the --
2    THE WITNESS:  I'm not.  I just wanted to point
3  with that.
4    MS. SLUSARZ:  Oh.  Okay.
5    THE WITNESS:  I don't want --
6  BY MS. AGRESTI:
7    Q.   It is a collection of documents that are Bates
8  labeled and have been previously produced, WestRock_147
9  through WestRock_157.  Why don't you take a minute and
10  just look?  I'm going to specifically be asking about
11  the first page first.  So if you want to take a few
12  minutes and just look at that.
13    A.   Okay.
14    Q.   Does this refresh your recollection related to
15  e-mails in September of 2022, regarding your
16  compensation change, with Nickie Parker?
17    A.   Yes.
18    Q.   Okay.  So can you tell me what is this
19  e-mail?
20    A.   This is saying that I'm now making $145,000 a
21  year as my annual base salary with a maximum of $58,000
22  in commission.
23    Q.   And when was that change effective?
24    A.   It says right here, "Effective October 1st,
25  2022."

1    Q.   Do you remember receiving this correspondence?
2    A.   Yes.
3    Q.   If you look at -- turn the next page,
4  WestRock_148 and WestRock_149, which is the page right
5  after that.  Take a minute to look at that and I'll be
6  asking you questions.
7    A.   Okay.
8    Q.   Okay.  Do you remember receiving this
9  acknowledgement of pay rate and payday form.
10    A.   Yes.
11    Q.   And is that your signature on the second page?
12    A.   Yes.
13    Q.   And so you acknowledge that your new salary
14  would be 145,000 with a max commission of 58,000?
15    A.   That's correct.
16    Q.   If you turn the page and look through the next
17  few pages, if you will, WestRock_150 through 156.  And
18  I'd like to ask you some questions about it after you've
19  had a chance to review.
20    A.   Okay.  Okay.
21    Q.   Okay.  Do you remember receiving the graphic
22  solutions business manager bonus plan terms and
23  conditions?
24    A.   Yes.
25    Q.   Okay.  And do you remember signing it?

1    A.   Yes.
2    Q.   And this plan stated that your annual salary
3  would be $145,000 base; is that correct?
4    A.   That's correct.
5    Q.   And it also showed a target award as well here
6  with a maximum of $29,000; is that correct?
7    A.   That's correct.
8    Q.   And you read this document at the time that
9  you signed it?
10    A.   I believe so.
11    Q.   Did you understand that as signing this
12  document, you were agreeing to a new base compensation
13  and new bonus plan?
14    A.   Yes.
15    Q.   Okay.  And that any prior bonus plans or
16  compensation agreements that you had in place were no
17  longer active as a result?
18    A.   That's correct.
19    Q.   Okay.  Do you recall filing a charge with the
20  Equal Employment Opportunity Commission in this matter?
21    A.   I personally did not.  I believe my attorneys
22  might have.
23    Q.   Okay.
24    MS. AGRESTI:  So I'm showing you a document
25  that has been pre-marked as Exhibit B.  Let me see

1  if I have one more.
2    (EXHIBIT B MARKED FOR IDENTIFICATION)
3  BY MS. AGRESTI:
4    Q.   And if you turn to Page 2 of this document,
5  take a minute there.  Is that your signature on the
6  charge of discrimination?
7    A.   Yes.
8    Q.   And this was dated June of 2023; is that
9  correct?
10    A.   Yes.
11    Q.   Okay.  Why did you file or why did you ask
12  your lawyers to file an Equal Employment Opportunity
13  Commission charge in this matter?
14    A.   Because they took me out of my role as a
15  commission salesman, and cut me by 70 percent, and
16  changed my whole job structure that I've had for
17  40-something years.
18    Q.   Would you agree that a company has a right to
19  change employees' --
20    A.   I do.
21    Q.   -- job structures?
22    A.   Yes.  I believe they did it because I was old
23  and they didn't think I could do my job anymore.
24    Q.   Would you agree that a company has a right to
25  change employees' compensation?

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 34

1    A.    Yes.
2    Q.    You also filed an amended complaint. You
3  filed a complaint, but you also filed an amended
4  complaint. And that's what I would like to discuss at
5  this moment.
6        MS. AGRESTI:  It's been pre-marked Exhibit C.
7        (EXHIBIT C MARKED FOR IDENTIFICATION)
8  BY MS. AGRESTI:
9    Q.    Do you recall this document?
10   A.    Yes.
11   Q.    What is it?
12   A.    This is my statement. This is my statement.
13   Q.    Okay. Let's walk through this statement. In
14 it you state, in Paragraph 1, that your income was cut
15 by about 70 percent to force you to retire; do you see
16 that?
17   A.    Yes.
18   Q.    What basis do you have to believe, other than
19 your personal belief, that you were being forced to
20 retire with this compensation change?
21   A.    Well, when I complained about it, they said,
22 if you don't like it quit. So in my mind they wanted me
23 to quit because they were afraid to fire me for some
24 reason.
25   Q.    Did anyone ever use the words, this is to

Page 35

1  force you to retire?
2    A.    No, but if you don't like it quit, that's what
3  they said 20 times.
4    Q.    And you said -- who said this again?
5    A.    Nickie Parker and David Steel.
6    Q.    Okay. Do you have any -- and this was
7  verbally said to you?
8    A.    Yes.
9    Q.    Was this written in any way?
10   A.    No.
11   Q.    Are there any witnesses to that communication,
12 that verbal communication?
13   A.    Oh, maybe, yes.
14   Q.    Who?
15   A.    Rick Shue.
16   Q.    Okay. If you turn to Page 5 of this document,
17 take a minute to look at that page.
18   A.    Okay.
19   Q.    Okay. Let's talk about your 2014 Stage IV
20 pancreatic cancer diagnosis. Who was your manager at
21 that time?
22   A.    I believe it was Peter Brandt.
23   Q.    Okay. Are you making any allegations related
24 to Peter Brandt in this case?
25   A.    I think so.

Page 36

1    Q.    And what is that?
2    A.    That when I came back, he treated me like --
3  didn't treat me well.
4    Q.    And why do you believe Peter Brandt did not
5  treat you well?
6    A.    Well, after I was sick, I was taking a lot of
7  medication. Up until today, I'm still taking medication
8  from my surgery. You know, not too many people survive
9  Stage IV pancreatic cancer. And then when I came back
10 to the office, I'm not sure when, I all of a sudden got
11 a random drug test. And I did not pass the drug test
12 and they put me on suspension.
13   Q.    Why did you not pass a drug test?
14   A.    I was taking a boatload of medicine just to
15 stay alive.
16   Q.    Did the medicine screen for illegal drugs?
17   A.    I believe so.
18   Q.    And did it -- did you not pass because of
19 illegal drugs?
20   A.    Well, they're all prescribed drugs that I've
21 been taking and I failed the test for some reason,
22 right.
23   Q.    Is this the basis of your disability claim in
24 this matter, or are there other facts related to your
25 disability claim?

Page 37

1    A.    Well, I was disabled then and he treated me
2  like crap.
3    Q.    My question was, were there any other
4  situations related to your disability that are a part of
5  this lawsuit?
6    A.    No.
7    Q.    And when you say that you were treated like
8  crap, what do you mean?
9    A.    Well, I was trying to stay alive and work at
10 the same time. And he sent me for a drug test and I
11 heard rumors that he called me a drug addict, and I
12 don't want a drug addict working here. And I probably
13 was taking 35 different medications, prescribed
14 medications.
15   Q.    Is there anything else related to your cancer
16 diagnosis that is relevant to this lawsuit?
17   A.    I don't think so.
18   Q.    So let's talk about the reorganization. Do
19 you believe -- does is -- the reorganization a part of
20 this lawsuit?
21   A.    Yes.
22   Q.    How so?
23   A.    Well, after they put me in Mark Van der
24 Kloet's group, they basically marginalized me,
25 internally and with my customers. And they told me to

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 38

1  stay out of everything.
2      Q.   What do you mean by that, marginalized you?
3      A.   Well, they told me that I -- I can't talk to
4  anybody in the factory.  If I need answers, talk to my
5  customer service person that's been there for a year,
6  and she'll get me an answer when she's ready to.
7      Q.   And who is that customer service person?
8      A.   Her name is Jessica Dela (phonetic) something.
9  I'm sorry, I don't know her last name.
10     Q.   So can you tell me more about that?  What do
11 you mean?  Like, if there are issues you're supposed to
12 go to Jessica?
13     A.   Yes.
14     Q.   Who told you that?
15     A.   This is what David Steel told me and Mark Van
16 der Kloet when I first started.  They told me We're
17 going to train your customer how to buy from us the
18 correct way.  Not the way I've been doing it for 25
19 years.
20     Q.   I'm sorry, can you repeat that?  We're going
21 to train your customer --
22     A.   We're going to train the customer how to buy
23 from us our way, not the way you've been doing it for
24 25 years.
25     Q.   And when was that?

Page 39

1      A.   A few -- a few months after I joined that
2  group.
3      Q.   Do you believe that age or disability had
4  anything to do with this process?
5      A.   Yes, yes.
6      Q.   How so?
7      A.   They thought I was too old and they thought I
8  was going to die any second.
9      Q.   Who did?
10     A.   Mark Van der Kloet, the company.
11     Q.   Was Mark Van der Kloet aware of your cancer
12 diagnosis?
13     A.   I'm pretty sure he was.
14     Q.   How do you know that?
15     A.   Well, Rick Shue knew, Peter Brandt knew, he
16 was part of that circle.
17     Q.   But do you have any knowledge of him actually
18 knowing?
19     A.   Yes, I do.
20     Q.   What is that?
21     A.   Because he did call me once asked me how I'm
22 feeling.
23     Q.   And when was that?
24     A.   I have no idea when.
25     Q.   And what was the context of him asking you how

Page 40

1  you were feeling.
2      A.   Just out of the blue, he called me.  When, I
3  don't remember.
4      Q.   So how did -- why --
5      A.   But he was aware of that for sure.
6      Q.   Well, I'm trying to understand that.  So when
7  he did call you and asked you how you were feeling, did
8  he -- was he talking about your cancer diagnosis?
9      A.   He asked me how I was feeling.
10     Q.   Right.  But how are you connecting the two?
11     A.   Well, I'm sure he didn't call me to say, you
12 know, I heard you sneezed yesterday.
13     Q.   That's not answering my question.  How did you
14 know that when he was calling and asking you, how are
15 you doing?
16     A.   Right.
17     Q.   That that had to do with cancer?
18     A.   I have no idea, I don't know.  I do -- or I do
19 not remember.
20     Q.   Do you believe that the company owes you
21 commission as you sit here today?
22     A.   Yes.
23     Q.   Why do you believe that?
24     A.   Because they cut my pay a month or two after,
25 like -- they cut my pay a month or two after I secured a

Page 41

1  two to three year contract with Pepperidge Farm that was
2  worth roughly 16.5 million dollars.  So once they
3  secured that -- that's when my plan changed.
4      Q.   Do you think they're under a legal obligation
5  to pay you that commission or you just believe it's
6  fair?
7          MS. SLUSARZ:  Objection.  Form.
8  BY MS. AGRESTI:
9      Q.   You may answer.
10     A.   Can you repeat it?
11         MS. AGRESTI:  Can you read it back, Esther?
12         (REPORTER READS BACK REQUESTED QUESTION)
13         THE WITNESS:  I just -- I don't believe it's
14 fair.  Legally I'm not a lawyer, so I have no idea.
15 BY MS. AGRESTI:
16     Q.   Well, you brought this lawsuit.  So what I'm
17 trying to understand is, do you believe that the company
18 has a legal basis to provide you what you believe is
19 owed commission?
20     A.   Yes.
21     Q.   Under what -- how?
22     A.   Well, they were paying me up until I had the
23 contract signed for three years.  Now, they had the
24 customer locked in for three years and now they could do
25 what they want with me.  They could have fired me, too,

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 42

1  I guess.
2      Q.   But they didn't?
3      A.   They -- well, basically they did.  They forced
4  me to quit or they forced -- they forced me to be
5  unhappy.
6      Q.   Right.  But they didn't --
7      A.   They cut me by 70 percent, they would --
8  right.
9      Q.   I understand.  But they didn't fire you?
10     A.   That's correct.
11     Q.   They -- in fact, you and the company agreed to
12  a new compensation plan, isn't that not correct?
13     A.   I signed that, correct.
14     Q.   Okay.  So what basis is there to state that
15  the company owes you commission?
16     A.   I was making this commission up until I had
17  the contract signed with my customer.
18     Q.   Right.  But you agree that a company can
19  change an employee's compensation?
20     A.   Right.
21     Q.   And so that's what happened here, correct?
22     A.   Right.  A week after I secured the contract,
23  they did that.
24     Q.   I understand the timing that you're saying.
25     A.   Okay.

Page 43

1      Q.   But my question is, what is there a legal --
2      A.   I have no idea.
3      Q.   Is there -- do you believe that they are --
4  that you are entitled to this commission under --
5      A.   Yes, I do.
6      Q.   Because you believe it is unfair?
7      A.   Yes.
8      Q.   Right.  But is there any requirement or
9  contract or anything in agreement with the company that
10  you have that states that you are owed this commission?
11     A.   I never had anything in writing over the years
12  with the company of what my commission was.
13     Q.   Right.  So my question was, is there a
14  contract, an agreement, anything like that -- that would
15  entitle you to commission with that account?
16     A.   Not that I'm aware of, no.
17     Q.   So I want to make sure I understand a few
18  things.  You make allegations related to your age.  You
19  make allegations related to a perceived disability.  Who
20  do you believe are the specific individuals who
21  discriminated against you on the basis of your age?
22     A.   Peter Brandt, Mark Van der Kloet, David Steel.
23     Q.   Anyone else?
24     A.   I believe Nickie Parker.
25     Q.   Okay, let's dissect that.  Peter, why do you

Page 44

1  think Peter discriminated against you based on age?
2      A.   Well, I know people heard him say that he's
3  old and he's a drug addict and he failed the drug test.
4  And he does nothing for the company.  Even though I sold
5  the most out of Newark over the years.
6      Q.   You said that people heard him say he's old?
7      A.   He's old.  Yep.  Yes.
8      Q.   Okay.  Who heard him say he's old?
9      A.   My sales manager.
10     Q.   Who is that?
11     A.   His name is Jeff Mulchon.
12     Q.   Mulchin?
13     A.   Mulchon.
14     Q.   M-U-L-C-H-I-N?
15     A.   I think it's O-N.
16     Q.   Is he still employed with the company?
17     A.   No.
18     Q.   When did he leave, if you know?
19     A.   I'm not sure.
20     Q.   Okay.  And when you -- and you state that --
21  strike that.  Did Jeff bring to your attention that
22  Peter said that you are old?
23     A.   Yes.
24     Q.   Okay.  Do you have a recollection of how that
25  was transmitted or informed?

Page 45

1      A.   No.
2      Q.   Okay.  Do you still keep in contact with Jeff
3  Mulchon?
4      A.   No.
5      Q.   Other than Jeff Mulchon -- or let me.  Other
6  than Jeff Mulchon, has anyone ever heard Peter make any
7  comments related to your age?
8      A.   I have no idea.
9      Q.   Okay.  When you filed, or when your attorneys
10  filed an Amended Complaint, in this matter, there is no
11  mention of Peter saying anything about your age.
12     A.   Okay.
13     Q.   Why are you -- why is that not included?
14     A.   I'm not sure.
15     Q.   Okay.  Is there anything else related to Peter
16  that is not in the Complaint?  And if you need to look
17  through the Complaint, that's fine.  But is there
18  anything else related to Peter that is not in the
19  Complaint?
20     A.   I don't think so.
21     Q.   When did you stop reporting to Peter?
22     A.   When they shut down Newark.  Was that 2020 --
23  2019.
24     Q.   So any allegations related to Peter they
25  predate the Newark closure?

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    A.    That's correct.

2    Q.    So they would've been prior to 2019?

3    A.    That's correct.

4    Q.    Okay.  You also identified Mark.  And before

5  we move on, I'm sorry, what is Peter's last name again?

6    A.    Brandt.

7    Q.    Okay.  And when we were talking about Peter a

8  few minutes ago, you were referring to Peter Brandt just

9  to be sure?

10    A.    That's correct.

11    Q.    Okay.  So Mark Van der Kloet, why do you say

12  that he discriminated against you on the basis of age?

13    A.    Because he knew I was old, he knew I was sick,

14  and he wanted to take my business.

15    Q.    Why do you say that he knew you were old?

16    A.    Because he knew me for at least 22 years or 24

17  years, and he knew I was working someplace else for 20

18  something years.

19    Q.    Do you know how old Mark Van der Kloet was?

20    A.    I think you already asked me that.  I -- I'm

21  not sure, a little over 60.

22    Q.    So you're approximately in the same age range

23  or are you older than him?

24    A.    Well, I'm ten years older.  If he's 60, I'm

25  70, that's ten years.

1    Q.    Okay.  And you said that Mark knew you were

2  sick?

3    A.    Yes.

4    Q.    Well, how do you know that?

5    A.    He called me.

6    Q.    Is there any other basis other than that phone

7  call that you mentioned?

8    A.    I don't think so.  I don't know.  I don't

9  recall.

10    Q.    Okay.  So you say that he knew you were -- you

11  were old and he knew that you were sick.  Do you have

12  any specific comments that were made by Mark --

13    A.    No.

14    Q.    -- related to your age?

15    A.    No.

16    Q.    Do you have any specific documents or anything

17  that would support Mark having an animus based on age?

18    A.    No.

19    Q.    So this is just how you felt?

20    A.    Yes.

21    Q.    You said David Steel discriminated against you

22  on the basis of age.  Can you tell me why you believe

23  David Steel discriminated against you on the basis of

24  age?

25    A.    Well, after he told me my -- my new plan, he

1  asked me how long, you know, when are you going to

2  retire?

3    Q.    What specific words did he use?

4    A.    I'm not sure of specific words.

5    Q.    Did he use the word retire?

6    A.    Yes.

7    Q.    Did he ask you when or a time frame?

8    A.    Yes, yes.  And then he also asked me, what do

9  you want to do long term?

10    Q.    Do you know if this was part of succession

11  planning for clients or --

12    A.    I doubt it.

13    Q.    -- or in what context?

14    A.    I doubt it very much.

15    Q.    Hold on.  Hold on.  Let me just finish.

16  Sorry.

17    A.    Sorry.

18    Q.    Or in what context was this conversation had?

19    A.    Just to see how long I was going to still

20  work.

21    Q.    Okay.  And was that a verbal conversation or

22  written?

23    A.    Yes, verbal.

24    Q.    Is there anything else related to David Steel,

25  related to any allegations -- strike that, let me

1  rephrase.  Are there any other facts or instances

2  related to David Steel that support your belief that he

3  was discriminated against you based on -- based on your

4  age?

5    A.    Maybe.  We went out to dinner one night when

6  they were supposed to train me in Florida, and all he

7  was talking about is his retirement, and asked me, so

8  when are you going to retire?

9    Q.    So let me make sure I understand.  So David

10  Steel was talking about his own retirement?

11    A.    That's correct.  And then asked me when I was

12  going to retire.

13    Q.    Sorry, let me just ask the question.

14    A.    I'm sorry.

15    Q.    It's okay.  So David Steel was asking you, or

16  was talking about his own retirement, and in that

17  context, asked you when you planned on retiring?

18    A.    That's correct.

19    Q.    Okay.  Going back here a second, Mark Van der

20  Kloet, you mentioned a phone call asking how you were

21  doing.  Do you recall when that phone call happened?

22    A.    No.

23    Q.    Do you recall if he was your supervisor at the

24  time the phone call happened?

25    A.    He definitely was not.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 50

1    Q.   Okay.  So was it prior to him supervising
2  you?
3    A.   Yes.
4    Q.   Was it near in time when you were actually
5  recovering from cancer that he made that phone?
6    A.   I'm not sure.
7    Q.   So could it have been years after?
8    A.   Could have been.
9    Q.   Okay.  But you're not sure when that phone
10  call happened?
11    A.   I'm not sure.
12    Q.   Okay.  Is there anything else related to David
13  Steel and your belief that he discriminated against you
14  based on age?
15    A.   No.
16    Q.   You mentioned the training and we'll talk
17  about that training.  But at that moment in time, was
18  David Steel your supervisor?
19    A.   Yes.
20    Q.   Do you know if David Steel retired?
21    A.   I don't think he retired.
22    Q.   Do you know if he is currently employed with
23  the company?
24    A.   With WestRock?
25    Q.   Yes.

Page 51

1    A.   He is not.
2    Q.   Okay.  You also identified Nickie Parker.  Why
3  did you state that you believed Nickie Parker
4  discriminated against you on the basis of age?
5    A.   Well, I called her to complain about my new
6  compensation package and she said, if you don't like it
7  quit, then, hopefully saved enough money over the years.
8  So she knew I worked for years saving my money and then
9  they cut me by 70 percent.  And if you don't like it
10  quit.  How do you work under conditions like that?
11    Q.   If you can go to the Amended Complaint.  What
12  was that marked?  Was it C?
13    A.   C.
14    Q.   Thank you.  If you go to the Amended Complaint
15  and you look at Paragraph 31.  This is the conversation
16  that you're referring to, it states, "Plaintiff appealed
17  to Nickie Parker, his one above manager, ignoring the
18  blatant unfairness of a 411,000 per year pay cut after
19  securing a highly profitable contract for Defendant
20  WestRock.  Manager Parker blithely commented, 'I hope
21  you saved money over the years.'"  Is that the
22  conversation you're referring to?
23    A.   That's correct.
24    Q.   Why do you not mention that she told you that
25  if you don't like it quit?

Page 52

1    A.   I'm not sure.
2    Q.   But that did happen?
3    A.   Yes.
4    Q.   And this was verbal, you said?
5    A.   Yes.
6    Q.   Is there anything else related to Nickie
7  Parker and why you -- that would support that -- your
8  belief that she discriminated against you based on age?
9    A.   No.
10    Q.   Okay.  Were you reporting to Nickie Parker
11  when this conversation was had?
12    A.   Yes.
13    Q.   You identified Peter Brandt, Mark Van der
14  Kloet, David Steel, and Nickie Parker.  Is there anyone
15  else that you believe discriminated against you based on
16  your age?
17    A.   I don't think so.
18    Q.   Okay.  Is there any -- you identified a few
19  different reasons why you believe you were discriminated
20  on the basis of your age.  Is there any other instance
21  in this litigation or in your employment with WestRock
22  that you believe is discriminatory against you because
23  of your age?
24    A.   I don't think so.
25    Q.   Okay.  Let's talk about perceived disability.

Page 53

1  You state that Defendant WestRock discriminated against
2  you based on the -- on the basis of perceived
3  disability.  Who do you believe discriminated against
4  you specifically?
5    A.   When you say perceived, what does that mean?
6    Q.   That is the way that the filing that is
7  perceived as the way that it's written in the Complaint,
8  if you want to take a look at that.  It is Paragraph 37.
9    A.   Okay, I see it.
10    Q.   So you're alleging that Defendant WestRock
11  discriminated against you based on age, we've talked
12  about that, and also perceived disability.  So I'm
13  asking about the perceived disability aspect?
14    A.   Okay.
15    Q.   So who do you believe discriminated against
16  you based on your perceived disability?
17    A.   All in the above.
18    Q.   Who specifically?
19    A.   Nickie Parker, Mark Van der Kloet, David
20  Steel, and Peter Brandt.
21    Q.   Before I move on, do you know how old David
22  Steel is?
23    A.   No.
24    Q.   Okay.  Do you know how old Nickie Parker is?
25    A.   No.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1     Q.   Do you know if they're both over 40?

2     A.   I believe they sure look like they are.

3     Q.   Do you believe that they're both over 50?

4     A.   Yes.

5     Q.   Do you know if they're both over 60?

6     A.   I don't think so.

7     Q.   Okay. So going back to perceived disability,

8 so you said Nickie Parker. Who else?

9     A.   Mark Van der Kloet and David Steel.

10     Q.   Okay. Let's break it down person by person.

11 Why do you believe Nickie Parker discriminated against

12 you based on your perceived disability?

13     A.   Because when I called her about my pay cut,

14 she didn't want to hear from it. I never met her. She

15 goes, that's your new deal, if you don't like it quit.

16 And hopefully you saved enough money.

17     Q.   You've never met Nickie Parker, correct?

18     A.   That's correct.

19     Q.   She's never seen your face, correct?

20     A.   That's correct. She saw my face on a Zoom

21 call.

22     Q.   When was that?

23     A.   No idea.

24     Q.   A minute ago you said you've never met her.

25     A.   Right, I never met her.

1     Q.   So she saw your face on a Zoom call?

2     A.   Now that I'm thinking, no, she did not.

3     Q.   Okay. So she's never seen what you look like?

4     A.   I don't think so.

5     Q.   Okay. So you were talking about when you

6 called about the pay cut. Why do you believe that the

7 conversation about your change in compensation supports

8 discrimination against you based on a perceived

9 disability?

10     A.   Oh, she knew I -- I'm sure she knew I was sick

11 and I just secured a big contract with the customer and

12 they want, you know, I don't think they think I could

13 have handled -- handling this because I was sick and

14 old. They expected me to die any second.

15     Q.   So you're talking about in 2014 when you had

16 cancer?

17     A.   That's correct.

18     Q.   And now we're talking about in 2022.

19     A.   That's correct.

20     Q.   So eight years later?

21     A.   Yeah.

22     Q.   Okay.

23     A.   And I'm still dealing with issues from that

24 operation.

25     Q.   Okay. You said that she knew you were sick?

1     A.   I believe she did, yes.

2     Q.   What basis do you have to state that she knew

3 you were sick?

4     A.   I have no basis, but I know they -- everybody

5 talks to everybody.

6     Q.   So it is your belief?

7     A.   That's correct.

8     Q.   But it's not based in fact?

9     A.   Yes.

10     Q.   Other than the conversation related to your

11 change in compensation, is there anything else,

12 facts-wise, as to why you believe Nickie Parker

13 discriminated against you based on your perceived

14 disability?

15     A.   No.

16     Q.   Let's talk about Mark Van der Kloet. Why do

17 you believe that Mark Van der Kloet discriminated

18 against you based on perceived disability?

19     A.   Because he knew I was sick and he -- people

20 usually don't survive what I went through. So they

21 wanted to secure my big account before I died.

22     Q.   And that's your belief?

23     A.   That's correct.

24     Q.   Did anyone ever say anything like that?

25     A.   I don't remember.

1     Q.   But as you sit here today, you can't provide a

2 specific situation where someone stated that to you?

3     A.   No, that's correct.

4     Q.   So other than your change in compensation, is

5 there anything else that supports your belief that Mark

6 Van der Kloet discriminated against you based on

7 perceived disability?

8     A.   Yes. He marginalized me.

9     Q.   What do you mean by that?

10     A.   He thought I was too sick to handle it. He

11 didn't want me to talk to anybody in the company except

12 for two people. Where before I reported to Mark Van der

13 Kloet I was allowed to watch my jobs being run and make

14 corrections if needed. He goes, just go out and sell.

15 We -- I don't want you to talk to anybody in production,

16 in quality, nobody, let them do their own job. And I

17 believe they did that because I was old and sick. He

18 thought I was going to die so he wanted his own people

19 into my accounts.

20     Q.   Other than your belief that he thought you

21 were old and he thought you were going to die, do you

22 have any facts that support that Mark Van der Kloet was

23 making decisions based on a 2014 cancer diagnosis?

24     A.   I have no idea.

25     Q.   As you sit here today, were there any times in

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1  which specific words were used that would suggest to you
2  that your -- that your 2014 cancer diagnosis was the
3  basis for any decisions related to your employment?
4      A.  I have no idea.
5      Q.  Either you do or you don't.
6      A.  You want -- can you say the question again?
7          MS. AGRESTI:  Yes.  Can you read the last
8      question?
9          (REPORTER READS BACK REQUESTED QUESTION)
10         THE WITNESS:  No.
11 BY MS. AGRESTI:
12     Q.  Is there anything else related to Mark Van der
13 Kloet and your belief that he discriminated against you
14 based on your -- a perceived disability?
15     A.  I don't think so, no.
16     Q.  And just so that we're on the same page, when
17 you say disability in your Complaint, you're only
18 talking about your 2014 cancer diagnosis?
19     A.  Only, yes.
20     Q.  Is there anything else?
21     A.  No.
22     Q.  I just want to make sure we're not missing
23 anything.
24     A.  No.
25     Q.  Okay.  You also mentioned David Steel.  What

1  is the basis for why you believe David Steel
2  discriminated against you based on your -- a perceived
3  disability?
4      A.  Just the way he treated me.  I mean, he was
5  just my manager, he didn't last long.  Just the whole
6  attitude.
7      Q.  Can you give me some examples?
8      A.  Well, when I told them I didn't -- even before
9  -- when they took me to the training program down in
10 Florida.  And before we went, I just wanted to get it
11 off my chest that I was still upset about what just
12 happened with my pay cut.  And he goes, if you don't
13 like it quit, with an attitude.  I mean, he went right
14 to my nose.  And he leaned on his chair and he went
15 right to my face, if you don't like it quit.
16     Q.  And why do you believe that that has to do
17 with the perceived disability?
18     A.  Because he knew I -- because he knew I was
19 sick and he knew -- he just -- they just cut me by a lot
20 of money and they wanted to take over the account.
21     Q.  You keep saying that he knew you were sick.
22 Do you believe that you were sick in 2022?
23     A.  Yes, I'm still sick today from this disease I
24 had, yes.
25     Q.  What do you mean by sick?

1      A.  Don't feel well.  I go to doctors all the
2  time.  I have different illnesses now from the Stage IV
3  cancer from all the chemotherapy I had.
4      Q.  Does it prevent you from working?
5      A.  No.
6      Q.  So when you say that if David Steel told you,
7  if you don't like it quit.  I asked you a minute ago,
8  why do you believe that that supports the belief that he
9  was discriminating against you based on the belief that
10 you replied that it had to do with his
11 whole attitude.  I want to make sure I'm not missing
12 anything because I'm trying to understand what the
13 allegations are.
14     A.  Okay.
15     Q.  Can you walk me through David Steel's specific
16 words or actions that you believe show that he was
17 discriminatory against you based on a perceived
18 disability?
19     A.  Not really.
20     Q.  A few minutes ago you said the whole -- his
21 whole attitude and that he knew you were sick, but do
22 you know whether in fact he knew about your cancer
23 diagnosis?
24     A.  The fact, I don't know.  He knew I was sick
25 because I even think we might have spoke about it.

1      Q.  And I just want to make sure we're on the same
2  page.  When you say he knew I was sick, what did he know
3  specifically?
4      A.  That I had stage four pancreatic cancer and
5  had chemotherapy for a few months.
6      Q.  And what year was that?
7      A.  2014.
8      Q.  As we sit here today, do you currently have
9  cancer?
10     A.  No, thank God.
11     Q.  And did you have cancer at any point after
12 your chemotherapy in 2014?
13     A.  No.  No.
14     Q.  Okay.  So your basis is that David Steel knew
15 you had a cancer diagnosis in 2014?
16     A.  Yes.
17     Q.  Did he specific mention your -- did he
18 specifically mention your cancer diagnosis when talking
19 to you about compensation?
20     A.  I don't remember.
21     Q.  Is there anything else related to David Steel
22 that supports that he discriminated against you based on
23 a perceived disability?
24     A.  I don't think so.
25         MS. AGRESTI:  Okay.  Can we take a ten-minute

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1  break?
2      THE VIDEOGRAPHER:  We are off the record at
3  11:37.
4      (OFF THE RECORD)
5      THE VIDEOGRAPHR:  Back on record, 12:02.
6      MS. AGRESTI:  Okay.  I'm providing a document
7  that has been pre-marked as Exhibit D.
8      (EXHIBIT D MARKED FOR IDENTIFICATION)
9      THE WITNESS:  Thank you.
10 BY MS. AGRESTI:
11     Q.   Before we get to that, though, I do need to
12 ask a couple of questions about what we were discussing
13 a few minutes ago.  So we've gone through the different
14 individuals and we've gone through the specific
15 situations that you believe support your allegations of
16 perceived disability discrimination and age
17 discrimination.  Is there any other person that we
18 missed?
19     A.   I don't think so.
20     Q.   And is there any other event, or fact, or
21 situation that you believe supports those allegations
22 that we did not discuss yet?
23     A.   Yeah, I think so.  As far as my cancer in
24 2014, so when you have stage four pancreatic cancer, I
25 think the life expectancy for five years is five

1  percent.  After five years, I believe it's one percent
2  of the five percent.  And those are like known facts.
3  So that's why I believe they were waiting for me to die
4  any second.  Because only five percent of the world
5  survives that.  And then one percent of the five percent
6  survived.  And that's me.
7      Q.   So other than the statistics related to your
8  illness in 2014, is there anything else related to Peter
9  Brandt, Nickie Parker, Mark Van der Kloet, David Steel,
10 that we did not discuss?  I just want to make sure that
11 we've discussed everything that is related to those
12 those two allegations.
13     A.   I think so.
14     Q.   Okay.  I have a question for you related to
15 when you were out with getting treatment for cancer.
16 Were you on a medical leave at that time?
17     A.   I was on medical leave, but not at that time.
18 I worked through it for around a year.
19     Q.   Okay.
20     A.   And then after I had the chemo, I had to take
21 off, I couldn't -- I was seven-eighths dead.
22     Q.   You were what?
23     A.   Seven-eighths dead, call it.
24     Q.   So --
25     A.   I couldn't move, so that's why.  Before that I

1  was still on the phone talking to everybody and doing my
2  job.
3      Q.   When were you -- when you took the time away
4  from work, were you on medical leave?
5      A.   Yes.
6      Q.   Do you know around what time frame that was?
7      A.   I could guess probably 2015.
8      Q.   Okay.  And during that time period, were your
9  accounts assigned to others while you were away so that
10 they could be serviced?
11     A.   I have no idea.  I doubt it, except for a
12 Pepperidge Farm.
13     Q.   What do you know about Pepperidge Farm?
14     A.   That somebody was sitting in the lobby,
15 waiting for them to call if they needed them.
16     Q.   Okay.  So but do you know whether all of your
17 accounts were being serviced or you do not know?
18     A.   I know none of them were being serviced.
19     Q.   Why do you say that?
20     A.   Because when I came back to work and I said,
21 I'm back, I feel great.  I'm coming over.  They go
22 Marsh, we called you.  We had orders.  You were late.
23 Nobody called us back.  We have a place of business.  We
24 had to go elsewhere.  We still love you.  We're still
25 friends, but we can't do business with you.

1      Q.   And what accounts were those?
2      A.   It was Markson Rosenthal, Henschel Steinau,
3  Rand Displays, and a handful of other small accounts,
4  which I can't recall right now.
5      THE REPORTER:  I'm so sorry.  Can you repeat
6  that?
7      THE WITNESS:  Sure.  I'm sorry.  Markson
8  Rosenthal.  Markson Rosenthal.  Henschel Steinau.
9  Can you spell that?
10     THE REPORTER:  I can ask you after.  When we
11 get off record.
12     THE WITNESS:  Okay.  And Rand Displays.
13 BY MS. AGRESTI:
14     Q.   And are those the names of the accounts?
15     A.   Yes.
16     Q.   Okay.  You say that, you know, they were
17 not --
18     A.   That's correct.
19     Q.   -- being serviced.  I understand that you are
20 identifying that there were issues with the service, but
21 do you know whether someone was assigned to those
22 accounts while you were out?
23     A.   I -- I don't think so.
24     Q.   Okay.  But do you know for sure?
25     A.   No.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    Q.   Okay.  Earlier in -- today, you mentioned that
2    your position was changed to customer service
3    representative or something to that effect; is that
4    right?
5        A.   That's correct.
6        Q.   Okay.  Is that in fact the job title though?
7        A.   No, it was business unit manager, I believe.
8        Q.   Okay.  So I am showing to you what I handed
9    to you a couple of minutes ago, the graphics business
10   manager job description, which has been produced in this
11   matter.  Is graphics business manager the role that you
12   were assigned to after the reorganization?
13       A.   Yes.
14       Q.   Okay.  So take a minute here and take a look
15   at this and -- and then I'll ask you some questions.
16       A.   Okay.
17       Q.   Is this an accurate representation of your job
18   duties as a graphic business manager?
19       A.   No, I don't think so.
20       Q.   All right.  So let's talk about that then.
21   Let's look at the first one or let's look at the
22   summary.  It says that "You will serve as the main point
23   of contact for WestRock's graphics capabilities and be
24   responsible for managing and supporting the business
25   needs of your customers."  Would you agree that that was

1    or disagree -- would you agree or disagree that that was
2    a --
3        A.   I agree.
4        Q.   -- responsibility --
5        A.   I agree.
6        Q.   -- of yours?  I'm sorry.  It's just we can't
7    talk over each other.
8        A.   I agree.
9            MS. AGRESTI:  Did you get that, Esther?
10           THE REPORTER:  I did.
11   BY MS. AGRESTI:
12       Q.   Okay.  It then states that "You will provide
13   differentiated service and strategic value to corporate
14   and local customers by proactively identifying customer
15   needs, providing comprehensive integrated graphic
16   solutions, and bringing to bear the products, services,
17   and cross-functional experience of WestRock to meet and
18   exceed your customer's needs."  Do you agree that that
19   is a part of your job responsibilities as a graphics
20   business manager?
21       A.   Yes.
22       Q.   Looking at the next bullet point, it says that
23   "You will -- how you will impact WestRock.  You will
24   maintain pipeline of graphic related opportunities with
25   customers focused on comprehensive WestRock products and

1    solutions to support customer growth, meet customers
2    business needs, and improve WestRock's position and
3    margin."  Would you agree that that was part of your job
4    duties as a graphic business manager?
5        A.   Yes.
6        Q.   The next job responsibility is, "To create
7    customer growth strategies centered on identified
8    graphics opportunities to drive revenue and or volume
9    growth within the corporate and local customer base."
10   Would you agree that those were part of your duties?
11       A.   Yes.
12       Q.   It states -- the next one is states, "Identify
13   and build relationships with new customers utilizing a
14   strategy based on the full breadth of the WestRock
15   graphics portfolio."  Do you agree that those were part
16   of your job duties as a graphics business manager?
17       A.   At the beginning, no.
18       Q.   Okay.  Talk to me about that.  Why do you say
19   that?
20       A.   They told me to stay on Pepperidge, this is
21   what I was doing.  And you'll handle some of Rick Shue's
22   accounts that he can't handle.
23       Q.   Who told you that?
24       A.   I'm trying to think.  I believe it was David
25   Steel.

1        Q.   So let me make sure I understand.  And please
2    correct me if I'm wrong, if I am mistaken.  So you were
3    told not to build relationships with new customers to
4    focus on Pepperidge?
5        A.   That's correct.
6        Q.   Okay.  And then talk to me a little bit more
7    about with the Rick Shue portion of that --
8        A.   Right.  He's a business --
9        Q.   -- so what does that mean?
10       A.   -- unit manager.
11       Q.   Okay.
12       A.   And he's very busy, so they say, so he's going
13   to give you some of his accounts to handle to help him.
14       Q.   Do you know what accounts those were?
15       A.   No.  He never gave me any to do.
16       Q.   Okay.  So to make sure I understand, and
17   please correct me if I'm wrong.
18           You were also told that Rick Shue needed some
19   help and they were going to give you some of his
20   accounts to help him with, but they never did that?
21       A.   That's correct.
22       Q.   Okay.  And this was all David Steel?
23       A.   I believe so.
24       Q.   Okay.  And you said not in the beginning, so
25   at some point, did this change?

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606


CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1   A.   Yes.

2   Q.   When did that change?

3   A.   I'm not sure when.

4   Q.   Do you remember under who it changed?  If

5   maybe that helps remember?

6   A.   I believe it was David Steel.

7   Q.   Okay.

8   A.   But I'm not 100 percent sure.

9   Q.   Okay.  What were the circumstances of that

10  change, of --

11  A.   Well, now after that, they said, well, Rick's

12  not giving anything up, so you have to get your own

13  accounts.  Start cold calling again, like I did 45 years

14  ago.

15  Q.   And --

16  A.   And I don't think anybody in the graphics

17  business manager ever did that.

18  Q.   So you believe no one else was asked to do

19  that?

20  A.   I don't believe so.  They were handed

21  accounts, internal accounts.  They only sold internal to

22  WestRock people.

23  Q.   And what you're stating is that you were told

24  you're not going to get the internal accounts, you need

25  to go find new accounts?

1   A.   That's correct.  After six months of waiting

2   for Rick Shue to hand stuff over to me to help.  I made

3   that six months up after a while.  I'm not sure when

4   that was, how long it was.

5   Q.   Got it.  So you made the six-month time frame

6   as an estimate?

7   A.   Correct.

8   Q.   Okay.  Okay.

9   A.   Could be a year.  It could have been six

10  weeks.

11  Q.   After a period of time?

12  A.   Exactly.

13  Q.   Okay.  And do you know whether Rick in fact

14  said, I'm not giving anything up --

15  A.   No.

16  Q.   -- or that's just what you believe happened?

17  A.   Well, he never gave it anything up, so that's

18  exactly what happened.

19  Q.   But do you know if that was Rick Shue's

20  decision?

21  A.   No, I don't.

22  Q.   Okay.  Where does Rick Shue in relative to

23  your position as a graphics business manager on the

24  organizational chart --

25  A.   He's my peer.  That's his job.

1   Q.   Did you both report to the same supervisor?

2   A.   Yes.

3   Q.   And at this time, that was David Steel?

4   A.   Yes.

5   Q.   Okay.  But you still had the Pepperidge Farm

6   account during that time, is that right?

7   A.   Well, they told me to handle it still, yes.

8   Q.   Okay.  So after the -- I'm trying to make

9   sure I understand.

10       After the period of time in which it did not

11  -- you did not get other accounts from Rick Shue, you

12  had Pepperidge Farm and no others, but were told to go

13  find new opportunities?

14  A.   That's correct.

15  Q.   Okay.  All right.  So let's look at the next

16  bullet point.  It says, "To build and foster

17  relationships throughout the customer organization by

18  delivering high quality products, service, sharing

19  insights, and identifying opportunities to support the

20  customer."  Would you agree or disagree that that was a

21  part of your job duties as a graphics business manager?

22  A.   I agree.

23  Q.   And going back here to the prior bullet point,

24  I'm sorry to come back to that one.  But would you agree

25  that at one point that did become your job

1   responsibility?

2   A.   I'm sorry.  Where are you?

3   Q.   Sorry.  Let me just make sure the record's

4   clear.  I'm going to go back to the previous bullet

5   point that we were just talking about that states,

6   "Identify and build relationships with new customers."

7   And you mentioned that at first, you just had Pepperidge

8   Farm.  And in the beginning, the answer was no, but then

9   that changed.  So my question is, did in fact that

10  become your job duty to identify and build new customers

11  utilizing a strategy based on the full breadth of the

12  WestRock graphics portfolio?

13  A.   Yes.

14  Q.   Okay.  So if you look at the fifth bullet

15  point, "Anticipate and identify the customer's graphic

16  needs and growth areas."  Would you agree that that

17  sentence in its entirety was a part of your job duties?

18  A.   Yes.

19  Q.   And we can move a little bit quickly here now,

20  because I think when you said that some of this was not

21  necessarily a part of your job duties, you were looking

22  at Bullet point 3 only; is that right?

23  A.   Which is what identifying build relationships?

24  Q.   Uh-huh.

25  A.   And what's the question again?

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Page 74

1    Q.    So my question is, for the rest of the bullet
2    points.  If you can take a minute and look through
3    those, would you agree that those were all part of your
4    job duties as a graphics business manager?
5    A.    Yes.
6    Q.    Okay.  So I'm summarizing, but Bullet 6, in
7    fact, I won't summarize, I'll just say the first few
8    words.  So you agree that Bullet 6, "Support and lead
9    special graphics projects," and the sentence goes on,
10   that is a part of your job duties as a graphics business
11   manager?
12   A.    Yes.
13   Q.    And you agree Bullet point 7, "To communicate
14   the changing needs of customers to internal leadership,"
15   and that sentence continues, but that that bullet point
16   also was part of your job duties as a graphics business
17   manager?
18   A.    Yes.
19   Q.    And Bullet point 8, "Orchestrate and
20   coordinate all work required to meet and exceed the
21   customer's needs by engaging WestRock cross-functional
22   partners."  Would you agree that those were part of your
23   job duties as a graphics business manager?
24   A.    Yes.
25   Q.    And number 9, was it part of your job duties

Page 75

1    as a graphics business manager to act as a liaison
2    between the customer and WestRock to support the
3    graphics needs of the customer?
4    A.    Yes.
5    Q.    And would you agree that you were continuous
6    -- that as part of your job duties, it was expected that
7    you would continuously engage in training to build
8    capability and knowledge?
9    A.    Yes.
10   Q.    Okay.  Okay.  I'm going to provide some
11   additional documents.  Actually, before we do that, let
12   me ask a few questions.  What were your -- other than
13   what we've already looked at here with these job duties.
14   Is there anything that's not listed here that were part
15   of your responsibilities as a graphics business manager?
16   A.    I'm not sure what you're looking at.
17   Q.    Exhibit D.  I'm sorry if that was not clear.
18   If you look at Exhibit D.
19   A.    The one we just had.  Okay.
20   Q.    Yep.  I just want to make sure we've gone
21   through ten different bullet points of the different job
22   responsibilities.  I'm asking if there's anything that's
23   not captured here that you were doing?
24   A.    No, I think that's it.
25   Q.    Okay.  Thank you.  All right.  You talked

Page 76

1    about in October 2022 training earlier.
2    A.    Okay.  I'm not sure about that date, but okay.
3    Q.    Okay.  I'm sorry.  If that date is incorrect,
4    but let me rephrase then.  You talked earlier about a
5    training.
6    A.    Correct.
7    Q.    Can you tell me specifically what you remember
8    about that training?
9    A.    Yeah, we went down to Florida.  It was Rick
10   Shue, myself, and David Steel.  We met in the
11   Jacksonville office and they were supposed to train me
12   on some computer stuff, which I'd only remember what
13   they were supposed to train me was, but nobody knew what
14   they were doing.  And after three hours, I walked out of
15   there more confused than I started.  And I even asked
16   Rick who's happened to be a computer guy.  I said, Rick
17   was I just trained or though I don't have a brain.  He
18   goes, they don't even know what they're talking about.
19   You were not trained.  This is a waste of time.
20        And that could be word for word.
21   Q.    Did you receive any other training?
22   A.    No.
23   Q.    What are some of the things that you needed
24   training on?
25   A.    I wasn't sure how to do PowerPoint stuff, how

Page 77

1    to enter -- do pricing.  And I was never trained, so I
2    really can't even explain what it was.  And I've never
3    done that before in my 45 years of work.  And 25 of
4    those were in the same company -- I'm sorry, 24 years in
5    the same company.
6    Q.    Did you know how to use Salesforce?
7    A.    A little.
8    Q.    Did you use Salesforce while you were a
9    graphics business manager?
10   A.    Yes.
11   Q.    How often would you say?
12   A.    Once every few weeks.
13   Q.    Was it an expectation that you were using
14   Salesforce as part of your job?
15   A.    Yes.
16   Q.    Do you know whether the company offered other
17   training opportunities?
18   A.    I believe they did, yes.
19   Q.    And did you take advantage --
20   A.    Yes.
21   Q.    -- of those opportunities?
22   A.    Yes.
23   Q.    What were some of those opportunities?
24   A.    Oh, they gave me a website to go online to
25   learn by myself.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 78

1    Q.   Was that on the internet?
2    A.   Yes.
3    Q.   And did you -- do you recall what trainings
4  you specifically did?
5    A.   No.
6         MS. AGRESTI:  Okay.  I already gave you the
7    training transcript.  I'm just trying to pull it up
8    here.
9         THE WITNESS:  Excuse me.
10        MS. AGRESTI:  Can we go off the record a
11   minute?
12        THE REPORTER:  Off the record at 12:20.
13        (OFF THE RECORD)
14        THE REPORTER:  Back on record 12:28.
15        MS. AGRESTI:  So I'm showing you a document
16   that's been pre-marked Exhibit E.
17        (EXHIBIT E MARKED FOR IDENTIFICATION)
18 BY MS. AGRESTI:
19   Q.   And this is Bates labeled WestRock 206.  But
20 it's a native document, which is why it doesn't have the
21 Bates labeling on the bottom.  If you want to take a
22 look a -- take a minute here and look at this, but it --
23 at the top it says "Transcript Report," and it's for
24 Marshall Krimsky.
25   A.   You're saying this is what they sent me?

Page 79

1    Q.   No, no, no.
2    A.   I know --
3    Q.   I'm just if you -- just take a look at it.
4    A.   Okay.  Okay.
5    Q.   So --
6    A.   I'm sorry, my phone on or no, I'm sorry.
7    Q.   No, you're fine.  Are these the online classes
8  here that you are referring to, for example here, where
9  it says, title Spotting and Reporting Fraud, Outlook
10 Online Essentials, Microsoft Teams Essentials, et
11 cetera?
12   A.   Yeah, I believe so.
13   Q.   Okay.  Do you know if when you took the
14 classes on the internet, if that would go to your
15 supervisor or if there was any sort of way to track the
16 classes that you were taking?
17   A.   I have no idea.
18   Q.   Okay.  If you could walk me through as a
19 graphics business manager, what was your day to day
20 like?  What -- what -- what would you do from day to
21 day?
22   A.   The same thing I did before I became a
23 graphics business manager, I would handle the stuff for
24 Pepperidge Farm.
25   Q.   And what does that look like in -- like, what

Page 80

1  can you walk me through like a sample, like a day in the
2  life of --
3    A.   Marshall, I got a new project.  I got product.
4  You need to come up here tomorrow.  And then I'd go up
5  there tomorrow or that afternoon.  And up there is in
6  Connecticut.  That's where their office was.  And I
7  reviewed the projects with them and then come back and
8  make samples -- have samples made.  And then wait for
9  the samples to be made, send it to me, and then I would
10 bring it up there.
11   Q.   So that's for and that's for the Pepperidge
12 Farm account?
13   A.   That's correct.
14   Q.   Who was your direct contact at the Pepperidge
15 Farm account?  Or who did you work with?
16   A.   Oh, everybody.  Every packaging engineer
17 there.
18   Q.   Every --
19   A.   Packaging engineer.  Sorry.
20   Q.   Did you have a specific contact at Pepperidge
21 Farm --
22   A.   No.
23   Q.   -- that you were supposed to work with or you
24 could speak to any of the packaging engineers?
25   A.   Any of them.

Page 81

1    Q.   Okay.  And what was -- what was your mode of
2  communications with them?
3    A.   Either by phone or in person.
4    Q.   Okay.  Were you ever expected to communicate,
5  or deal, or do your work with Pepperidge Farm on the
6  computer?
7    A.   I would send them quotes via e-mails and
8  that's basically it.  All the communication was done
9  live.
10   Q.   And when you say -- we just went through a
11 sample day in the life of, was that accurate or true
12 through your termination?
13   A.   No.
14   Q.   So explain to me --
15   A.   Because they closed Pepperidge Farm's office
16 in Connecticut.
17   Q.   Okay.  And when was that?  Do you know?
18   A.   Six months ago to a year ago.
19   Q.   Okay.  So up until the closure of the
20 Connecticut office, your dealings were there?
21   A.   That's correct.
22   Q.   And after that?
23   A.   After that, it'd just be on the phone because
24 they weren't in their office and half of them left.
25   Q.   Okay.  So half of the people that you were

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 82

1  dealing with, they left the company?
2     A.   Correct.
3     Q.   So what about for new clients?
4     A.   Well, then they wanted me to get new clients.
5  How long ago was that, that was maybe six months ago to
6  a year ago, maybe.  They said Rick's not going to hand
7  on anything.  We want you to start knocking on doors.
8     Q.   Okay.  And did you do that?
9     A.   I called a few people.
10    Q.   Do you know --
11    A.   That I knew.  Right.
12    Q.   So you called a few previous business
13  contacts --
14    A.   That's correct.
15    Q.   -- is that fair?  Do you recall how many?
16    A.   Four, or five, or six.
17    Q.   And how much -- how much time?
18    A.   In around six months.
19    Q.   Are there any other attempts at new business
20  other than the four, or five, or six calls in the six
21  months --
22    A.   I made some cold calls.  Didn't go anywhere.
23  And I believe they knew I wasn't going to call on them.
24    Q.   Why do you say that?
25    A.   Because when I -- after I got sick, I told

Page 83

1  everybody, I'm not you know, you lost all my other
2  accounts, and I'm not going around chasing new accounts.
3  I'm going to stick with Pepperidge Farm.  I know they
4  buy a lot and I'm going to grow within their company.
5  That's going to be my day to day thing from zero dollars
6  to 16 million.
7     Q.   Who did you say that to?
8     A.   Oh, I don't remember.  It could have been
9  Peter Brandt at the time.
10       MS. AGRESTI:  Okay.  I'm showing you a group of
11    documents that are marked as Exhibit, I believe
12    we're up to, F.  Is that right?
13       THE REPORTER:  Yes.
14       MS. SLUSARZ:  Yes.
15          (EXHIBIT F MARKED FOR IDENTIFICATION)
16       MS. AGRESTI:  Not going to -- actually, I'll
17    staple them for you.
18       MS. SLUSARZ:  This one going to Mr. Krimsky or
19    me?
20       MS. AGRESTI:  Either one.  I'll give you
21    another one.
22       MS. SLUSARZ:  Okay.
23       THE WITNESS:  Thank you.
24       MS. AGRESTI:  I'll give it to you after.
25       MS. FLOYD:  Yeah.

Page 84

1       THE WITNESS:  I can pass it down.
2       MS. AGRESTI:  Oh, no, no.  It's okay.
3  BY MS. AGRESTI:
4     Q.   Okay.  So these are a series of personnel
5  related documents, but I'm not going to ask you about
6  all of them at once.  So if you can just look at
7  WestRock 207 through 209.
8     A.   Right, a minute.
9     Q.   The first three pages.
10    A.   Oh, I'm sorry.
11    Q.   And then we'll talk about it when you're
12  ready.
13    A.   Okay.  Go.
14    Q.   Ready?
15    A.   Yes.
16    Q.   All right.  What is this document?
17    A.   This is a Performance Improvement Plan dated
18  of January of 2024.
19    Q.   Okay.  Let's talk about the Performance
20  Improvement Plan, so who was your supervisor at the time
21  of the performance improvement --
22    A.   Tammie -- (crosstalk).  I'm sorry.  Tammie
23  Siracusa.
24    Q.   Okay.  As you understand it, or as was
25  communicated to you, what are the reasons for being on a

Page 85

1  performance improvement plan?
2     A.   Well, we lost 90 percent of the Pepper Farm
3  business due to quality issues and lack of service.
4     Q.   When did WestRock lose 90 percent of
5  Pepperidge Farm?
6     A.   I'm trying to think.  I was told last April
7  that we were losing it.  So that was April of 2023.  And
8  I think we just lost it all, this is July, I think we
9  lost it in April of 2024.
10    Q.   And you were told April 2023?
11    A.   That's correct.
12    Q.   Who informed you?
13    A.   The customer.
14    Q.   Who specifically?
15    A.   Ray Fordyce.
16    Q.   Ray Fordyce -- can you repeat that?
17    A.   His last name is Fordyce, F-O-R-D-Y-C-E, I
18  believe.
19    Q.   Fordyce.
20    A.   I could be making that spelling up.
21    Q.   Okay.  So Ray informed you April 2023, the
22  company's going to lose over 90 percent of the business?
23    A.   That's correct.
24    Q.   Did he say why?
25    A.   Quality issues.  We had over a hundred

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1  non-conformances, which are complaints against our
2  product, shipping issues, just issues totally, all over
3  the place.
4      Q.   And when did you first learn -- or let me ask
5  you this first.  Were you aware of these quality issues
6  prior to April 2023?
7      A.   Yes.
8      Q.   When did you first learn of the quality
9  issues?
10     A.   A few months after I joined the graphics
11  division.  They kept on calling me, Marshall, it's worse
12  than ever.  Ever since they shut down Newark your
13  company stinks.  We're not allowed to ask you questions.
14  We have to track down the proper people.
15     Q.   They specifically said that we're not allowed
16  to ask you questions?
17     A.   Well, they can, but they knew I couldn't give
18  them answers.  Every time they asked me, it took me
19  three days to get back to them.
20     Q.   Can you tell me more about that?  Why -- what
21  was that process?
22     A.   That's a good question.  I had to -- I had to
23  ask Jessica my customer service person, and she had to
24  find out in a meeting, which was every other day at
25  4:00.  And -- and in the old days, if I needed an

1  answer, I'd call and they wouldn't let me leave until I
2  gave them a straight answer.  So now on a Monday, if
3  they asked me a question, well, the meeting's not until
4  Wednesday, so I can let you know what's happening with
5  your job until Wednesday.
6      Q.   And when you say in the old days, when are you
7  referring to?
8      A.   Before I went to graphics.
9      Q.   So before the reorganization?
10     A.   That's correct.
11     Q.   Before the Newark plant closed?
12     A.   That's correct.
13     Q.   What did you do to try to address this issue?
14     A.   Well, I couldn't -- they wouldn't allow me to
15  talk to anybody, so I had to go through the proper
16  channels and tell Jessica.
17     Q.   And what happened as a result of telling
18  Jessica?
19     A.   I lost all the work.
20     Q.   Well, hold on, let me finish the question.
21     A.   I'm sorry.  Sorry.
22     Q.   Okay.  And what happened as a result of
23  telling Jessica?
24     A.   She put it on her list and she asked a
25  question when it was her turn to talk to them.

1      Q.   Did you talk to anyone else about it other
2  than Jessica?
3      A.   Rick Shue.  And I'm sure I spoke to David
4  Steel at the time, who was busy talking about his
5  retirement plans.  And I think that's it.
6      Q.   And what happened as a result of talking to
7  Rick Shue, for example?
8      A.   Nothing.
9      Q.   What happened as a result of talking to David
10  Steel?
11     A.   Nothing.
12     Q.   Do you know whether in fact they did any --
13  either of those two people did anything in that regard?
14     A.   I think Rick tried to move everything off
15  center but failed.
16     Q.   Tried to move everything off?
17     A.   Off center.  You know, he tried to fix the
18  problem or tried to find out what the real problem is.
19     Q.   Do you know if he was able to find out?
20     A.   Yeah, he found out.  He says, they're just a
21  bunch of idiots and they don't understand the business.
22     Q.   Did you raise the quality issues -- prior to
23  April 2023, you raised them to your supervisor at the
24  time; is that right?
25     A.   That's correct.

1      Q.   What about after -- or when -- so when did you
2  first learn that they were going to pull business?  You
3  said April 2023?
4      A.   That's correct.
5      Q.   Did you have any indicia or indication prior
6  to April --
7      A.   Yes.
8      Q.   -- April of 2023, that they were going to pull
9  the business?
10     A.   Well, not to pull the business, but they said,
11  we're very unhappy with WestRock since the change from
12  Newark to the graphics.
13     Q.   When was that that they told --
14     A.   I don't remember.  It could have been a year
15  after I went.  So that could have been in 2020, maybe.
16  I'm guessing.
17     Q.   And -- okay.  And did you raise or elevate
18  this to your superiors?
19     A.   Yes.
20     Q.   To -- who did you raise it to, in total?
21     A.   I would think Mark Van der Kloet.  He was the
22  king.
23     Q.   Why -- why -- why do you say that?
24     A.   Well, he was in charge of the whole program,
25  of the whole department there.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

CHURCHILL
REPORTING

1    Q.   Okay.  And he --
2    A.   And nobody would do anything unless it came
3  from him.
4    Q.   And do you know whether anything happened as a
5  result of telling him?
6    A.   Apparently nothing happened because we lost
7  all the business.
8    Q.   But do you know if in fact anything was done?
9    A.   No.
10    Q.   Do you have any written communications or
11  anything related to those conversations?
12    A.   Any written communications?
13    Q.   Yes.
14    A.   No, I don't.
15    Q.   So what happened after April 2023 in regards
16  to trying to keep this business?
17    A.   It was still -- we were still getting orders.
18  I was still going up there trying to get new projects.
19  And then eventually we started losing some of the
20  business.
21    Q.   Did you inform at any point -- who was your
22  supervisor in April 2023?
23    A.   I think it was David Steel.
24    Q.   And after David Steel?
25    A.   It was Nickie Parker for a few weeks, and then

1  Tammie Siracusa.
2    Q.   Did you inform Nickie Parker or Tammie
3  Siracusa of any issues related to Pepperidge Farm?
4    A.   I'm sure I did but I don't remember what or
5  when.
6    Q.   And during this time frame that you were
7  reporting to David Steel and then Nickie Parker and then
8  Tammie Siracusa, were you able to get any other new
9  clients besides Pepperidge Farm?
10    A.   No.
11    Q.   Okay.  So let's look at the specific language
12  of the performant [sic] improvement plan -- performance
13  improvement plan, excuse me.  So here it states that you
14  have three performance targets.  I'm looking at the
15  section that says Performance Targets.  "One, develop a
16  clear, specific plan to achieve sales revenue of at
17  least $10 million, two, utilize Salesforce for new
18  customers and opportunities as well as managing current
19  business, and three, become proficient in Microsoft
20  Outlook and Teams.  Do you see that?
21    A.   Yes, I do.
22    Q.   The specific action items that were provided
23  to you were, "One, to complete key account plan for
24  Campbell's to identify opportunities within Campbell's
25  to maintain 25 percent of fiscal year '23 business and

1  execute forward actions by deliverable dates set forth
2  in the KAP, and two, prepare a detailed written KAP to
3  grow WestRock's current share of Campbell's business in
4  order to maintain 25 percent before the end of fiscal
5  year '24."  Your KAP must be e-mailed to Tammie.  So it
6  says to me, but it's from Tammie, so I'm replacing me to
7  Tammie.  Your KAP must be e-mailed to Tammie for her
8  review and approval no later than January 31st, 2024.
9  Is that right?
10    A.   I see that, yes.
11    Q.   Did you e-mail a KAP by January 31st, 2024?
12    A.   I'm not sure.
13    Q.   Okay.  The second action item is to, "Achieve
14  sales revenue of at least $10 million in fiscal year
15  2024."  Do you see that?
16    A.   Yes, I do.
17    Q.   And it says you -- underneath that "Qualify at
18  least three new accounts to generate sales for WestRock,
19  and by March 1st, 2024, you must submit to Tammie a
20  detailed written plan to achieve and sustain $10 million
21  in revenue, including Campbell's and new accounts."  Do
22  you see that?
23    A.   Yes, I do.
24    Q.   Did you indeed submit a detailed written plan
25  to achieve and sustain $10 million in revenue, including

1  Campbell's and new accounts by March 1st, 2024?
2    A.   I think I put some accounts in there but I
3  also told them it's physically impossible to get
4  $10 million in one year.
5    Q.   My question was, did you submit a detailed
6  written plan by March 1st, 2024?
7    A.   And my answer was, I'm not sure.  I think I
8  did.
9    Q.   The third action item is to, "Coordinate a
10  monthly meeting with operations team to review
11  Campbell's account."  And underneath that it says, "You
12  must establish a regular cadence for Microsoft Teams
13  meetings with the WestRock operations team members who
14  support the Campbell's account.  Your first meeting
15  should be held on or before January 31st, 2024."  Do you
16  see that?
17    A.   Yes, I do.
18    Q.   Did you in fact establish a regular cadence
19  for Microsoft Teams meetings?
20    A.   A regular cadence, no.  I had a few calls.
21    Q.   And did you have the first meeting on or
22  before January 31st, 2024 --
23    A.   I'm --
24    Q.   -- with the WestRock operations team members.
25  Who support the Campbell's account?

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 94

1    A.   I'm not sure of the date.
2    Q.   Did you eventually have that meeting with
3  them?
4    A.   Yes.  Yes.
5    Q.   Sorry.  It's just that we can't talk over each
6  other.
7    A.   I'm sorry.
8    Q.   It's okay.
9    A.   Sorry.
10   Q.   It's okay.  The next bullet point says that
11 "Your monthly meetings with the operations team should
12 cover agenda topics that include but are not limited to
13 the following: new items, forecast, and quality issues."
14 Do you know whether those agenda topics were covered in
15 your meetings?
16   A.   Yes.
17   Q.   The next bullet point says that "You must
18 prepare a written agenda for each monthly call, and you
19 must include Tammie on all calendar invitations for the
20 monthly calls.  And when Tammie's schedule allows, she
21 will attend those meetings to observe your performance."
22 Did you in fact prepare a written agenda for each
23 monthly call?
24   A.   For the few calls that I had, I did prepare an
25 agenda, yes.

Page 95

1    Q.   But the calls were not monthly; is that right?
2    A.   That's correct.  Because I didn't have
3  anything to talk about because they were pulling the
4  work and there was no more work to discuss.
5    Q.   It also states that "Your monthly meetings
6  must be conducted via Microsoft Teams because it is
7  WestRock's exclusive virtual meeting platform, and to
8  ensure that you know how to use Microsoft Teams
9  proficiently, WestRock will provide you with training as
10 set forth below."  Did you conduct the monthly meetings
11 via Teams?
12   A.   Yes.
13   Q.   And did you receive the training that was
14 stated here that would be provided to you?
15   A.   They gave me the website to look at, yes.
16   Q.   And by website, do you mean the company's
17 intranet with various training opportunities?
18   A.   That's correct.
19   Q.   The next action item of your performance
20 improvement plan is to complete training for Microsoft
21 Outlook and Teams.  The next bullet point says, "Utilize
22 Outlook effectively for scheduling meetings and your
23 paid time off.  HR manager Carrie Robards will contact
24 you about scheduling virtual training sessions on
25 Microsoft Outlook.  These training sessions are not

Page 96

1  optional and you must complete this training by January
2  31st, 2024."  Did you in -- did were you contacted by
3  Carrie Robards about scheduling virtual training
4  sessions?
5    A.   Yes.
6    Q.   And did you complete those virtual training
7  sessions with Carrie Robards?
8    A.   Yes.
9    Q.   And did you complete that training by January
10 31st, 2024?
11   A.   I believe so.
12   Q.   It also states that you must attend each
13 session assigned to you.  Microsoft Outlook is
14 WestRock's Exclusive e-mail and Calendaring software.
15 So it is critical that you know how to use it,
16 proficient to communicate with both internal and
17 external clients.  Did you attend each session assigned
18 to you?
19   A.   Yes.
20   Q.   And did you use Microsoft Outlook after this
21 to communicate with internal and external clients?
22   A.   Yes.
23   Q.   The next bullet point says, "Utilize Teams
24 effectively for meetings and presentations.  Carrie will
25 also contact you about scheduling virtual training

Page 97

1  sessions on Microsoft Teams.  These training sessions
2  are not optional and you must complete it by January
3  31st, 2024."  Did Carrie contact you about virtual
4  training sessions on Microsoft Teams?
5    A.   Yes.
6    Q.   And did you indeed take these training
7  sessions with Carrie?
8    A.   Not with Carrie, but I did attend them, yes.
9    Q.   And did you do them by January 31st, 2024?
10   A.   I believe so, yes.
11   Q.   Sorry, you just have to wait until I'm done.
12   A.   I'm sorry.  I'm sorry.
13   Q.   Did you complete them by January 31st, 2024?
14   A.   Yes, I believe so.  I'm sorry.
15   Q.   Okay.  No problem.  It also states -- skipping
16 to the next section, "Complete Salesforce Training.
17 Modules to be completed are as follows: CRM basics
18 leads, accounts, contacts, call reports, opportunities,
19 and cross selling program.  And these modules include
20 how to navigate each area, new entries, changes, and
21 modifications."  Did you complete those modules?
22   A.   Yes.
23   Q.   It says here that "This training can be
24 completed through self-service modules in the Sales
25 Resource Center in Salesforce or a virtual or in-person

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1  session can be arranged." Do you remember how you
2  conducted that training?
3      A.  Online somehow I'm sure.
4      Q.   And it must be completed by, according to
5  this, February 9th, 2024.  Do you know if you completed
6  it by that date?
7      A.  I'm not 100 percent sure, no.
8      Q.   It also states that you have to, "Maintain
9  active pipeline in Salesforce.  So you must enter all
10 new opportunities and update all opportunities in
11 Salesforce through various stages and that the -- you
12 and Tammie will discuss your existing Salesforce
13 pipeline by February 9th, 2024." Did you in fact enter
14 all new opportunities and update all opportunities in
15 Salesforce through the various stages?
16     A.  Yes.
17     Q.   Do you recall if you had that conversation
18 with Tammie by February 9th?
19     A.  I believe I did.  Yes.
20     Q.   On February 9th, 2024?
21     A.  I'm sorry.  I think so, yes.
22     Q.   Okay.  It says here that you would have a
23 progress midpoint meeting on or around February 9th,
24 2024.  Do you know whether you had that progress
25 meeting?

1      A.  I think so.
2      Q.   What was communicated to you at the midpoint
3  progress meeting?
4      A.  No, I'm not 100 percent sure.
5      Q.   It also states that, on the next page, there
6  would be a final assessment meeting on or around March
7  11th to meet with HR again, to review your progress
8  against the improvement target and to discuss next
9  steps.  Do you recall whether or not you had that
10 meeting on March 11th?
11     A.  I think I did, yes.
12     Q.   Okay.  At the bottom it says, "Timeline for
13 improvement, consequences, and expectations." And it
14 says, "Effective today, you have been placed on a
15 60-day performance improvement plan that will remain in
16 effect through and including Monday, March 11th.  During
17 the PIP period, you are expected to make significant
18 progress on the performance targets outlined above.
19 Failure to meet or exceed outlined performance
20 improvement targets will result in further action up to
21 and including termination.  While this is a 60-day PIP,
22 you should understand that we must see immediate and
23 sustained improvement.  If sufficient progress is not
24 made at any point during the PIP, your employment may be
25 terminated.  Continued employment depends upon

1  consistent and sustained performance. Nothing in this
2  plan alters your employment at-will relationship with
3  West -- with WestRock.  Additionally, the content of
4  this PIP are to remain confidential.  If you choose not
5  to sign below, the PIP will go into effect today and
6  will remain in effect for a 60-day period." Do you
7  recall receiving this PIP?
8      A.  Yes.
9      Q.   And if you look at the next page, WestRock
10 210, Bates -- the Bates stamped WestRock 210, I believe
11 that is your signature acknowledging that you received a
12 copy of the PIP; is that correct?
13     A.  That's correct.  Yes.
14     Q.   Okay.  My mistake.  Hold on.  Bear with me a
15 second.  I believe that WestRock 210 is actually -- I'm
16 -- pardon.  WestRock 210 is not the document.  That's
17 the document for the extension of the PIP.  So we'll
18 talk about that document shortly.  If you can go to
19 WestRock 216.  Based on the dates is how I -- it says,
20 "I acknowledge I received this copy of my PIP dated
21 January 17th, 2024." Is that your signature?
22     A.  Yes.
23     Q.   Okay.  And is this -- this is your signature
24 on the January 2024 PIP, is that right?
25     A.  That's -- that's what it looks like, yes.

1      Q.   Okay.
2      MS. AGRESTI:  Why don't we break for lunch
3  here?
4      THE VIDEOGRAPHER:  Okay.  Off the record at
5  12:56.
6      (OFF THE RECORD)
7      THE VIDEOGRAPHER:  Back on record, 1:44 p.m.
8  BY MS. AGRESTI:
9      Q.   After the January 2024 PIP, did you receive a
10 30-day extension?
11     A.  I believe so, yes.
12     MS. AGRESTI:  Let's go off the record a minute.
13     THE VIDEOGRAPHR:  Off the record.
14     (OFF THE RECORD)
15     THE VIDEOGRAPHR:  Back on record.
16     MS. AGRESTI:  Thank you.
17 BY MS. AGRESTI:
18     Q.   If we look at the -- what's been pre-marked
19 Exhibit F, which we were looking at before the break.
20 If you turn to -- at the bottom, it says WestRock 0211.
21     A.  Okay.
22     Q.   Is that the 30-day extension of the
23 performance improvement plan document?  And if you need
24 to look through those pages before answering, that's
25 absolutely fine.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606


CHURCHILL REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    A.   Okay.

2    Q.   Is that the --

3    A.   I believe so, yes.

4    Q.   Is that -- I'm going to just ask.  It's okay.

5  Is that the 30-day extension document?

6    A.   I believe so.

7    Q.   Okay.  So if we look at this document a

8  little bit more closely here, the first paragraph, the

9  last sentence states, "Your current performance level

10 falls below WestRock's expectations as reflected in your

11 fiscal year '23 performance evaluation."  Do you recall

12 receiving a 2023 performance evaluation?

13   A.   Yes.

14   Q.   And do you recall your performance being

15 identified as falling below expectations?

16   A.   Yes.

17   Q.   Okay.  The next paragraph says that "This is a

18 follow-up to the PIP issued on January 15th and is --

19 and initially extended for 30 days on April 26th, 2024."

20 It states that "To date you have not made significant

21 progress on the PIP despite our efforts to help you

22 accomplish all the action items below.  Incomplete action

23 items have been identified.  In a final attempt to help

24 you successfully complete those action items, the PIP

25 will be an -- will be extended an additional 30 days

1  from today."  Is that what you recall happening, that it

2  was extended?

3    A.   Yes.

4    Q.   Okay.  The document also states that "The

5  expectations are outlined below in order for you to

6  perform successfully going forward."  And does this

7  appear to be the performance improvement plan as you

8  recall it on April 26th, 2024?  Let me strike that.  Let

9  me rephrase that.  Is this an accurate representation of

10 the 30-day extension document as you recall?

11   A.   Yes.

12   Q.   Okay.  The third paragraph also says, the

13 second sentence, "You are expected to complete each

14 action item below by the date specified.  The action

15 items are designed to help you achieve the performance

16 targets outlined below.  We will meet weekly or as

17 needed to discuss your progress on each action item

18 below."  My question is, did you in fact meet weekly

19 with Tammie Siracusa or as needed?

20   A.   Yes.

21   Q.   Okay.  So the performance targets for the 30-

22 day extension document are, "One, develop a clear

23 specific plan to achieve sales revenue of at least $10

24 million, two, utilize Salesforce for new customers and

25 opportunities as well as managing current business, and

1  three, become proficient in Microsoft Outlook and

2  Teams."  Would you agree?

3    A.   Yes.

4    Q.   Okay.  Let's look through the action items.

5  It states, "Complete key account plan, KAP, for

6  Campbell's," and it's identified as complete.  Do you

7  agree with that?

8    A.   Yes.

9    Q.   Okay.  The next action item is identified as

10 incomplete.  "Achieve sales revenue of at least

11 $10 million in fiscal year 2024."  Underneath it, it

12 says, "Qualify at least three new accounts to generate

13 sales for WestRock.  And by March 1st, 2024, you must

14 submit to Tammie a detailed written plan to achieve and

15 sustain $10 million in revenue, including Campbell's and

16 new accounts."  If we turn the page, Tammie identifies a

17 specific follow up action.  She states that "The below

18 sales plan was sent on March 1st.  The format of your

19 sales plan is unpolished and unprofessional.  An e-mail

20 is an -- is not an acceptable format for your sales plan

21 and it is not what I expect from an experienced sales

22 professional."  It further states that "In subsequent

23 calls since March 1st, there has been no update on

24 activity from this sales plan and no new account

25 opportunities have been entered into Salesforce."  Do

1  you agree with both of those items?

2    A.   Yes.

3    Q.   If we look at the bottom here, you'll see the

4  sales plan that Tammie is referring to.  It's an e-mail

5  at the bottom.  This is from Marshall Krimsky to Tammie

6  Siracusa, subject, "Sales Plan."  And if you turn the

7  page, you will see the rest of that e-mail that you sent

8  to Tammie.  Would you agree that that's the sales plan

9  that Tammie is referring to?

10   A.   I believe so, yes.

11   Q.   Okay.  As you sit here today, do you believe

12 that this sales plan is what an experienced sales

13 professional such as yourself should send to a

14 supervisor?

15   A.   This is what I've been doing all my life.

16 Yes.  I was never trained to fill out anything they were

17 looking for.  What they were really looking for was a

18 KAP plan.

19   Q.   Did you seek any training on completing a KAP

20 plan, as you said?

21   A.   Yes, I did.

22   Q.   What training did you look for?

23   A.   I called up this guy, David Sharp, who's the

24 head of marking or something.  And he tried to walk me

25 through it but that was the first I had ever seen it.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    Q.   Okay.  Going back to the follow up action
2    item, the third bullet point, it says, "Follow up action
3    required.  Revise your sales plan by May 10th. You must
4    prepare a written sales plan in Microsoft Word or
5    PowerPoint.  Your sales plan must include goals that
6    are," acronym, "SMART, specific, measurable, achievable,
7    relevant, and time bound.  You should research how to
8    prepare a sales plan using resources available to you
9    such as the internet, the library, and your colleagues."
10   Did you revise your sales plan by May 10th?
11       A.   I believe so.
12       Q.   Okay.  If you go to the next sentence after
13   the AI sentence, it states, "In addition, you will enter
14   each prospect's complete information into Salesforce.
15   You cannot provide a general description of an
16   individual as you did in the original sales plan.
17   Rather, you must properly identify everyone that you
18   consider a prospect.  You will present the revised plan
19   to me via Microsoft Teams on or around May 10th.  You
20   must be prepared to share your screen during that Teams
21   call to walk me through your plan."  Did you do that?
22       A.   I'm not sure.  I think I did.
23       Q.   The next follow-up action item is hold a sales
24   call with a prospect by May 25th.  "You must schedule
25   and hold a sales call via telephone or Teams with at

1    least one prospect identified in your plan.  You will
2    invite another WestRock teammate to that call to support
3    and participate as needed.  After the call, you will
4    e-mail the prospect with specific next steps you will
5    complete.  You will copy me on all follow up e-mails to
6    the prospect."  Did you complete that?
7        A.   I don't believe I did.
8        Q.   The next action item is, "Create a robust
9    prospect list by May 15th.  Generate leads and qualify
10   prospects that fit WestRock's graphics or display
11   capabilities.  Develop actions for your prospect lists
12   such as sales capabilities, presentations to prospects
13   in person when possible.  You are taking on each
14   customer to expedite their movement on the customer
15   buying journey."  Did you accomplish that follow up
16   action item?
17       A.   I'm not 100 percent sure.
18       Q.   The last bullet point says, "In addition, the
19   quality issues mentioned in the sales plan are being
20   addressed jointly by the operations team at WestRock and
21   the Denver plant as the customer is also having machine
22   issues."  If you go to the next page, WestRock 0213, at
23   the bottom underneath the e-mail that you sent with the
24   title Sales Plan, it says, "Incomplete: Coordinate a
25   monthly meeting with operations team to review

1    Campbell's account."  Would you agree that you did not
2    coordinate a monthly meeting with operations team to
3    review Campbell's account?
4        A.   We had a few meetings.  I think it was two or
5    three.
6        Q.   Okay.  Underneath it says, "You must establish
7    a regular cadence for Microsoft Teams meetings with the
8    WestRock operations team members who support the
9    Campbell's account."  And underneath that, it says,
10   "Your monthly meetings with the operations team should
11   cover agenda topics that include but are not limited to
12   the following: new items, forecast, and quality issues."
13   If you turn to the next Page -- skip the next two
14   bullets.  Underneath, it says, "As of April 28th, you
15   have not established any regular cadence with the
16   operations team that supports the Campbell's count."  Do
17   you agree with that statement?
18       A.   It wasn't a regular cadence.  I had a few
19   calls with them but not on a regular basis.
20       Q.   If you skip down to the bottom of this page,
21   it says, "Incomplete: maintain active pipeline in
22   Salesforce.  You must enter all new opportunities and
23   update all opportunities in Salesforce through various
24   stages.  We will discuss your existing Salesforce
25   pipeline by February 9th, 2024."  Do you know -- if you

1    turn the page to WestRock 215, it states, "As of April
2    28th, no new account opportunities have been entered
3    into Salesforce.  In the past 12 months, only three
4    opportunities have been entered for Pepperidge Farms."
5    Do you agree with that statement?
6        A.   I think I might have put some new accounts
7    into Salesforce.  As far as the three opportunities,
8    that's all I had.  I wasn't making anything up.  If you
9    remember, they threw us out for quality and service, so
10   they're not going to give me work so fast.
11       Q.   And so as of April 28th -- putting aside
12   Pepperidge Farm for a minute as of April 28th, is it
13   true that no new account opportunities had been entered
14   into Salesforce by that time?
15       A.   I believe that's false.
16       Q.   That's false?
17       A.   I believe so, yeah.
18       Q.   Okay.
19       A.   I thought I entered three of them.  As -- let
20   me look back at my -- one second, please.
21       Q.   No problem at all.
22       A.   One on March 1st.  Yeah, if you look at my
23   March 1st e-mail to Tammie, which she said was very
24   unprofessional, I did put three new accounts on there.
25   Right?  That was dated March 1st.  Oh, so maybe it

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 110

1  wasn't.  No, it was March 1st.  This says April 28th.
2  So I did enter them into Salesforce.  At least I believe
3  I did.
4      Q.  Okay.  Is it possible -- and I'm -- if -- I'm
5  just trying to understand, is it possible that you
6  identified it in this sales plan, but did not enter it
7  into Salesforce?
8      A.  It's very possible, but I believe I did put it
9  into Salesforce.
10     Q.  Okay.
11     A.  But I could be wrong.
12     Q.  Okay.  Underneath that statement, it says,
13  "Progress checkpoints."
14     A.  I'm sorry.  Where are you looking again?
15     Q.  I'm sorry.  WestRock 215, the page we were on
16  before we --
17     A.  Thank you.  Sorry.
18     Q.  Where it says, "Progress checkpoints, Final
19  assessment meeting."  It says, "On or around May 28th,
20  2024, we will meet with HR again to review your progress
21  against the action items outlined above."  And under --
22  do you -- do you see that?
23     A.  Yes.
24     Q.  Okay.  And is that what happened?
25     A.  That I did have a check-in meeting?  Yes, I

Page 111

1  did.
2      Q.  Okay.  And underneath that, it says,
3  "Effective today, your PIP period has been extended
4  through and including Tuesday, May 28th, 2024.  During
5  the extended PIP period, you are expected to complete
6  the action items outlined above.  Failure to complete
7  the outlined action items and achieve the performance
8  improvement targets will result in further action up to
9  and including termination."  Do you see that?
10     A.  Yes.
11     Q.  Did you understand when reading this that
12  failure to meet the required aspects of the performance
13  improvement plan could result in termination of
14  employment?
15     A.  Yes.  Sorry.  Yes.
16     Q.  Did you meet the action items that are
17  outlined in the performance improvement plan and
18  extension document?
19     A.  Apparently not.
20     Q.  Why do you say apparently not?
21     A.  Well, because they fired me.  They terminated
22  me.  So as far as they're concerned, I didn't do it.
23     Q.  I'm asking you, do you -- did you do it?  Did
24  you --
25     A.  I entered --

Page 112

1      Q.  -- fulfill those --
2      A.  -- stuff into Salesforce.
3      Q.  I'm sorry.  I'm sorry.  Let me just finish.
4  Sorry.
5      A.  Go ahead.  Sorry.
6      Q.  Did you fulfill these action items?
7      A.  Which action items?
8      Q.  The action items in the performance
9  improvement plan and the extension --
10     A.  I did put -- I'm sorry.
11     Q.  -- and the extension document?
12     A.  I did put three things into Salesforce, and
13  that's what I did.
14     Q.  But what about the other action items?
15     A.  I had no other dealings with Pepperidge at
16  that time.  Every time I called them, they said, don't
17  call us for a while.  We hate your company.
18     Q.  Did you in fact send a -- an updated sales
19  plan, a written sales plan?
20     A.  I might have.  I'm not 100 percent sure.
21     Q.  Okay.  Did you coordinate a monthly meeting
22  with operations team to review Campbell's account?
23     A.  Like I said, we had around two to three
24  meetings, conference calls.
25     Q.  No, I understand.  I'm saying --

Page 113

1      A.  Regarding Campbell's, but there was no new
2  actions, no new orders, no anything.
3      Q.  My question was though, after this feedback,
4  did you coordinate those meetings on a monthly basis?
5      A.  No, I did not.
6      Q.  And did you maintain an active pipeline in
7  Salesforce?
8      A.  I maintained an honest plan in Salesforce.
9      Q.  If you look at document WestRock 210.
10     A.  Okay.
11     Q.  Is that your signature acknowledging receipt
12  of the PIP extension document?
13     A.  Yes.
14     Q.  Okay.  All right.  If you turn to the last
15  page, WestRock 217.  Take a minute and look at this
16  document.
17     A.  I -- I'm ready.
18     Q.  Okay.  What is this document?
19     A.  Saying that I'm terminated.
20     Q.  Okay.  It says -- who sent this document?
21     A.  Tammie Siracusa, SVP Merchandise and Displays
22  and Graphics.
23     Q.  From your -- from your understanding, who made
24  the decision to terminate your employment?
25     A.  Tammie Siracusa.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    Q.    Okay.  Anyone else?

2    A.    Not that I know of.

3    Q.    Okay.  And it states here in the letter, "In

4  follow up to our recent call."  Did you have a call with

5  Tammie?

6    A.    The day before this letter, yes.

7    Q.    Okay.  And what was discussed or said on that

8  call?

9    A.    Basically the same thing, that we're

10  separating.  You're no longer working here because you

11  didn't fill out Salesforce.

12    Q.    Okay.  Let's read this together then.

13    A.    Sure.

14    Q.    As this states on the second -- on the -- let

15  me just start from the beginning.  "In follow up to our

16  recent call, this letter confirms that your employment

17  with WestRock Services, LLC has been terminated

18  effective June 6th, 2024.  As discussed during our call,

19  your employment has been terminated because you failed

20  to complete the performance improvement plan issued to

21  you on January 16th, 2024.  Despite receiving extensions

22  of the initial 60-day PIP period, you failed to complete

23  specific action items marked as incomplete in the

24  enclosed document dated April 26th, 2024."  Do you see

25  that?

1    A.    Yes, I do.

2    Q.    And is that your understanding as to why

3  WestRock was terminating your employment?

4    A.    Yes.

5    Q.    Okay.  Did you ever receive, if you recall,

6  did you ever receive an equal employment opportunity

7  policy from WestRock?

8    A.    I think I might have.

9    Q.    Okay.  Do you know if you were required to

10  acknowledge it?

11    A.    I don't believe I was.

12    Q.    Okay.

13    A.    But I'm not sure.

14    Q.    Did you ever take advantage of any of the

15  internal complaint procedures at the company?

16    A.    No.

17    Q.    Okay.  Are you aware that the company has

18  various policies related to the claims that you make in

19  this lawsuit, including an Americans With Disabilities

20  Act policy?

21    A.    Not really, no.

22    Q.    Okay.  Are you aware of the company's code of

23  conduct?

24    A.    Yes.

25    Q.    And have you been required to -- strike that.

1  In the past have you acknowledged the company's code of

2  conduct?

3    A.    Yes.

4    Q.    Okay.  And did you ever --

5    A.    I believe so anyway, yeah.  I believe so.

6    Q.    Okay.  And did you ever make any complaints as

7  a result of any of the allegations here in this lawsuit

8  internally to the company?

9    A.    No.

10    Q.    In that call that you had with Tammie to

11  terminate your employment, was there anyone else on the

12  call?

13    A.    HR was on the call.  Carrie Robards.

14    Q.    Anyone else?

15    A.    No.  At least I don't think so.

16    Q.    Okay.  Was that call via -- was it -- was it a

17  Zoom call where you could see each other, or it was only

18  voices?

19    A.    That's the only way they can -- I'm sorry.

20    Q.    Or was it only voices?

21    A.    It was face.  That's the only way that they

22  want to communicate.

23    Q.    Okay.  Prior to this performance improvement

24  plan, had you ever been disciplined by the company?

25    A.    No.

1    Q.    Earlier today you had mentioned a drug, not

2  infraction, but like a drug discipline; is that

3  accurate?

4    A.    Yes.

5    Q.    Okay.  Do you recall when that was?

6    A.    It was probably in 2015 or 2016.

7    Q.    Okay.

8    A.    Right after my chemo.

9    Q.    Okay.  Other than the discipline related to

10  drugs and --

11    A.    It wasn't drugs, it was prescribed drugs, so

12  let's --

13    Q.    Understood.

14    A.    Okay, okay.

15    Q.    Other than the discipline related to how you

16  described, prescribed drugs --

17    A.    Thank you.  Sorry.

18    Q.    No problem.  And other than this performance

19  improvement plan and the related documents, have you

20  ever been disciplined by WestRock?

21    A.    No.

22    Q.    Okay.  What is your understanding of a -- what

23  is your understanding that -- what is your understanding

24  of what impact a new sales plan would have on prior

25  sales plans?  In other words, if you're issued a new

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1  sales plan, is it your understanding that, that
2  supersedes prior sales plans?
3       MS. SLUSARZ:  Objection to form.  You may
4     answer.
5       THE WITNESS:  Yes.  I agree with that.
6  BY MS. AGRESTI:
7     Q.   Okay.  Do you believe that you were treated
8  less favorably than other specific employees?
9     A.   Specific?  I don't have that.  I was not
10 treated fairly, and I can't compare myself with -- or
11 with anybody else.
12    Q.   Understood.  Earlier you mentioned various
13 names, give me a minute here to pull up the list.  I'll
14 come back to that line of questioning in a minute.
15 Earlier you mentioned a supervisor named Peter?
16    A.   Yes.
17    Q.   What's his full name?
18    A.   Peter Brandt.
19    Q.   Peter Brandt.  Do you know whether Peter
20 Brandt himself has suffered from a disability?
21    A.   Yes, I do.
22    Q.   Has he in fact?
23    A.   Yes, he has.  That's why I said yes.
24    Q.   Are you aware whether any of your -- of your
25 other supervisors have suffered from a disability?

1     A.   No idea.
2     Q.   All right.  One of your allegations is that
3  you are or have been retaliated against.  Can you tell
4  me what the basis of that allegation is?
5     A.   You mean with Peter Brandt?
6     Q.   No.  Forget Peter Brandt a second, unless he
7  becomes relevant based on your testimony.  You allege
8  that you've been retaliated against in this lawsuit.
9  That's one of the allegations that you have made.
10    A.   Uh huh.
11    Q.   My question to you is why do you believe that?
12    A.   Because after he -- after I was suffering from
13 stage four pancreatic cancer and taking a special brand
14 new chemotherapy drug, and when I came back to work he
15 -- he sent me for a random drug test.  And didn't
16 understand that I was sick, and he blamed Rick Shue for
17 not telling him.  Because at that time Rick Shue worked
18 for Peter Brandt.
19       So my understanding was that Peter Brandt went
20 to Rick and said, why didn't you tell me he had cancer?
21 When we all know he knew, because I told him, and all of
22 Newark knew, but he played dumb, and he blamed Rick for
23 not telling him.  And that's why Rick left that division
24 and moved on to a different division, because he
25 couldn't work with him.

1     Q.   Is there anything else that you believe is
2  retaliation against you in this lawsuit?
3     A.   When they put me in the graphics division for
4  no commission.
5     Q.   Who do you believe was retaliating against you
6  in that instance?
7     A.   The company.  I mean it's the whole company.
8  I don't think, you know, Mark Van der Kloet did it, but
9  I'm sure he was told to.
10    Q.   So to be clear, you're saying Mark Van der
11 Kloet accepted you into the graphics division, you know,
12 unit, but he's not the one who made that decision?
13    A.   I have no idea who makes the decisions.  It's
14 a big company.  All I know is he knew I was sick and he
15 knew I was -- my life expectancy should have been five
16 years ago.
17    Q.   And I'm sorry, remind me again, how did Mark
18 Van der Kloet know that you were battling cancer in
19 2014?
20    A.   He heard through the grapevine, because he
21 called me if -- you know, I'm not sure when he called me
22 to see how I was feeling, but I know he did call me.  I
23 don't know if it was two months after or two years
24 after.
25    Q.   So you believe that when the reorganization

1  happened in 2019, you were being retaliated against
2  because you had been sick?
3     A.   Yeah.  And they didn't think I would last that
4  long, so, let's take his business and move it to where
5  it counts, and keep him out of everything.  So they gave
6  me a brand new job, and they didn't let me do my job
7  that I've been doing for 40 years, to create this
8  account.
9     Q.   From your perspective, were you servicing the
10 Pepperidge Farm account in an adequate way?
11    A.   I think in more than an adequate way.
12    Q.   How many times did you travel to Pepperidge
13 Farm in 2019?
14    A.   Oh, hundreds.  That's probably up there, three
15 -- three to four times a week.
16    Q.   What about in 2020?
17    A.   The same thing.  Wait a minute, when was the
18 pandemic?  I'm sorry.
19    Q.   I was going to say, did the pandemic impact
20 that?
21    A.   Yes.
22    Q.   What about in 2021?
23    A.   Was there still a pandemic then?  I forget.
24
25       MS. SLUSARZ:  Yes.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

1    THE WITNESS: Then no. Everybody was working
2    remote.
3    BY MS. AGRESTI:
4    Q. What about in 2022?
5    A. That's when it opened back up, but that's when
6    we were getting thrown out. So I was up there maybe
7    twice a week.
8    Q. You were up at --
9    A. At Pepperidge Farm in Connecticut.
10   Q. Twice a week?
11   A. At least.
12   Q. Would you submit reimbursement forms or
13   anything like that for your travel?
14   A. No.
15   Q. How would you document your travel to the
16   client?
17   A. By seeing them in my -- they saw me
18   personally. What do you mean how -- I didn't document
19   anything to the client. They called me, can you be up
20   here tomorrow? I said, I'm on my way.
21   Q. Would you have to document business expenses,
22   or reimbursements, or anything like that?
23   A. No. I don't like using computers, so the
24   tolls, it wasn't worth my time to enter it into my
25   expense report. It wasn't much money. I wasn't flying,

1    and if I took them to lunch, I took -- I paid cash.
2    Because I don't like submitting forms.
3    Q. Are your efforts, and the time and effort that
4    you were taking with the client, do you think it's
5    important for that to be documented?
6    A. No.
7    Q. What about in 2023? How often would you visit
8    the client?
9    A. Probably the same amount of time.
10   Q. One to two times a week?
11   A. Yeah. Two to three times a week.
12   Q. Two to three times a week. During these years
13   after your transfer in the reorganization, did you
14   generate any new contacts or accounts, outside of this
15   client, Pepperidge Farms?
16   A. No.
17       THE REPORTER: Repeat that answer.
18       THE WITNESS: I'm sorry?
19       THE REPORTER: I didn't hear your answer.
20       THE WITNESS: I said no. Sorry.
21   BY MS. AGRESTI:
22   Q. Do you believe that it was part of your role
23   to do so?
24   A. I think it was part of my role to increase
25   sales wherever I could get it. In my opinion, I don't

1    think it mattered where I got it from, from Customer A,
2    B, or C, as long as I got business.
3    Q. Are there any other specific instances of
4    retaliation that you are alleging in this lawsuit?
5    A. Off the top of my head, I can't think of any
6    right now.
7    Q. Okay. If you look at, I believe it's
8    Exhibit A, or is it B? Let me see.
9    A. Do you mind showing -- no, I'm kidding.
10   Q. Exhibit -- the third one, C. Thank you. If
11   you look at Paragraph 11 -- I'm sorry, Page 11,
12   Paragraph 51, it says, "Plaintiff complained to the EEOC
13   about the age discrimination to which he was subjected
14   during his employment with Defendant."
15   A. Okay.
16   Q. Can you tell me more or -- you haven't
17   mentioned that as part of your retaliation claims, and I
18   want to make sure that I fully understand your claims
19   here. So can you tell me more about that?
20   A. Well, they marginalized me because of my age.
21   They thought I was too old to handle the account, that's
22   why they demoted me to a customer service person, or a
23   business unit manager. And they thought I was too old
24   for it. They thought I would die any second, so let's
25   get some other people in there, because of my age.

1    Q. Are there any instances in which you were
2    retaliated against, is what I'm trying to understand?
3    A. By marginalized me, I don't want you talking
4    to anybody. I don't want you talking to our quality
5    team, or the factory people. You talk to your customer
6    service person.
7    Q. I'll come back to the retaliation piece in a
8    minute. You said that you could only talk to the
9    customer service person; is that Jessica?
10   A. Yes.
11   Q. Who specifically told you that?
12   A. I believe it was Mark Van der Kloet.
13   Q. Did David Steel tell you that?
14   A. David Steel came a few years after Mark, or a
15   year after. He just said, if you don't like it, quit.
16   Q. No. My question --
17   A. That's all he said. That's all he ever told
18   me. That's all he ever said to me.
19       And, I want to retire soon, what about you?
20   Q. I understand that, but it's important that we
21   actually get the specific words that were said.
22   A. Okay.
23   Q. My question to you is did David Steel ever
24   tell you that you can only deal with Jessica, in terms
25   of any issues with Pepperidge Farm quality control

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 126

1  concerns?
2      A.   No.  I doubt it.  I don't think so.
3      Q.   Did Nickie Parker ever tell you that you can
4  only deal with any quality concern issues by speaking
5  with Jessica?
6      A.   No.  I've only spoke to Nickie Parker twice.
7      Q.   And did Tammie -- did Tammie ever tell you
8  that you can only speak to Jessica?  Tammie Siracusa
9  ever tell you that you can only speak to Jessica about
10 any quality control issues for Pepperidge Farm?
11     A.   No.
12     Q.   In hindsight, do you believe that there was
13 more you could have done with the Pepperidge Farm
14 account?
15     A.   If Tammie would have been there earlier, yes.
16     Q.   What could have -- what, in your opinion,
17 might have happened?
18     A.   Well, I could have had conversations, and I
19 could have had conference calls with our quality team
20 and manufacturing team.  Before that, I wasn't allowed
21 to talk to anybody.
22     Q.   And by who specifically?  You said, "I wasn't
23 allowed," who did not allow you?
24     A.   Mark Van der Kloet.
25     Q.   Do you recall when you stopped reporting to

Page 127

1  Mark Van der Kloet?
2      A.   When he got fired or quit.
3      Q.   Do you know what year approximately?
4      A.   No.  2022, maybe.
5      Q.   Okay.
6      A.   Or 2023.  I'm not sure.
7      Q.   Okay.  Did you ever complain -- strike that.
8  So other than the drug test that you said was ordered by
9  Peter Brandt, and other than the reorganization that you
10 said the company did, but Mark Van der Kloet
11 communicated, are there any other instances of
12 retaliation in this matter?
13     A.   I don't think so.  And can I just say
14 something?
15     Q.   Absolutely.
16     A.   I was allowed to talk to Rick Shue also.  I
17 was allowed to talk to him.  I only said Jessica, but I
18 was allowed to speak to him.
19     Q.   Okay.  What was Rick Shue's role in the
20 relationship with Pepperidge Farm?
21     A.   He was my customer service person for 30 --
22 30 years.  And he also was my sales manager back in, I
23 don't know, 2005 or 2010.  No.  In, I don't know, 2014,
24 he became my sales manager, and he did all the pricing.
25     Q.   Did Rick support you with the Pepperidge

Page 128

1  Farms' account?
2      A.   Yes, he did.
3      Q.   How was your role different than Rick's?
4      A.   Rick was my inside guy, my customer service
5  person.  So he would give me prices, he would tell me
6  when they were running jobs, if I asked him.  He'd tell
7  me when jobs would be shipped, and that's --
8      Q.   And your role was different in that --
9      A.   My role was getting the orders.
10          I'm a salesman outside, bring in the orders,
11 we'll take care of it.
12     Q.   Okay.
13     A.   So I brought the orders in, Rick would enter
14 the orders or give it to another customer service, and I
15 would communicate through him.
16     MS. AGRESTI:  Okay.  All right.  Can we go off
17   the record a minute?
18     THE VIDEOGRAPHR:  Off the record at 2:24.
19     (OFF THE RECORD)
20     THE VIDEOGRAPHR:  Back on the record at 2:39.
21 BY MS. AGRESTI:
22     Q.   Have you suffered any injuries as a result of
23 the alleged unlawful discrimination you've alleged in
24 this matter?
25     A.   No.

Page 129

1      Q.   Have you seen or sought medical treatment as a
2  result of any of the allegations in this complaint?
3      A.   Maybe.
4      Q.   What does that mean?
5      A.   That means I see a lot of doctors recently,
6  more often now than before this happened.
7      Q.   Okay.  Did you see those doctors before the
8  allegations in this lawsuit?
9      A.   On occasion, yes.
10     Q.   Okay.  And how has that changed since?
11     A.   Well, I was sick in 2014, and now ever since
12 the incident, I have been not feeling well.
13     Q.   Which incident?
14     A.   I'm sorry?
15     Q.   Which specific incident?  You said ever since
16 this incident, so I'm trying to --
17     A.   When they took away my commission job and made
18 me a customer service or a business unit manager.  And
19 that was when --
20     Q.   So ever since you became a graphics business
21 manager?
22     A.   That's -- that's correct.
23     Q.   Okay.  And why is that?
24     A.   Stress.  Harassment.  That I got fired from a
25 job that I increased sales from zero to $16.5 million.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 130

1    Q.   You say harassment, that's a very specific
2 word.  So what are you referring to?
3    A.   Well, when they cut me -- when they fired me
4 from my job for 45 years, and they told me I'm making
5 70 percent less, and now you're going to be a customer
6 service person, that's when it -- that's when I started
7 feeling worse and worse.
8    Q.   But a customer service person, is that really
9 what you were?
10    A.   A graphics business manager, in my mind,
11 that's what it is, a customer service person.
12    Q.   Okay.
13    A.   Because they're not going out there getting
14 new accounts, they're servicing existing internal
15 accounts.
16    Q.   Didn't we look at the job description --
17    A.   Yes.
18    Q.   -- and that included getting new accounts?
19    A.   That's correct.
20    Q.   So it does include getting new accounts?
21    A.   At the beginning, it did not.  They did not
22 have a plan when they first hired me there.  All Mark
23 Van der Kloet says, just do what you're doing, and we'll
24 discuss your commission every few months, up or down,
25 depending on how much sales you generate.

Page 131

1    Q.   But -- sorry.  But that changed, correct?
2    A.   That's correct.
3    Q.   Would you say that an individual who is not
4 building relationships with new customers is not
5 fulfilling the role of a graphics business manager?
6    A.   I'm not 100 percent -- I guess so, yeah.  I
7 guess.
8    Q.   So who have you been seeing for this medical
9 treatment?
10    A.   A few doctors.
11    Q.   Who?
12    A.   You want doctors' names?
13    Q.   Yes, please.
14    A.   Dr. Myron Schwartz, Dr. William Sherman, I've
15 got a Dr. Wolfe.  I've got a Dr. Nguyen.  And I'm sure
16 I've got a few more doctors that I can't think of right
17 now.
18    Q.   Okay.  First, for Dr. Myron Schwartz, what
19 does he or she treat?
20    A.   Liver.
21    Q.   Okay.
22    A.   He's a liver surgeon.
23    Q.   Okay.  And were you -- when did you begin
24 seeing Dr. Schwartz?
25    A.   In 2014.

Page 132

1    Q.   Okay.  So Dr. Schwartz is -- is -- is
2 Dr. Schwartz treating you for the stress that you
3 specifically said a few minutes ago, related to the
4 claims in this matter?
5    A.   No.
6    Q.   Okay.  What about Dr. Sherman?
7    A.   He's treating me.
8    Q.   For the stress related to the claims in this
9 matter?
10    A.   He's basically -- he's an oncologist --
11    Q.   Okay.
12    A.   -- and he's basically my primary care doctor.
13    Q.   Okay.
14    A.   Because all his patients usually die from
15 pancreatic cancer.  So I'm basically the last man
16 standing, so he treats me.
17    MS. AGRESTI:  I'm going to ask Counsel, if you
18 could provide a HIPAA authorization form for
19 Dr. Sherman?
20    MS. SLUSARZ:  Uh huh.
21 BY MS. AGRESTI:
22    Q.   What about Dr. Wolfe?
23    A.   I'm not even sure what kind of -- she's a -- a
24 heart specialist.
25    Q.   Is Dr. Wolfe treating you for the stress that

Page 133

1 you allege was caused by the claims in this litigation?
2    A.   Well, now I have heart issues, so I'm sure
3 that's part of it.  Yes.
4    Q.   When did the heart issues begin?
5    A.   Two years ago, three years ago.  I'll show you
6 my heart monitor I'm wearing.  Around two, three years
7 ago.
8    MS. AGRESTI:  Okay.  We'll also ask for HIPAA
9 authorization forms for Dr. Wolfe, please.
10 BY MS. AGRESTI:
11    Q.   And what about Dr. Nguyen?
12    A.   She's a cardiologist.
13    Q.   And do you believe that you are treating with
14 -- or are you treating with Dr. Nguyen for the stress
15 you are alleging was caused by the claims in this
16 litigation?
17    A.   Probably, yes.
18    Q.   What do you see Dr. Nguyen for?
19    A.   For my heart.  She's a cardiologist.
20    MS. AGRESTI:  Can you also -- I'm asking
21 counsel to also provide HIPAA authorization forms
22 for Dr. Nguyen.
23 BY MS. AGRESTI:
24    Q.   Are there any other doctors that you can
25 recall or remember, in which you have sought medical

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 134

1  treatment for as a result of the claims in this
2  litigation?
3      A.  I don't think so.
4      Q.  Okay.
5      A.  I don't remember.
6      Q.  Okay.  Have you been hospitalized as a result
7  of the allegations in this claim?
8      A.  No.
9      Q.  Are you on any medication as a result of the
10  claims in this litigation?
11      A.  I might be, yes.
12      Q.  What medication?
13      A.  Xanax.
14      Q.  Who prescribed the Xanax?
15      A.  Dr. Sherman.
16          MS. AGRESTI:  Okay.  I believe Dr. Sherman's
17      one I already asked for a HIPAA authorization form
18      for, but if not, they can be added.
19  BY MS. AGRESTI:
20      Q.  Any other medication?
21      A.  No.
22      Q.  Okay.  And these symptoms remain to this day?
23      A.  Yes.
24      Q.  Did you see Dr. Schwartz, Dr. Sherman,
25  Dr. Wolfe, or Dr. Nguyen prior to 2019?

Page 135

1      A.  Yes.
2      Q.  Okay.
3      A.  Not -- not all of them.
4      Q.  Which ones?
5      A.  Dr. Sherman and Dr. Schwartz.
6      Q.  Okay.
7      A.  Those are the two guys that saved my life.
8      Q.  Have you engaged a medical expert in this
9  litigation, if you know?
10      A.  No.
11      Q.  When is the last time that you saw Dr.
12  Schwartz?
13      A.  I saw him in June.
14      Q.  2024?
15      A.  Yes.
16      Q.  When is the last time you saw Dr. Sherman?
17      A.  The same time period.
18      Q.  When is the last time you saw Dr. Wolfe?
19      A.  The same time period.
20      Q.  And when is the last time you saw Dr. Nguyen?
21      A.  Two weeks ago.
22      Q.  Okay.  Do you have any social media?
23      A.  Yes.
24      Q.  What social media do you have?
25      A.  Facebook, LinkedIn, and Instagram.

Page 136

1      Q.  Have you mentioned or discussed your
2  allegations or WestRock in any of your social media
3  posts?
4      A.  I don't post anything.  I just, like, hunt
5  around for my children, I think.
6      Q.  Are you currently receiving Social Security
7  benefits?
8      A.  Yes.  Just started.
9      Q.  Are you currently receiving unemployment
10  benefits?
11      A.  No.
12      Q.  Are you currently receiving any other income?
13      A.  No.
14      Q.  All right.  There's some background
15  information that I didn't gather from you at the
16  beginning, and so I'll do that now.
17          I assume you -- did you graduate from high
18  school?
19      A.  Yes.
20      Q.  Did you graduate from college?
21      A.  No.
22      Q.  Did you attend college?
23      A.  Yes.
24      Q.  What college did you attend?
25      A.  Queensborough Community College.

Page 137

1      Q.  Have you attended any vocational or
2  apprenticeship programs, or schools of other sorts?
3      A.  Electrical apprentice.  You know, right out of
4  high school.
5      Q.  Do you have any professional certificates, or
6  licenses, or credentials?
7      A.  No.
8      Q.  Okay.  Have you ever been fired, or demoted,
9  or asked to resign from a job, other than WestRock?
10      A.  No.
11      Q.  WestRock, sorry.  What would you like out of
12  -- what are you hoping to accomplish with this
13  litigation?
14      A.  Something that's fair to me.
15      Q.  Is there anything that we have not talked
16  about, related to age and your allegations of age
17  discrimination, that form the basis of your complaints
18  in this litigation?
19      A.  I think we covered it now.
20      Q.  Is there anything that we have not discussed
21  that is relevant to your claims of disability or
22  perceived disability discrimination in this litigation
23  that we have not yet discussed?
24      A.  I don't think so.
25      Q.  Is there anything related to retaliation, as

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 138

1  it relates to your claims in this litigation, that we

2  have not yet discussed?

3     A.  I don't think so.

4     Q.  Is there anything related to your compensation

5  that we have not yet discussed that is relevant to the

6  claims in this litigation?

7     A.  No.  I don't think so.

8        MS. AGRESTI:  Okay.  All right.  I think I'm

9  going to take five minutes here and see if I'm -- if

10  I'm all done.

11       THE VIDEOGRAPHR:  Okay.  Off the record at

12  2:51.

13       (OFF THE RECORD)

14       THE VIDEOGRAPHR:  Back on record at 2:56.

15       MS. AGRESTI:  Okay.  I don't have any further

16  questions at this time.

17       MS. SLUSARZ:  Okay.  And I don't have any

18  questions right now.

19       THE REPORTER:  Okay.

20       THE WITNESS:  Do you guys have any questions

21  for me?

22       MS. AGRESTI:  Thank you.

23       THE VIDEOGRAPHR:  We're off the record at 2:57.

24       (DEPOSITION CONCLUDED AT 2:57 P.M. ET)

25

Page 139

1         CERTIFICATE OF REPORTER

2          STATE OF NEW YORK

3

4  I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Title page here of by me after

7  first being duly sworn to testify the truth, the whole

8  truth, and nothing but the truth; and that the said

9  matter was recorded digitally by me and then reduced to

10  type written form under my direction, and constitutes a

11  true record of the transcript as taken, all to the best

12  of my skill and ability. I certify that I am not a

13  relative or employee of either counsel, and that I am in

14  no way interested financially, directly or indirectly,

15  in this action.

16

17

18

19

20

21

22  ESTHER HEATH,

23  COURT REPORTER / NOTARY

24  MY COMMISSION EXPIRES ON:  12/27/2026

25  SUBMITTED ON:  08/02/2024



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

CHURCHILL
— REPORTING —



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

CHURCHILL
REPORTING