# In the Matter of

Case No. 23-Civ-6252 (JPC)

KRIMSKY

v.

WESTROCK COMPANY, et al.

---

## Examination of Nickie Parker

*Monday, July 29, 2024*

---

**CONDENSED**

The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
MARSHALL KRIMSKY,
Plaintiff,

-against-

Case No.: 23:Civ-6252 (JPC)

WESTROCK COMPANY and WESTROCK SERVICES, LLC,
Defendant.
----------------------------------------X

July 29, 2024
9:36 a.m.

Examination of NICKIE PARKER, held pursuant to Notice, held via Zoom conference, before Ruthayn Shalom, a shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :

GODDARD LAW PLLC
Attorneys for Plaintiff
39 Broadway, Suite 1540
New York, New York 10006
BY: FRANCES CODD SLUSARZ, ESQ.
frances@goddardlawny.com

COZEN O'CONNOR
Attorneys for Defendant
3 World Trade Center
175 Greenwich Street, 55th Floor
New York, New York 10007
BY: JANICE SUED AGRESTI, ESQ.
jagresti@cozen.com

ALSO PRESENT:
Marshall Krimsky
Anissa Floyd, Esq., Smurfit WestRock

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be sworn to before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the said examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections to questions except as to form shall be reserved for trial.

N I C K I E P A R K E R, having been first duly sworn by Ruthayn Shalom, a Notary Public of the State of New York, and stating her address as 1000 Abernathy Road, Atlanta, Georgia 30328, was examined and testified as follows:

EXAMINATION BY
MS. SLUSARZ:

Q Good morning, Ms. Parker. My name is Fran Slusarz. I represent Marshall Krimsky in a lawsuit that he brought against WestRock, and I'm going to ask you some questions today about your experience both working with WestRock and working with Mr. Krimsky.

A few things to go over before we start. Everything we each say when we're on the record is taken down word for word by the court reporter. That means it's important for us not to speak over each other. Please let me finish the question before you begin to answer. I'll try not to interrupt you as well. If at any time you don't understand a question, ask me to rephrase it because if you answer a question, I'm going to assume that you knew what I meant.

Do you have any medical conditions

N. Parker

that could affect your ability to recall or relay facts?
A No.
Q Are you on any medication that affects your ability to recall and relay facts?
A I'm not.
Q Are you currently under the influence of any illicit drugs or alcohol?
A I'm not.
Q Do you know that you need to speak truthfully today to the best of your knowledge?
A Yes.
Q Have you previously given testimony under oath?
A I have not.
Q Do you have any criminal convictions?
A I do not.
Q Have you ever been a party to a lawsuit?
A I have not.
Q Have you ever complained about discrimination in the workplace?
A I have not.
Q Did you discuss today's deposition with anybody?

N. Parker

A Yes.
Q Who did you discuss it with?
A With Anissa Floyd that's here in the room, and also with Janice Agresti.
Q Anyone else?
A I think I told my husband what was happening but not details.
Q Did you review any documents to prepare for today's deposition?
A I looked at the claim, I looked at -- I think that's about it.
Q Okay.
MS. SLUSARZ: Can we go off the record for a second?
(Whereupon, an off-the-record discussion was held.)
BY MS. SLUSARZ:
Q Ms. Parker, what is the highest level of education you've completed?
A I have a master's degree in business.
Q What school did you go to to get that?
A Tulane University.
Q Did you have any particular focus in your master's program?
A International business.

N. Parker

Q Do you have a bachelor's degree?
A I do.
Q What did you study as an undergrad?
A Chemical engineering.
Q Where did you get your chemical engineering degree?
A Texas A&M University.
Q Do you have any other higher education degrees?
A I do not.
Q Do you have any professional licenses?
A I do not.
Q Trade group certifications?
A Not certifications. I'm part of a trade group but not certifications.
Q You testified before that you're married; is that correct?
A I am, yes.
Q Do you have any children?
A I do not.

N. Parker

Q What is your date of birth?
(Whereupon, the following testimony was deemed confidential)
A PII/Confidential 1974.
MS. AGRESTI: Mark that confidential on the record, please.
MS. SLUSARZ: Sure.
MS. AGRESTI: Thank you.

N. Parker

BY MS. SLUSARZ:

Q You just turned 50?

A I did.

Q Who is your current employer?

A Smurfit WestRock.

Q What is your title at Smurfit WestRock?

A SVP of commercial.

Q What does that entail?

A I have responsibility for our corrugated packaging sales, our marketing, also our commercial excellence.

Q What do you mean by commercial excellence?

A Commercial excellence, that group manage pricing for our sales team, it also manages -- connected with our HR department, manages sales training, learning and development, it also helps us with our commercial strategy.

Q When did you become senior vice president of commercial?

A About three weeks ago in that role.

Q Congratulations.

A Thanks.

Q Before you were the senior vice president of commercial, what was your title?

N. Parker

A I was senior vice president commercial but for our business in the south.

Q When did you become senior vice president of commercial for the south?

A October of 2022.

Q What were your job responsibilities as senior vice president of commercial for the south?

A I had responsibility for all of our sales for our 33 plants across corrugated in the south, I also had responsibility for several of our end-of-market segments including our industrial packing, our home beauty and health packaging, our beverage packaging and our sheet feeders.

Q What is a sheet feeder?

A They make corrugated sheets that they sell to somebody else to make the box. So it doesn't actually make the box, we just sell the sheet of corrugated.

Q Before you were senior vice president of commercial for the south, what was your next most recent job with WestRock?

A Before that, I was senior vice president of our merchandising displays and graphics solutions business.

N. Parker

Q How long did you have that role?

A I started about our merchandising displays business in about March of 2021 and then also got responsibility or our graphics solutions part of the business around February of 2022.

Q What were your responsibilities as the senior vice president of merchandising displays and graphics solutions?

A Sure. We had a business that does point of purchase displays, so manufacturers and sales point of purchase displays to the market. When I first took on that responsibility, just had the displays business and so again, sales and operations for that business.

Then about a year into that role we had a separate business called graphics solutions, and the leader of that business was retiring so I brought those two businesses together and graphics solutions was the business that did preprint and managed litho laminating rolls to sell into the corrugated packaging business.

Q What is the name of the manager who retired?

A His name as Mark van der Kloet.

N. Parker

Q When did you first join WestRock or one of its predecessor entities?

A As a summer intern during college, so in the summer of '93 I spent several summers as a summer intern and then joined full time in March of 1998 after I graduated.

Q In what year did you receive your MBA?

A 2011.

Q And your chemical engineering degree?

A December of 1997.

Q Before you were the senior vice president of merchandising displays, what was your next most recent role with WestRock or one of its predecessors?

A Vice president of commercial excellence.

Q What timeframe were you vice president of commercial excellence?

A October of 2016 until I took the role in merchandising displays.

Q Before vice president of commercial excellence, what was your role?

A I was managing director of our business in Asia Pacific.

Q During what time were you managing

N. Parker

director of the Asia Pacific business?

A I went to Shanghai from 2013, July 2013 until 2016. I went over as head of sales but I became managing director some time after I got there. I don't remember exactly when.

Q Before you went to Shanghai, what was your role at -- what was the name of the corporation at the time?

A MeadWestvaco.

Q Before you went over to Shanghai, what was your role at MeadWestvaco?

A I was a vice president of our liquid packaging business.

Q That's packaging for liquids, not packages made out of liquid, correct?

A Correct, it's for liquid.

Q During what timeframe did you have that role?

A Let me think. So I would say I started in the liquid packaging business in 2011 as that role, about 2011.

Q Before liquid packaging, what was your role?

A I had been in our liquid packaging

N. Parker

business for several years and with increasing responsibility, so I believe I was a senior leader for our Americas and Europe business, before that just our Americas business. I had been in that liquid packaging business for quite a while.

Q That started in 2011?

A That started back in about 2004 when I started in liquid packaging and then had success over gained additional responsibility through those years.

Q Before you started in liquid packaging, what were your responsibilities?

A I was the quality assurance manager at our Evedale, Texas paper mill.

Q During what time frame were you the quality assurance manager?

A So without looking at my resume, it was 2003, 2004, right in those few years. 2005, we are getting way back now. It was right around those times.

Q Before that?

A I was a technical sales service representative.

Q What did that involve?

N. Parker

A I worked with customers on quality issues or developing new products and worked between our operations and our customers.

MS. AGRESTI: I'm sorry, this is Janice. Can we go off record for a minute? We need to disable Teams on Ms. Floyd's laptop so messages are not appearing.

MS. SLUSARZ: Okay.

(Whereupon, a short recess was taken.)

BY MS. SLUSARZ:

Q We were talking about your role as a technical sales service representative.

Were you a commissioned salesperson in that role?

A No.

Q Have you ever been a commissioned salesperson at WestRock or one of its predecessors?

A I have not been.

Q Before technical sales service rep, what was your role?

A That was my first role out of college. First full-time role.

Q Currently to whom do you report?

A I report to the president of the

N. Parker

corrugated packaging business.

Q Who is that?

A Donald Sperico.

Q So we are clear, in your current senior vice president of commercial role, are you responsible for the entire United States or global?

A United States and Canada.

Q How many direct reports do you currently have?

A At least eight that I can think of right now.

Q What are their titles?

A I have a senior vice president of commercial for the west, I have a senior vice president of commercial for the midwest, I have a senior vice president of commercial in the north Atlantic, I have a vice president of marketing, I have a vice president of commercial excellence, I have a general manager for our joint venture, I have two field sales managers, and I also am still playing the role as the south leader because I have not filled that role yet, so I have another set of direct reports that would be for that role as the south leader, and I'm happy to go through all of

N. Parker

those as well but hopefully at some point, I'm replacing myself in that south role. I wouldn't consider those direct reports for this current role.

Q Ordinarily there would be a senior vice president of commercial for south but it's an open position?

A It's an open position right now. There is about another eight people that report to that role that are still at this point reporting to me.

Q Who is the senior vice president of commercial for the west?

A Mark Rikkard.

Q And for the midwest?

A Jeff Turner.

Q What about for the north Atlantic?

A Tim Kelly.

Q Who is the vice president of marketing?

A Jeremy Keenan.

Q And the vice president of commercial excellence?

A Brittany McCall.

Q Who is in charge of joint ventures?

A Simon Shaw.

Q The field sales managers?

N. Parker

A Dino Abbot and Tim Kocher.

Q The field sales manager, do they have commissioned salespeople reporting to them?

A One does, yes.

Q To your knowledge, are they paid exclusively on commission or a combination of salary and commission?

A I actually don't know. That's for our sheet feeder business.

MS. SLUSARZ: Can you give me one second off the record?

(Whereupon, an off-the-record discussion was held.)

BY MS. SLUSARZ:

Q How often are performance evaluations performed at WestRock?

A Formally yearly.

Q Is it on a cycle for the entire company at one time or is it based on your anniversary?

A No. It's all on a cycle at the same time for everyone across the organization.

Q When does that happen?

A About September, October of each year. At the end of what was our fiscal year.

Q Do you no longer have a fiscal year?

N. Parker

A Correct. With new Smurfit WestRock, we will be a calendar year.

Q When was it changed over from WestRock to Smurfit WestRock?

A Officially on July 5th and our first official day was on Monday, July 8th.

Q Are you familiar with Marshall Krimsky?

A Yes.

Q How do you know Mr. Krimsky?

A When I took on responsibility for our graphics solutions business, he was part of our graphics solutions business.

Q How would you describe your relationship with Mr. Krimsky?

A I would say he was a sales rep that was part of our graphics business and I started to get to know him once I joined that business as the leader.

Q Was it a tense relationship, was it just professional?

A Just a professional relationship.

Q Did Mr. Krimsky ever complain to you about how he was treated by any of his managers at WestRock?

N. Parker

A Not that I recall.

Q Were you involved at all in the closing of the Newark facility in 2019?

A I was not.

Q Were you involved at all in the decision to transfer Mr. Krimsky to the graphics solutions business?

A I was not.

Q When you were the senior vice president of merchandising displays and graphics solutions, how was the graphics solutions department organized?

A We had an operations leader and then we had a sales leader and then when I took responsibility for it, Marshall was not reporting to that sales leader and then I also had a supply chain leader. So the sales team, when I think about who had reporting to me, that was the groups at that time.

Q You said Marshall wasn't reporting to the sales leader. To whom did you report?

A Directly into Mark van der Kloet when I took on the team.

Q Were there any other sales representatives in the graphics solutions department?

N. Parker

A Yes. A guy named David Steele had sales representatives that reported to him. Marshall was a sales representative and we also had a sales representative that sold rolls externally.

Q What do you mean by sold rolls externally?

A For the most part, we sell boxes to our customers, but we had one representative that sold printed roll so that someone else could make the boxes.

Q David Steele's two sales reps, one sold boxes and one sold printed rolls?

A No. David Steele had a team of sellers, several, I don't remember how many but at least four or five. So there was a team of sellers under David Steele. They all sold boxes but they were high graphics printed, so graphics solutions. And then we had a gentleman that only sold rolls that were printed to someone else who would turn it into boxes, so kind of our competition. He sold rolls to our competition is the way to think about that.

Q Where did the graphics business managers fit into the organization?

A They worked for David Steele. They worked for David Steele.

N. Parker

Q Was David Steele the sales leader?

A He was, yes.

Q What were the graphics business managers responsibilities?

A They were experts in understanding of our graphics business and worked with customers and worked internally with our plants on trying to sell value to customers of high graphics business.

Q Were they organized by geographic location?

A I don't remember how they were organized at that time.

Q Do you recall if they only took orders from the sales representatives on David Steele's team?

A I don't understand that question.

Q Okay. Correct me if I'm wrong, my understanding is that the graphics business managers -- that sales representatives brought opportunities to the graphics business managers; is that accurate?

A That's not the only way that happened. That definitely was part of the role, but there was also an expectation that graphics business managers

N. Parker

were working directly with customers and looking for new opportunities or managing current opportunities.

Q Were they looking for new customers or looking for new opportunities with existing customers?

A Both.

Q Did they work with sales reps from other divisions within the organization?

A That was part of their role, yes.

Q Who were the graphics business managers when you were in charge of merchandising displays and graphics solutions?

A I probably won't be able to name them all, but I can try to name as many as I remember. Patty Metalco, Tony Patarinni, Nicole Contraris, someone with the last name of Shu, I think it's Richard, Jeff Walker, I think was his name. That's all I can remember right now.

Q What was Marshall Krimsky's title when you were in charge of graphics solutions and merchandising displays?

A I don't remember what it was whenever I came into the business. I don't remember what it was, but I believe we made him a graphics business

N. Parker

manager.

Q Why did you make him a graphics business manager?

A He was doing the same role as the others, he was part of our graphics business and so it was important to have some consistency in our sales team so that everybody that was selling externally to customers were part of the same team and doing the same function.

Q Why was that important?

A When I look at the scope and span of what I had across both graphics and displays, I think it was important that we were consistent with our customers and while I believe he had just one customer, I think it was important that he was part of the broader team that managed our graphics solutions business.

Q Were there -- did problems arise when he was not in any consistent position with the rest of the graphics solutions department?

A One of the things I noticed right away, one of our expectations across every seller in WestRock in every division is that you're in Salesforce.com tracking opportunities, looking to

N. Parker

grow new opportunities, and I noticed Marshall was not part of our Salesforce.com system. And training had been provided to everyone at WestRock, every seller, no matter what your role. So driving that consistency was important to me as a leader of this new business.

I also think it was important that we were doing things like call reports and visits and that we had some oversight in consistency in that, and one of the things I noticed right away is that Marshall didn't give me any expense reports. There wasn't a clear understanding that when he was visiting customers, because there were no expense reports that suggested he was traveling or taking customers out for lunch or any of those things. It was important to me that we drive consistency on the customer experience we are creating, so being part of the sales team that he was a part of was important.

Q In the graphics solutions department, who had the highest sales?

MS. AGRESTI: Objection to form. You may answer.

A What do you mean the highest sales?

N. Parker

Q Who brought in the greatest sales volume of the salespeople in the graphics solutions; department?

A I don't know the answer to that.

Q Who were the top five customers of the graphics solutions department?

MS. AGRESTI: Objection to form. You may answer.

(Whereupon, the following testimony was deemed confidential)

A The largest was a customer called -- is Confidential and it's probably over a Confidential dollar business for graphics solutions business. If we look at the total of that graphics solutions business, it's almost a Confidential dollar business. If you think about the number of sellers we have, there are quite a few really large customers across that business.

(Whereupon, the following testimony was deemed not to be confidential)

MS. AGRESTI: Can we mark the numbers that were provided confidential, please?

MS. SLUSARZ: Yes.

MS. AGRESTI: Thank you.

N. Parker

BY MS. SLUSARZ:

Q Was Pepperidge Farm considered a large customer?

A I don't remember the exact size but I would have considered them a midsize customer for us.

Q Do you remember what their sales volume was for the fiscal year that ended September 30, 2022?

A I do not.

Q When you were in charge of graphics solutions and merchandising displays, were you aware that Mr. Krimsky had a history with cancer?

A I did not.

Q Who is the oldest salesperson in the graphics solutions business?

MS. AGRESTI: Objection to form. You may answer.

A I have no idea.

Q Did you know that Mr. Krimsky was in his 60s when you were in charge of graphics solutions and merchandising displays?

A I did not know that.

Q When you were in merchandising displays

N. Parker

and graphics solutions, did you receive any sales override on sales generated by the graphic business team?

MS. AGRESTI: Objection, form.

A Can you ask that again or in a different way? I'm not sure I understand what sales override means?

Q Did you receive a commission or bonus based on the sales volume generated by your department?

A Me, I did not.

Q Do you know if the -- did the head of sales -- sales leader receive any bonus or commission generated from his division?

MS. AGRESTI: Objection to form. You may answer.

A The head of sales would have been on a salary plus stip and most of that was based on WestRock overall results.

Q What do you many by plus stip?

A Short-term incentive plan. That would be what I would consider a yearly bonus.

Q Was any component of the short-term incentive plan tied to the performance of his group?

N. Parker

A I don't know. I don't remember if his was.

Q Why was Mr. Krimsky's compensation changed as of October 1, 2022?

A When I took on the responsibility for the graphics business, Mark van der Kloet was retiring and we had probably two to three weeks of overlap that he was able to pass along all of the open items to me as he was leaving. He, at the time told me when Marshall came into the graphics business, he told him he would hold his salary constant for a year, and then he would be moving him to the graphics business manager compensation plan.

And Mark admitted to me he hadn't taken care of it yet. I knew I needed to make that change. I was going to move him into David Steele's group so that all of our sellers were part of one team, and so Mark had told me he had communicated to him that change was going to be made. So at the time, I think it was October 1st of that year which was our new fiscal year, we moved him into David Steele's team and made his compensation consistent with the rest of the graphics business managers.

Q He moved to Mark van der Kloet's team in

N. Parker

2019, correct?

A I don't know.

Q Do you know how long Mark van der Kloet paid him -- held his income constant?

A I don't know.

Q Would it surprise you to learn that it was three years?

MS. AGRESTI: Objection to form. You can answer.

A I don't know how long it was.

MS. SLUSARZ: I would like to take a ten-minute break. It's 10:20. Can we break until about 10:30?

MS. AGRESTI: That's fine with us.

(Whereupon, a short recess was taken.)

BY MS. SLUSARZ:

Q Ms. Parker, are you familiar with the contract between WestRock and Campbell's/Pepperidge Farm?

A I'm familiar there is one. I don't know that I'm familiar with a lot of the details.

Q What do you know about it?

A I believe they have been a customer for a long time. I believe we lost quite a bit of

N. Parker

position here over the last two years. I would say they're high level, that's what I understand about it.

Q Who was responsible for securing that contract for WestRock?

A Originally, I don't know.

Q The most recent written contract, who was responsible for securing that agreement with Campbell's/Pepperidge Farm?

A I actually don't know.

Q When you took over for Marshall van der Kloet, did you have any discussions about whether Mr. Krimsky would fit as a graphics business manager?

A No.

Q Did you consider other positions for Mr. Krimsky?

A I considered that he was a salesperson and our sales team was all part of David Steele's team and so that was my consideration. I didn't consider him for other things outside of sales.

Q You mentioned before there were sales representatives that reported to David Steele. Am I summarizing your testimony, correctly?

N. Parker

A I would use the word sales representative and graphics business manager interchangeably. I would consider those all salespeople.

Q Is it correct to say that there were no sale representatives who were not also graphics business managers?

MS. AGRESTI: Objection to form. You can answer.

A On David Steele's team?

Q Yes.

A Yes. I believe their title was all graphics business manager that I recall, but again I would use those two terms interchangeably. They were salespeople that worked with customers so I would consider those salespeople.

Q To your knowledge, at the time when you were in charge of merchandising displays and graphics solutions, to your knowledge, did WestRock employee traditional outside salespeople?

A Can you define what you would call traditional outside salespeople?

Q People who were, I guess, exclusively commissioned outside salespeople?

A Our graphics business team did not have

N. Parker

any commissioned outside salespeople.

Q To your knowledge, did any of the other teams within WestRock have commissioned outside salespeople?

MS. AGRESTI: Objection to form. You can answer.

A Other team within WestRock do.

Q What are those teams?

A Our corrugated packaging team has commissioned outside sales reps, our consumer packaging team has commissioned outside sales reps.

Q Any other group?

A Those are -- I believe most of our paper sales reps are not commissioned, but there could be people on that team but it's been many years since I have been part of that team.

Q Did you talk to Mr. Krimsky about the change in his job title?

A I did.

Q What was the substance of those communications?

A I remember telling him that it was important for me as I came into this role to have organizational consistency and moving him into David

N. Parker

Steele's team and having him part of that group was important.

Q Why was it important to the company to have him in David Steele's team?

A I believe it's important for a salesperson to drive a consistent experience for our customers, so if you think about WestRock, we have come together over the years through acquisitions and mergers. For me, when we approach a customer I think that customer experience we deliver is very important and so having a team that works consistently on how they create consistent experience for customers, whether you're part of our graphics business team or wherever you are in our business, creating that experience is important. Having just one person report separately, I don't think does very much to drive that consistency so having everyone part of a sales team was going to be important.

Q If he was the only one calling upon Pepperidge Farm, wouldn't keeping him in his role maintain consistency with that customer?

MS. AGRESTI: Objection to form. You can answer.

N. Parker

A We also may have had people from consumer packaging calling on that team. I do know they worked with people from our displays business and so with that logic, every single sales rep should be separate. What's important to me is we are driving consist for all of our customers, not just an individual customer. That's why it was important that it was part of the sales team.

Q Was the decision to make Marshall Krimsky a graphics business manager successful vis-a-vis Pepperidge Farm and Pepperidge Farm's business?

MS. AGRESTI: Objection, form. You may answer.

A I don't know how -- are you asking from Pepperidge Farm's standpoint or from my standpoint?

Q From the standpoint of WestRock. Was making this universal experience or consistent experience something that worked well for Pepperidge Farm?

MS. AGRESTI: Objection to form. You may answer.

A I don't know how to answer that question. I think having -- because another part of working with customers is customer service experience, the

N. Parker

operational experience, and so for our team being able to work with that customer the same way was important, so I would call that successful, so I think it drove consistency within our business in an important way.

Q Didn't WestRock lose a lot of its business with Pepperidge Farm after the changeover in Mr. Krimsky's job?

MS. AGRESTI: Objection, form. You may answer.

A I don't know. I have heard that we lost business. I don't know the timing of when we lost business or how much we've lost. That was after the time I left the graphics business.

Q Have you ever made any statements about Mr. Krimsky's age?

A No, I don't know Mr. Krimsky's age.

Q Have you ever said anything like, he's old?

A I have not.

Q Have you ever said anything suggesting that he's getting ready to retire?

A I have not.

Q If he was going to retire in a short

N. Parker

period of time, would that inform your drive for consistency in Pepperidge Farm's experience with WestRock?

MS. AGRESTI: Objection, form. I think it calls for a hypothetical. You may answer.

A I have no idea if he was going to retire.

Q Were you concerned that he was going to retire?

A I had no idea of his age. I had no idea if he was going to retire. To be clear, this was during the days about a year after Covid, so most of our meetings were on Teams. To me, I believe from a cultural standpoint I like to see someone's face and talk to them. I've never seen Mr. Krimsky. I have no idea what his age is. I had never even see him to be able to understand if he was close to retiring.

Q Did you tell him you hoped he saved up a lot of money when he was earning all commissions?

A I don't think I said that.

Q Were you present when anyone else made comments about Mr. Krimsky's age?

MS. AGRESTI: Objection, form. You may answer.

N. Parker

A No.

Q Were you present when anyone else made a comment about Mr. Krimsky and retirement?

MS. AGRESTI: Objection, form. You may answer.

A No, I don't recall ever hearing that he was close to retiring.

Q David Steele didn't stay as the sales leader -- is not currently the sales leader of graphics solutions; am I correct?

A He's not currently the sales leader; that's correct.

Q Do you know why he left?

A I do not. That was after my time in that business.

Q Who is the current senior vice president of merchandising display and graphics solutions?

A Tammie Siracusa.

Q Who is the current sales leader within that department?

A I don't believe she has one sales leader, but I don't know exactly the organizational structure she has right now.

Q Was Ms. Siracusa your successor?

N. Parker

A She was, yes.

Q Did you play any role in placing Mr. Krimsky on a performance improvement plan?

A I did not.

Q I would like to mark some documents. What I'm going to do is drop some documents into the chat and you should be able to open them from there. I will also share my screen. I find that a little awkward because I'm deciding your reading speed if I do that.

The first document I'm going to mark is Bates-stamped Westrock0223 through 25 and this is going to be Exhibit 1, Plaintiff's 1.

(Plaintiff's Exhibit 1, Marked for Identification.)

MS. SLUSARZ: Now it's in the chat.

MS. AGRESTI: Give me a minute to look at it before she does.

THE WITNESS: I've got it.

(Witness perusing document.)

THE WITNESS: I'm looking at a performance evaluation.

BY MS. SLUSARZ:

Q Okay. Have you seen this document before?

A I don't remember it, if I have. Is this a

N. Parker

performance evaluation I did or someone else did, because I can't tell who did this.

Q That's what I was going to ask you. It's dated on the top 2022. When would that have been prepared?

A Based on our timing, it would have been in the fourth calendar quarter, so I don't know if I did this or if it was Tammie who did it, but I can't look at it and tell.

Q The fourth calendar quarter of which year?

A 2022.

Q This would have been -- a performance evaluation dated 2022 would be for the period October 1, 2021 through September 30, 2022?

A That's right.

Q Can you tell from the context whose performance evaluation it is?

A It looks -- I don't know. Whoever was managing the Pepperidge Farm contract at that point.

Q Whoever's this is, would you turn to the second page?

A Okay.

Q Whoever's performance evaluation plan this is, would you agree with me that the final rating is

N. Parker

that this person successfully met expectations?

MS. AGRESTI: Objection, form. You may answer.

A That's what it says.

MS. SLUSARZ: I would like to mark another document.

(Plaintiff's Exhibit 2, Marked for Identification.)

MS. SLUSARZ: This will be Exhibit 2. It is Bates-stamped Westrock254. I will put that in the chat.

(Witness perusing document.)

BY MS. SLUSARZ:

Q Ms. Parker, please take a few moments to review this document.

MS. AGRESTI: We're pulling it up now. Just a second.

A I'm looking at it.

Q Have you seen this document before?

A I'm not copied on this document, so I don't recall seeing this document before.

Q Can you tell me who Cameron McBride is?

A He was, I would say, a finance person that was part of the graphics business, graphics solutions business, whenever I came into that

N. Parker

business.

Q Who is Natalia Baldwin?

A I don't recognize that name.

Q In March of 2022, to your knowledge, was Mr. Krimsky still paid on a commission basis?

A So this was -- I think this was before I moved into the business, so I don't know how he was paid before I moved into the business.

MS. SLUSARZ: I would like to mark another document.

(Plaintiff's Exhibit 3, Marked for Identification.)

MS. SLUSARZ: This will be Exhibit 3. I put it into the chat. It's Exhibit 3, Bates-stamped Westrock0288 through 69.

BY MS. SLUSARZ:

Q Ms. Parker, please take a few moments to review this document. Let me know when you're ready to talk about it.

(Witness perusing document.)

MS. AGRESTI: She's taking a look through it now.

A Okay.

Q Have you seen this document before?

A Yes. These were emails between, it looks

N. Parker

like me and Carrie Robards and David Steele.

Q From August 2022?

A Yes.

Q Were you in charge of merchandising displays and graphics solutions at this time?

A Yes.

Q Focusing on the email that begins at the bottom at the page from David Steele -- first, who is Katherine Smith?

A Katherine Smith was my HR leader at the time for both graphics solutions and merchandising displays.

Q How had you planned to tell Mr. Krimsky about the change in his job?

A I was going to give him a letter with the details and also call and tell him directly.

Q Was that going to come from you or Mr. Steele?

A It was going to come from me, but what I thought what was important, and you can see that here in this email, that as soon as I had that conversation I wanted David to connect with him as his new manager and make sure he felt welcome as part of the team.

N. Parker

Q He did not report to David Steele before that change in his job?

A Correct.

Q What did you expect his response would be, Mr. Krimsky?

MS. AGRESTI: Objection, form. You may answer.

A I don't know Marshall that well so I didn't -- I didn't have an expectation of how he would respond.

Q Who is Pam Andrews?

A I've seen that name. I don't remember who Pam Andrews is.

Q Was she also having her job changed for the new fiscal year?

MS. AGRESTI: Objection to form. You can answer.

A I don't remember the name so I don't know.

Q Who is Carrie Robards?

A Carrie worked for Katherine Smith and Carrie focused only on our graphics solutions business. She was our HR partner for our graphics solutions business.

MS. SLUSARZ: Let's take a break for

N. Parker

15 minutes.

MS. AGRESTI: Okay.

(Whereupon, a short recess was taken.)

MS. SLUSARZ: I'm marking Exhibit Number 4, which is Westrock0255 through 0256.

(Plaintiff's Exhibit 4, Marked for Identification.)

MS. SLUSARZ: Ruthayn, would you back my last question?

(Whereupon, the referred to question was read back by the reporter.)

BY MS. SLUSARZ:

Q Ms. Parker, please review what's been marked as Exhibit 4, and let me know when you have had a chance to review it.

(Witness perusing document.)

A Okay, I reviewed it.

Q Have you seen this document before?

A Yes, it looks like an email between me and David Steele back from September of 2022.

Q It's concerning Marshall Krimsky's change in compensation?

A Yes.

Q What was Mr. Krimsky's reaction to having his compensation changed?

N. Parker

MS. AGRESTI: Objection, form. You may answer.

A According to this email?

Q Or your recollection.

A I recall that he was disappointed and upset that his compensation was being changed.

Q Do you see the very last paragraph on the first page? It says, Having my compensation cut so drastically (by 75 percent) especially based on both the above circumstances and the fact that I recently secured the contract with Pepperidge Farm seems very unfair (to say nothing of the fact that I have increased sales over 30% over the past few years and have always had positive reviews).

Do you see that?

A I see it.

Q Do you agree with Mr. Krimsky's calculation, that his compensation was being cut by 75 percent?

MS. AGRESTI: Objection, form. You may answer.

A I don't remember what his compensation was before or what it was cut to after. I would need to calculate it myself to know if I agree with that

N. Parker

number.

Q What about in the paragraph above that where he says that -- the second line, there is a sentence beginning, When I was transferred to graphics, I did not have a written agreement. I therefore gave my manager, Mark van der Kloet, all my commission statements and discussed the matter with him. After not getting paid for two months, my manager told me that he could not figure out how my commissions were calculated and finally said he would pay me the same commission amounts I had received the previous year.

Do you see where it says that?

A I see where it says that, yes.

Q Are you -- before you received this email, were you familiar with the issues Mr. van der Kloet had with calculating Mr. Krimsky's commissions?

MS. AGRESTI: Objection, form. For the record, I don't think that Nickie received this particular email so I wanted to note that for the record.

A This looks to be a note between David Steele and Marshall so I'm reading it now, but I was not aware of that.

N. Parker

Q The email immediately above that is from David Steele to you; do you agree?

A Yes.

Q Is it fair to say you received the email we were just reading from in the series that you received from David Steele?

MS. AGRESTI: Objection, form. You may answer.

A It looks to be forwarded as part of this email.

Q Mr. Steele expresses in the email in the middle of this page, he writes, This is the expected feedback and want to handle this discussion appropriately. Should we all get on a call to discuss the appropriate path forward?

Do you see that?

A I do see that. Yes, I do see that.

Q What was your response?

A The email above says, Thanks for the update, David. At the end of the day we are actively changing commercial compensation plans across the entire corrugated segment. We need to draft consistent plans and will no longer support individual plans. Continue to hold the line that we

N. Parker

are consolidating plans.

Q What were you trying to express to Mr. Steele?

A That we had made a decision to move Marshall into the graphics business team, that the change that we had made was what we were going to stick with and that we weren't changing to something different.

Q You keep using the pronoun, we. Are you referring to WestRock or are there specific individuals?

A Sorry. Usually I use the word we even when I'm talking to me. Me, I made that decision.

Q Could you have kept Mr. Krimsky on his commission-based compensation plan?

MS. AGRESTI: Objection, form. You may answer.

A It's not something I considered. It was important to create consistency so I don't think I could have kept him on the current plan.

MS. SLUSARZ: I would like to mark another document. This is Exhibit 5, Bates-stamped Westrock0265. It's one page.

(Plaintiff's Exhibit 5, Marked for Identification.)

N. Parker

MS. AGRESTI: The document is open and she will look at it now.

MS. SLUSARZ: Sure.

(Witness perusing document.)

A Okay.

Q Have you seen this document before?

A Looks like an email between me and David Steele.

Q Sent on or about September 16, 2022?

A Yes.

Q Is it concerning his discussions with Marshall?

A Yes.

Q Marshall wanted to speak with you as well, correct?

A That's correct.

Q Did you actually have a conversation with him about the change in his compensation?

A What I remember is being the one that communicated the change in compensation and telling him that he would be working for David. I do remember having a subsequent conversation.

Q What was the subject of the subsequent conversation?

N. Parker

A I remember Marshall just continuing to appeal to, please keep it the way it was and not make the change.

Q When you were in charge of graphics solutions, did your compensation depend at all upon the profitability of the graphics solutions department?

MS. AGRESTI: Objection, form. You may answer.

A My compensation -- my short-term incentive, which was a small portion of my compensation, depended on the merchandising displays and graphics solutions business meeting the business objectives.

Q Does the business objective --

A I don't recall at the time if those were operational or EBITDA objectives. I don't recall the makeup of the short-term incentive plan at that time. Those, for us, usually changed every year.

Q You don't recall if the profitability of graphics solutions was part of your short-term incentive pay?

MS. AGRESTI: Objection, form. You may answer.

N. Parker

A It wouldn't have been that specifically. A portion of it may have been based on overall revenue of displays and graphics combined, but it wouldn't have been graphics solutions' profitability the way you're asking me. It wouldn't be that specific.

Q Well, would you agree with me that one of the ramifications of changing Mr. Krimsky's compensation is that WestRock got to keep more of the money it collected from Pepperidge Farm?

MS. AGRESTI: Objection, form. You may answer.

A I agree that -- ask it again. I'm sorry.

Q Am I correct that by changing Mr. Krimsky's compensation, WestRock kept more of the money it collected from Pepperidge Farm?

MS. AGRESTI: Objection, form. You may answer.

A WestRock kept more, yes. WestRock kept more of the revenue it collected from Pepperidge Farm.

Q To your recollection, did keeping more of the revenue affect your compensation?

A It did not impact my compensation. Again,

N. Parker

my short-term incentive, it wouldn't have been specifically the profitability of graphics solutions business, but in the overall business result -- it would have had a very small impact, if at all, on my overall short-term incentive. It would not have been something I would have considered as part of this decision.

Q You talked about short-term incentive. Was there a long-term incentive as well? Did a long-term incentive also comprise part of your compensation?

A Long-term incentive did compromise part of my compensation.

Q What did that consist of?

A It's subjective and those decisions are made by senior leaders on who they are trying to keep at WestRock long term.

Q Was it a stock plan?

A It was, yes. I think it's also important to note that I took over responsibility for this graphics business about halfway through a fiscal year, and so my incentive plan for that fiscal year did not change when I took over this business.

My base salary compensation changed,

N. Parker

but my short-term incentive did not. We can go back and look, but it didn't get recast to include the graphics business. That would have happened on the next fiscal year. I had moved then into a new business at that point.

Q Was WestRock trying to get rid of Mr. Krimsky by cutting his income by 75 percent?

MS. AGRESTI: Objection, form. You may answer.

A I don't know who WestRock is. Can you be more specific?

Q Was the merchandising displays and graphics solutions business, were they trying to get rid of Mr. Krimsky by cutting his income by 75 percent?

MS. AGRESTI: Objection, form. You may answer.

A I was the leader of that business and I was not trying to get rid of Mr. Krimsky.

Q What did you think was the likely -- his likely reaction to having his income cut by 75 percent?

MS. AGRESTI: Objection, form. You may answer.

N. Parker

A I anticipated -- any time there's change, people are upset with change and so I thought about that and that's one reason I wanted to make sure that David Steele talked to him right away. You can see that in those emails. But no, I did not want him to leave WestRock. For consistency with customers, I wanted him to be there.

Q You're saying even though you cut his income by 75 percent, you did not think that that would motivate him to move to another company?

MS. AGRESTI: Objection, form. You may answer.

A I did not.

Q In your years of experience as a manager, have you ever had another situation where a subordinate's income was cut by 75 percent?

MS. AGRESTI: Objection, form. You may answer.

A To be clear, I don't know that his salary was cut by 75 percent. When I look at this email, it looks like it's not considering his short-term bonus, so I don't believe it was 75 percent. So I have had other instances where employees' salaries were cut during my time as a manager.

N. Parker

Q Those employees whose salaries were cut, approximately what percentage were they cut by?

MS. AGRESTI: Objection, form. You may answer.

A I don't recall.

Q Do you recall if it was more than 10 percent?

MS. AGRESTI: Objection, form. You may answer.

A I really don't recall.

Q Of those employees whose salaries were cut, how many of them remained employees six months after the fact?

MS. AGRESTI: Objection, form. You may answer.

A I don't recall.

Q Do you recall if any of them left after having their salary cut?

MS. AGRESTI: Objection, form. You may answer.

A I really don't remember any specific incident where the person left.

Q What would you do if your salary were cut by 75 percent, or rather your income were cut by

N. Parker

75 percent?

MS. AGRESTI: Objection, form. You may answer.

A Again, I'm not clear that his salary was cut by 75 percent. I don't know what I would do.

Q Do you think that a pay cut of any kind is a reflection of how the company values your work?

MS. AGRESTI: Objection, form. You may answer.

A I don't believe that a pay cut is how someone values you. I believe what you're paid is in concert with what your role is and that's how I see pay versus your role, and not how you're valued.

MS. SLUSARZ: I would like to mark another document. This is Exhibit Number 6. It's Bates-stamped Krimsky00087 through 90.

(Plaintiff's Exhibit 6, Marked for Identification.)

BY MS. SLUSARZ:

Q Please take a few moments to look through.

MS. AGRESTI: Exhibit 5?

MS. SLUSARZ: Exhibit 6.

MS. AGRESTI: We are downloading the document now.

MS. SLUSARZ: Okay.

N. Parker

(Witness perusing document.)

A Okay.

BY MS. SLUSARZ:

Q Ms. Parker, have you seen this document before?

A It looks like I was copied on the email from David Steele to Marshall in September of 2022.

Q In September of 2022, is it still unsettled, the issue of Mr. Krimsky's compensation?

MS. AGRESTI: Objection, form. You may answer.

A At this point, I believe it was settled. We had communicated to Mr. Krimsky in early September that this would be taking place October 1st, so in my mind this was settled.

Q Do you see the line, it's on the first page, the second from the bottom. Mr. Steele writes, Understand that this program has been accepted by the rest of the team and is consistent with the alignment across the division.

Do you see that?

A I do.

Q Was there a broader compensation change within the graphics solutions group that involved

N. Parker

people other than Mr. Krimsky?

A I don't recall but that is what this suggests.

MS. SLUSARZ: I would like to mark another document. This is Exhibit 7 and the Bates number is Krimsky91 through 93.

(Plaintiff's Exhibit 7, Marked for Identification.)

(Witness perusing document.)

MS. AGRESTI: The document is open and Nickie is looking at it now.

MS. SLUSARZ: Okay.

THE WITNESS: Okay.

BY MS. SLUSARZ:

Q The email at the bottom of this page, have you seen this document before?

A It looks like it was an email from me to Marshall on September 20th.

Q Of 2022?

A 2022, yes.

Q Are you setting forth his new compensation plan?

A Yes.

Q The second-to-last line on page one, it says, Effective on October 1, 2022 -- let me start

N. Parker

over.

The paragraph begins, As we also discussed, WestRock will be increasing your annual base salary amount. Effective on October 1, 2022, your annual base salary will be $145,000.

Do you see that?

A Yes.

Q What was Mr. Krimsky's base salary before this change took effect?

A I don't recall. I don't recall.

Q Do you recall what his earnings were in the year prior to this?

A I do not.

Q Do you know if Mr. Krimsky was earning more than $500,000 per year before this change took effect?

MS. AGRESTI: Objection, form. You may answer.

A I don't recall.

Q Do you recall that Mr. Krimsky was earning substantially more than $145,000 for the year?

MS. AGRESTI: Objection, form. You may answer.

A I do recall that he was making more than

N. Parker

what we took his salary to, but again, I don't remember the exact numbers.

Q In that first paragraph it says that -- it starts, As we discussed today, WestRock will be reducing your annual commission amount. Effective October 1, 2022, your new commission amount will be a maximum of $58,000 for fiscal year 2023.

Do you see that?

A I do see that, yes.

Q Between his annual base salary and his commission, the most that Mr. Krimsky could possibly earn would be $203,000 per year, correct?

MS. AGRESTI: Objection, form. You may answer.

A I don't know if the incentive plan had tiers for how much for additional above that $58,000. It looks like that says that was the maximum, I don't recall. I know there were tiers built into it on how you met target versus being higher than your target. It says maximum, so I assume that was the total max, but I don't recall the specifics of the plan.

Q Assuming that's the maximum, is it correct that the most he could earn in the fiscal year 2023

N. Parker

is $203,000 per year?

MS. AGRESTI: Objection, form. You may answer.

A Again, I don't remember the specifics of the plan, but if this is the max and the target base salary then that would be the maximum.

Q It would be $145,000 plus $58,000, correct?

MS. AGRESTI: Objection to form.

A I don't know if those are all the tiers because I don't remember the specifics of the plan, but if this is saying that was the max and that's the base salary, then that's the salary plus incentive.

Q Assuming that this maximum of $58,000 is correct, then the most that Mr. Krimsky could earn for the fiscal year 2023 is $58,000 plus $145,000?

MS. AGRESTI: Objection, form. You may answer.

A I don't recall specifics about all the tiers, and I knew all of these plans had tiers. If this is saying that is the max, plus that's the salary, then that would be the maximum that he could make.

N. Parker

MS. SLUSARZ: I would like to mark another exhibit. It is Bates-stamped Westrock257.

(Plaintiff's Exhibit 8, Marked for Identification.)

MS. SLUSARZ: I will pull it up.

MS. AGRESTI: While we do that, I want to mark an objection on the record. The reference to 75 percent keeps being made, but I don't know that that's an actual calculation.

I want to mark that for the record that, to the extent that 75 percent is consistently being used, that's not necessarily an accurate percentage here. I just want to note that for the record.

MS. SLUSARZ: I'm reading that from the document in front of me.

MS. AGRESTI: Understood.

MS. SLUSARZ: I agree that may not be mathematically accurate.

MS. AGRESTI: Yes, that's what we're saying that that might not be mathematically accurate. I understand you were reading that from Mr. Krimsky's email. I want to note that that is not necessarily mathematically accurate.

N. Parker

BY MS. SLUSARZ:

Q Please take a look at what's been marked as Exhibit 8. It's Bates-stamped Westrock257.

(Witness perusing document.)

MS. AGRESTI: The document is open. We are looking at it now.

A Okay.

Q Ms. Parker, have you seen this document before?

A It looks like I was copied on, yes, these emails. Maybe not the first one but the second and third.

Q The email at the bottom of the page is from David Steele concerning a need for some training on October 12th, correct?

A I wasn't copied on that, yes, but yes, that's what it looks like.

Q Do you know who Elizabeth Rigdon is?

A Yes. Liz was part of -- she led our customer service team. She also led scheduling, so she had a lot of supply chain functions for our preprint business.

Q Who is Jill Heishman?

A Jill is also part of our supply chain

N. Parker

team. She managed our litho packaging business so she had customer service, scheduling all of those things for our litho packaging business. Those would both be support functions for any of our sellers.

Q The next email -- the one that starts about maybe a quarter of the way down the page, the second one on the page from David Steele, and you are copied on this one, correct?

A Yes.

Q Do you agree with me that Mr. Steele, in this email, he's talking about job responsibilities that Marshall said he had never had to do in the past?

MS. AGRESTI: Objection, form. You may answer.

A I agree that's what the email says. I don't agree that sellers had never been asked to do these things in the past.

Q Do you know for a fact whether Mr. Krimsky had been asked to do these tasks in the past?

MS. AGRESTI: Objection, form. You may answer.

A Every seller is expected to work with

N. Parker

their customer service representatives and their scheduling teams to manage business with their customer, so it would surprise me if he had not been asked to do these things because that's one of the main jobs of a salesperson.

Q At the end of the third line, Mr. Steele writes, His attitude is toxic at this point and if he doesn't improve we will need to develop a plan to deal with his behavior; do you see that?

A I see that.

Q The last sentence is, Again this is just my start of documentation for Marshall.

Do you see that?

A I see that.

Q To your knowledge, what was Mr. Steele documenting?

MS. AGRESTI: Objection, form. You may answer.

A To my knowledge, the feedback I had been given is that he didn't know how to price new quotes, work with our teams the right way and, again, that's a basic function of sales in any role, no matter what the title, that's called.

And so I know we were getting

N. Parker

pushback from Marshall as he was being asked to manage this customer the way that we needed him to manage the customer. I'm sure that I asked David to document pushback he would get, as I'd give that guidance to any manager that was getting pushback from a sales rep.

Q What was the purpose of documenting the pushback he was getting?

MS. AGRESTI: Objection, form. You may answer.

A Because you get several years down the road and don't remember what happens and so, just as a recollection, as we were making these changes in his role, what his reaction was and what was happening.

Q What was the importance of documenting his reaction in what was happening?

MS. AGRESTI: Objection, form. You may answer.

A I think it's important when we go back at end of year to have the next years, because we are already into the new fiscal year. So when we go to the next year to have the performance evaluation, that that could be part of his performance

N. Parker

evaluation.

Q At the top of the page, the first email on this page you write, My guidance is to be as specific as possible when documenting behavior. You need to document dates and situations. You also need to document when you set expectations for reporting, meetings, training, et cetera. I'd recommend following the training in Jax that you send an email to him stating what you learned and the expectation. It needs to be clear it was communicated to him.

Do you see that?

A I do.

Q In October 2022, was WestRock considering terminating Mr. Krimsky's employment?

MS. AGRESTI: Objection, form. You may answer.

A When you say WestRock, I can speak for myself only. I don't know who WestRock is. At that point, I was not considering terminating Marshall, no.

Q Jax, that's stands for Jacksonville, correct?

A Correct.

N. Parker

Q Did this training in Jacksonville actually take place, to your knowledge?

A I don't know.

MS. SLUSARZ: I would like to mark Exhibit 9, which is Bates-stamped Westrock263 through 264.

(Plaintiff's Exhibit 9, Marked for Identification.)

MS. SLUSARZ: I just dropped it in the chat.

MS. AGRESTI: All right. The document is open.

(Witness perusing document.)

THE WITNESS: Okay.

BY MS. SLUSARZ:

Q Have you seen this document before?

A This is between Carrie Robards and David Steele. It doesn't look like I was copied on any of these, so I don't recall these emails.

Q Did you have any discussion with David Steele that encompassed the subject matter of these emails?

MS. AGRESTI: Objection, form. You may answer.

A Not that I recall.

N. Parker

MS. SLUSARZ: I'm going to mark another exhibit. It is Bates-stamped Krimsky39.

(Plaintiff's Exhibit 10, Marked for Identification.)

MS. SLUSARZ: You will probably need to enlarge it on your screen because it's very small.

MS. AGRESTI: This was produced by Mr. Krimsky. The document is open and we are trying to zoom in as much as possible.

THE WITNESS: Okay, I'm looking at it. Okay.

BY MS. SLUSARZ:

Q Have you seen this document before?

A I don't believe I have, no.

Q Have you seen a document in this form before?

A I don't believe I have. I'm trying to see what it tells us. No, I haven't seen one of these before.

Q Okay. To your knowledge, did anyone receive a 2 percent commission on Pepperidge Farm sales in August 2023?

A Not to my knowledge.

MS. SLUSARZ: I would like to take a

N. Parker

ten-minute break because I mismarked the next couple of documents instead of having you wait while I fumble. If we can break until 12:12, that would probably save some hassle.

MS. AGRESTI: Give me one minute here. That's no problem here.

MS. SLUSARZ: Sure.

MS. AGRESTI: We would suggest at this time maybe taking a lunch since, it's about lunchtime and we are going to have to break anyway. Does that work?

MS. SLUSARZ: That works for me. How long do you need?

MS. AGRESTI: Thirty minutes.

MS. SLUSARZ: Okay, 30 minutes. So let's reconvene around 12:35.

MS. AGRESTI: That's fine. Thanks so much.

(Luncheon recess: 12:02 p.m.)

***

(Afternoon session: 12:40 p.m.)

N. Parker

N I C K I E P A R K E R, resumed, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION BY

MS. SLUSARZ: (Continued)

MS. AGRESTI: Before we continue, we did not discuss stipulations at the beginning of the deposition, I don't want us to forget to do that. Really quickly, I believe we have the same stipulations that we had at the other depositions, which is that we reserve objections and that we will review and sign; is that okay with you, Fran?

MS. SLUSARZ: That's fine.

MS. AGRESTI: Thank you. I wanted to make sure we got that on the record. Thank you.

MS. SLUSARZ: I would like to mark Exhibit 11, which is a spreadsheet that was produced in native form, Bates-stamped Krimsky32.

(Plaintiff's Exhibit 11, Marked for Identification.)

MS. AGRESTI: This is Exhibit 11?

MS. SLUSARZ: Yes.

MS. AGRESTI: We are downloading it now.

N. Parker

(Witness perusing document.)

THE WITNESS: Okay.

BY MS. SLUSARZ:

Q Have you seen this document before, Ms. Parker?

A I don't remember seeing Marshall's specifically, but this is the format for all of our sales, our graphics business managers.

Q What does this chart communicate?

A Their 2023 budget and incentive plan based on their budget for that year and it has that annual salary and then additional incentive payout based on where they are in that plan.

Q What is -- according to this chart, what incentive payout had Mr. Krimsky earned as of August 2023?

A I don't remember what his -- does it have it on here? Let's see. Okay. Let me read this.

MS. AGRESTI: I'll object to form. You may answer.

A If I kind of talk through it, his preprint Pepperidge Farms budget was 101 and new business was 21, for a total of 122 for October. It looks like his actual was 157.

N. Parker

If I go through and look at the full year, or through August, looks like his target -- his budget was 1,032 rolls. That looks like for the full year. If you subtract out September, let's see -- so through August, year to date would have been 929, and it looks like he's at 1,028.

But new business, he had a target of 273, and it looks like he was at zero, so that's on preprint. And then on litho budget, would have been $2,200,000 for Pepperidge and $125,000 minus $13,000, so at that point $111,111 for new business. It looks like he had met 7.6 million for litho, and 111 -- or zero for new business.

Q Okay. At the top of the page is that a summary of his incentive payments toward the right half of the page?

MS. AGRESTI: Are we talking -- can you share your screen so we are all on the same page?

MS. SLUSARZ: Sure.

BY MS. SLUSARZ:

Q I'm trying to understand what this -- the green and the aqua boxes, whether they are telling us potential numbers or actual numbers?

N. Parker

MS. AGRESTI: To be clear, columns J through O?

MS. SLUSARZ: Yes.

A It looks like the other ones are target. I will admit, I don't typically deal with this level. My sales manager would deal with it. I'm trying to look at it and figure it out as well. I'm not exactly sure what it's telling me. I'd have to go back and add up these numbers.

Q That's not necessary.

A Okay. I don't know what those columns J through O are telling us.

Q Just to confirm, you stopped being the senior vice president for merchandising displays and graphics solutions in October 2022, correct?

A That's correct, yes. So I was not here for this 2023 year.

Q Did you play any role in the decision to place Mr. Krimsky on a performance improvement plan?

A I did not.

Q Did you play any role in the decision to terminate Mr. Krimsky's employment?

A I did not.

MS. SLUSARZ: I would like to take a short

N. Parker

break just to go through my notes and I may be finished. So can we take about five or ten minutes?

MS. AGRESTI: That's fine.

MS. SLUSARZ: Let's reconvene at one o'clock. I should know if there is anything else I need to ask.

MS. AGRESTI: Sounds good. Thank you.

(Whereupon, a short recess was taken.)

BY MS. SLUSARZ:

Q I have a few more questions.

Ms. Parker, you testified earlier that met with Mr. Krimsky twice to discuss the change in his compensation; is that correct?

A I remember meeting with him to communicate the change and I also remember having a conversation with him after that, yes. It may have been more times than that, but those are two that I recall, yes.

Q Do you recall telling him that if he does not like the change, he can leave?

A I don't recall that, no.

Q I understand you're in Atlanta right now?

A Yes.

N. Parker

Q Is that the headquarters of Smurfit WestRock?

A It's the U.S. headquarters.

MS. SLUSARZ: I don't have any other questions.

MS. AGRESTI: We don't have any questions either.

MS. SLUSARZ: Great. Ms. Parker, thank you very much for your time this morning and afternoon and best of luck to you.

THE WITNESS: Thank you.

THE REPORTER: Ms. Agresti, will you be purchasing a copy of this transcript?

MS. AGRESTI: Yes.

(Time noted: 1:02 p.m.)

______________________
NICKIE PARKER

Subscribed and sworn to before me this _____ day of _____________ 2024.

____________________________, Notary Public.

N. Parker

I N D E X

| WITNESS | | PAGE |
|---|---|---|
| NICKIE PARKER | | |
| EXAMINATION BY | | |
| MS. SLUSARZ | | 4 |

E X H I B I T S

| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Westrock0223-25 | 39 |
| Exhibit 2 | Westrock254 | 41 |
| Exhibit 3 | Westrock0288-69 | 42 |
| Exhibit 4 | Westrock0255-0256 | 45 |
| Exhibit 5 | Westrock0265 | 50 |
| Exhibit 6 | Krimsky00087-90 | 57 |
| Exhibit 7 | Krimsky91-93 | 59 |
| Exhibit 8 | Westrock257 | 63 |
| Exhibit 9 | Westrock263-264 | 69 |
| Exhibit 10 | Krimsky39 | 70 |
| Exhibit 11 | Krimsky32 | 72 |

Attorney Slusarz has retained all exhibits.

C E R T I F I C A T I O N

STATE OF NEW YORK )
) ss.:
COUNTY OF QUEENS )

I, RUTHAYN SHALOM, a Court Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of August, 2024.

Ruthayn Shalom
______________________
RUTHAYN SHALOM

ERRATA SHEET

NAME OF CASE: KRIMSKY v WESTROCK, et al.
DATE OF DEPOSITION: July 29, 2024
NAME OF DEPONENT: Nickie Parker

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |
| ____ | _______ | ____________________ | ________________ |

________________________
NICKIE PARKER

Subscribed and sworn to before me this _____ day of ___________, 2024

______________________, Notary Public.

________________________
MY COMMISSION EXPIRES:

**A**

**A&M** 7:8
**a.m** 1:10
**Abbot** 18:2
**Abernathy** 4:5
**ability** 5:2,6
**able** 23:14 29:9 36:3 37:17 39:8
**accepted** 58:20
**accurate** 22:22 63:12 63:19,22,25
**acquisitions** 34:9
**action** 79:17
**actively** 48:22
**actual** 63:9 73:25 74:25
**add** 75:10
**additional** 14:10 61:17 73:13
**address** 4:4
**admit** 75:6
**admitted** 29:15
**affect** 5:2 52:24
**afternoon** 71:23 77:11
**against-** 1:5
**age** 36:17,18 37:10 37:16,23
**ago** 9:21
**agree** 40:25 46:18,25 48:3 52:8,14 63:18 65:12,18,19
**AGREED** 3:2,7,11
**agreement** 31:9 47:6
**Agresti** 2:9 6:5 8:6,9 15:5 25:23 26:8,22 26:25 27:18 28:5,16 30:9,15 32:8 33:6 34:24 35:13,21 36:10 37:5,24 38:5 39:17 41:3,16 42:21 44:7,17 45:3 46:2 46:21 47:19 48:8 49:17 50:2 51:9,24 52:12,18 54:9,17,24 55:12,18 56:4,9,15 56:20 57:3,9,21,23 58:11 59:10 60:18 60:23 61:14 62:3,10 62:19 63:6,17,20 64:6 65:16,23 66:18 67:10,19 68:17 69:11,23 70:8 71:6 71:9,15,18 72:7,16 72:23,25 73:20 74:18 75:2 76:5,9 77:7,13,15
**al** 80:4
**alcohol** 5:9
**alignment** 58:21
**Americas** 14:4,5
**amount** 60:5 61:6,7
**amounts** 47:12
**Andrews** 44:12,14
**Anissa** 2:14 6:4
**anniversary** 18:19
**annual** 60:4,6 61:6 61:11 73:12
**answer** 4:20,23 25:24 26:5,9 27:19 28:17 30:10 32:9 33:7 34:25 35:14,22,23 36:11 37:6,25 38:6 41:4 44:8,18 46:3 46:22 48:9 49:18 51:10,25 52:13,19 54:10,18,25 55:13 55:19 56:5,10,16,21 57:4,10 58:12 60:19 60:24 61:15 62:4,20 65:17,24 66:19 67:11,20 68:18 69:24 73:21
**anticipated** 55:2
**anybody** 5:25
**anyway** 71:12
**appeal** 51:3
**appearing** 15:8
**approach** 34:10
**appropriate** 48:16
**appropriately** 48:15
**approximately** 56:3
**April** 8:5
**aqua** 74:24
**Asia** 12:24 13:2
**asked** 65:19,22 66:5 67:2,4
**asking** 35:15 52:6
**assume** 4:23 61:22
**Assuming** 61:24 62:16
**assurance** 14:14,17
**Atlanta** 4:5 76:24
**Atlantic** 16:18 17:16
**attitude** 66:8
**Attorney** 78:20
**attorneys** 2:3,7 3:3
**August** 43:3 70:23 73:17 74:3,6 79:21
**aware** 27:13 47:25
**awkward** 39:10

**B**

**B** 78:10
**bachelor's** 7:2
**back** 14:8,20 45:8,10 45:20 54:2 67:21 75:10
**Baldwin** 42:3
**base** 53:25 60:5,6,9 61:11 62:6,14
**based** 18:19 28:10,19 40:7 46:10 52:3 73:11,13
**basic** 66:23
**basis** 42:6
**Bates** 59:6
**Bates-stamped** 39:13 41:10 42:15 49:23 57:17 63:3 64:4 69:6 70:3 72:20
**beauty** 10:13
**beginning** 47:5 72:8
**begins** 43:8 60:3
**behavior** 66:10 68:5
**believe** 14:3 23:25 24:15 30:24,25 32:12 33:14 34:6 37:13 38:22 55:23 57:11,12 58:13 70:15,18 72:10
**best** 5:12 77:11
**beverage** 10:14
**birth** 8:2
**bit** 30:25
**blood** 79:18
**bonus** 28:9,14,23 55:23
**bottom** 43:9 58:18 59:15 64:14
**box** 10:17,18
**boxes** 21:7,10,12,16 21:20 74:24
**break** 30:13,13 44:25 71:2,4,11 76:2
**Brittany** 17:22
**broader** 24:17 58:24
**Broadway** 2:4
**brought** 4:11 11:19 22:20 26:2
**budget** 73:11,12,23 74:4,10
**built** 61:20
**business** 6:20,25 10:3 10:25 11:4,6,10,14 11:15,17,18,20,22 12:23 13:2,14,21 14:2,4,5,6 16:2 18:10 19:12,13,17 19:18 20:8 21:22 22:4,7,9,19,21,25 23:11,24,25 24:3,6 24:18 25:7 26:14,15 26:16,17,19 27:17 28:3 29:7,11,14,24 31:14 32:3,7,13,25 34:15,16 35:4,11,12 36:5,7,13,14,15 38:16 41:24,25 42:2 42:8,9 44:23,24

49:6 51:14,14,16 53:4,4,22,24 54:4,6 54:14,19 64:23 65:2 65:4 66:3 73:9,23 74:8,12,14
**businesses** 11:19

**C**

**C** 2:2 4:2 72:2 79:2,2
**calculate** 46:25
**calculated** 47:11
**calculating** 47:18
**calculation** 46:19 63:9
**calendar** 19:3 40:8 40:11
**call** 25:9 32:21 36:4 43:17 48:15
**called** 11:17 26:12 66:24
**calling** 34:21 35:3
**calls** 37:6
**Cameron** 41:22
**Campbell's/Peppe...** 30:19 31:10
**Canada** 16:8
**cancer** 27:14
**care** 29:16
**Carrie** 43:2 44:20,21 44:22 69:17
**Case** 1:4 80:4
**Center** 2:8
**certifications** 7:14,15 7:16
**certify** 79:10,16
**cetera** 68:8
**chain** 20:16 64:22,25
**chance** 45:15
**change** 29:17,20 33:19 43:15 44:3 45:21 49:7 50:19,21 51:4 53:24 55:2,3 58:24 60:10,16 76:15,17,22 80:5
**changed** 19:4 29:4 44:15 45:25 46:7 51:20 53:25
**changeover** 36:8
**changes** 67:14
**changing** 48:22 49:8 52:9,15
**charge** 17:23 23:12 23:21 27:12,22 32:18 43:5 51:5
**chart** 73:10,15
**chat** 39:7,16 41:11 42:14 69:10
**chemical** 7:5,6 12:10
**children** 7:20
**circumstances** 46:11
**claim** 6:11
**clear** 16:5 25:13 37:11 55:20 57:5 68:11 75:2
**close** 37:17 38:8
**closing** 20:3
**CODD** 2:5
**collected** 52:11,17,21
**college** 12:4 15:22
**columns** 75:2,12
**combination** 18:7
**combined** 52:4
**come** 34:8 43:18,20
**comment** 38:4
**comments** 37:23
**commercial** 9:8,11 9:13,14,18,20,25 10:2,5,8,21 12:16 12:18,21 16:6,15,16 16:17,19 17:6,12,20 48:22
**commission** 18:7,8 28:9,15 42:6 47:8 47:12 61:6,7,12 70:22 80:23
**commission-based** 49:16
**commissioned** 15:14 15:17 18:4 32:24 33:2,4,11,12,15
**commissions** 37:20 47:11,18
**communicate** 73:10 76:16
**communicated** 29:19 50:21 58:14 68:12
**communications** 33:22
**company** 1:6 18:18 34:4 55:11 57:8
**compensation** 29:4 29:14,23 45:22,25 46:7,9,19,23 48:22 49:16 50:19,21 51:6 51:11,13 52:10,16 52:24,25 53:12,14 53:25 58:10,24 59:21 76:15
**competition** 21:20,21
**complain** 19:23
**complained** 5:21
**completed** 6:19
**component** 28:24
**comprise** 53:11
**compromise** 53:13
**concerned** 37:8
**concerning** 45:21 50:12 64:15
**concert** 57:13
**conditions** 4:25
**conference** 1:17
**confidential** 8:4,6 26:11,21,23
**confirm** 75:14
**Congratulations** 9:22
**connect** 43:23
**connected** 9:16
**consider** 17:4 28:23 31:17,21 32:4,16
**consideration** 31:21
**considered** 27:3,6 31:19 49:19 53:7
**considering** 55:22 68:15,21
**consist** 35:7 53:15
**consistency** 24:7 25:6 25:10,17 33:25 34:18,23 36:5 37:3 49:20 55:7
**consistent** 24:14,20 29:23 34:7,13 35:18 48:24 58:20
**consistently** 34:13 63:11
**consolidating** 49:2
**constant** 29:12 30:5
**consumer** 33:11 35:2
**context** 40:17
**continue** 48:25 72:7
**Continued** 72:6
**continuing** 51:2
**contract** 30:19 31:6,8 40:20 46:12
**Contraris** 23:16
**conversation** 43:23 50:18,23,25 76:17
**convictions** 5:17
**copied** 41:20 58:7 64:11,17 65:10 69:18
**copy** 77:14
**corporation** 13:8
**correct** 7:18 13:16,17 19:2 22:18 30:2 32:5 38:11,13 44:4 50:16,17 52:15 61:13,24 62:9,17 64:16 65:10 68:24 68:25 75:16,17 76:15
**correctly** 31:25
**corrugated** 9:10 10:10,16,19 11:22 16:2 33:10 48:23
**COUNTY** 79:6
**couple** 71:3
**court** 1:1 4:17 79:8
**Covid** 37:12
**COZEN** 2:7

**create** 34:13 49:20
**creating** 25:18 34:16
**criminal** 5:17
**cultural** 37:14
**current** 9:5 16:5 17:4 23:3 38:17,20 49:21
**currently** 5:8 15:24 16:9 38:10,12
**customer** 24:16 25:18 26:12 27:4,6 30:24 34:10,11,23 35:8,25 36:3 64:21 65:3 66:2,4 67:3,4
**customers** 15:2,4 21:8 22:7,9 23:2,4,6 24:9,15 25:14,16 26:6,19 32:15 34:7 34:14 35:7,25 55:8
**cut** 46:9,19,24 54:22 55:9,17,21,25 56:2 56:3,13,19,24,25 57:6,7,11
**cutting** 54:8,15
**cycle** 18:18,20

**D**

**D** 78:2
**date** 8:2 74:6 80:4
**dated** 40:5,14
**dates** 68:6
**David** 21:2,11,13,15 21:24,25 22:2,15 29:17,22 31:20,24 32:10 33:25 34:5 38:9 43:2,9,23 44:2 45:20 47:23 48:3,7 48:21 50:8,22 55:5 58:8 64:15 65:9 67:4 69:17,20
**day** 19:7 48:21 77:23 79:21 80:20
**days** 37:12
**deal** 66:10 75:6,7
**December** 12:11
**deciding** 39:10
**decision** 20:6 35:10 49:5,14 53:8 75:19 75:22
**decisions** 53:16
**deemed** 8:3 26:10,20
**Defendant** 1:8 2:7
**DEFENDANTS'** 78:11
**define** 32:21
**definitely** 22:24
**degree** 6:20 7:2,7 12:10
**degrees** 7:10
**deliver** 34:11
**department** 9:16 20:12,25 24:21 25:21 26:4,7 28:11 38:21 51:8
**depend** 51:6
**depended** 51:13
**DEPONENT** 80:5
**deposition** 5:24 6:10 72:9 79:11 80:4
**depositions** 72:12
**der** 11:25 20:22 29:7 29:25 30:4 31:12 47:7,17
**describe** 19:14
**DESCRIPTION** 78:11
**details** 6:8 30:22 43:17
**develop** 66:9
**developing** 15:3
**development** 9:17
**different** 28:6 49:9
**Dino** 18:2
**direct** 16:9,24 17:4
**directly** 20:22 23:2 43:17
**director** 12:23 13:2,5
**disable** 15:7
**disappointed** 46:6
**discrimination** 5:22
**discuss** 5:24 6:3 48:16 72:8 76:14
**discussed** 47:8 60:4 61:5
**discussion** 6:16 18:13 48:14 69:20
**discussions** 31:13 50:12
**display** 38:18
**displays** 10:24 11:3,8 11:11,12,14 12:13 12:20 20:11 23:12 23:22 24:13 27:13 27:23,25 32:18 35:4 43:6,13 51:13 52:4 54:13 75:15
**DISTRICT** 1:1,1
**division** 24:24 28:15 58:21
**divisions** 23:9
**document** 39:12,20 39:24 41:7,12,15,19 41:20,21 42:11,18 42:20,24 45:16,18 49:23 50:2,5,7 57:16,24 58:2,5 59:6,9,10,16 63:16 64:5,6,9 67:5 68:6,7 69:11,13,16 70:9,14 70:16 73:2,5
**documentation** 66:13
**documenting** 66:17 67:8,17 68:5
**documents** 6:9 39:6,7 71:3
**doing** 24:5,9 25:9
**Donald** 16:4
**downloading** 57:23 72:25
**draft** 48:24
**drastically** 46:10
**drive** 25:17 34:7,18 37:2
**driving** 25:5 35:6
**drop** 39:7
**dropped** 69:9
**drove** 36:5
**drugs** 5:9
**duly** 4:3 72:3 79:12

**E**

**E** 2:2,2 4:2,2 72:2,2 78:2,10 79:2
**earlier** 76:13
**early** 58:14
**earn** 61:13,25 62:17
**earned** 73:16
**earning** 37:20 60:15 60:21
**earnings** 60:12
**EBITDA** 51:18
**education** 6:19 7:9
**effect** 60:10,17
**Effective** 59:25 60:5 61:6
**eight** 16:11 17:9
**either** 77:8
**Elizabeth** 64:19
**email** 43:8,22 45:19 46:4 47:16,21 48:2 48:5,11,12,20 50:8 55:21 58:7 59:15,17 63:23 64:14 65:7,13 65:18 68:3,10
**emails** 42:25 55:6 64:12 69:19,22
**employee** 32:20
**employees** 56:2,12,13
**employees'** 55:24
**employer** 9:5
**employment** 68:16 75:23
**encompassed** 69:21
**end-of-market** 10:12
**ended** 27:9
**engineering** 7:5,7 12:10
**enlarge** 70:6
**entail** 9:9
**entire** 16:7 18:18 48:23

**entities** 12:3
**ERRATA** 80:2
**especially** 46:10
**Esq** 2:5,9,14
**et** 68:8 80:4
**Europe** 14:4
**evaluation** 39:22 40:2,14,18,24 67:24 68:2
**evaluations** 18:15
**Evedale** 14:15
**everybody** 24:8
**exact** 27:5 61:3
**exactly** 13:6 38:23 75:9
**examination** 1:16 3:4 3:8 4:7 72:5 78:7
**examined** 4:6 72:3
**excellence** 9:12,13,14 12:16,18,22 16:19 17:21
**exclusively** 18:7 32:23
**exhibit** 39:14,15 41:8 41:9 42:12,13,14 45:5,7,14 49:23,25 57:16,18,21,22 59:6 59:8 63:3,4 64:4 69:6,8 70:3,4 72:19 72:22,23 78:13,13 78:14,14,15,15,16 78:16,17,17,18
**exhibits** 78:20
**existing** 23:5
**expect** 44:5
**expectation** 22:25 44:10 68:11
**expectations** 24:23 41:2 68:7
**expected** 48:13 65:25
**expense** 25:12,14
**experience** 4:12 25:18 34:7,11,14,16 35:18,19,25 36:2 37:3 55:15
**experts** 22:6
**EXPIRES** 80:23
**express** 49:3
**expresses** 48:12
**extent** 63:11
**externally** 21:5,6 24:8

**F**

**F** 79:2
**face** 37:14
**facility** 20:4
**fact** 46:11,13 56:14 65:21
**facts** 5:3,6
**fair** 48:5
**familiar** 19:8 30:18 30:21,22 47:17
**Farm** 27:3 30:20 31:10 34:22 35:12 35:20 36:8 40:20 46:12 52:11,17,22 70:22
**Farm's** 35:12,16 37:3
**Farms** 73:23
**February** 11:6
**feedback** 48:14 66:20
**feeder** 10:15 18:10
**feeders** 10:14
**felt** 43:24
**field** 16:21 17:25 18:3
**figure** 47:10 75:8
**filing** 3:8
**filled** 16:23
**final** 40:25
**finally** 47:11
**finance** 41:23
**find** 39:9
**fine** 30:15 71:18 72:15 76:5
**finish** 4:19
**finished** 76:3
**first** 4:3 11:13 12:2 15:22,23 19:6 39:12 43:9 46:9 58:17 61:4 64:12 68:3
**fiscal** 18:24,25 27:9 29:22 44:16 53:22 53:23 54:5 61:8,25 62:18 67:23
**fit** 21:23 31:14
**five** 21:15 26:6 76:3
**Floor** 2:8
**Floyd** 2:14 6:4
**Floyd's** 15:7
**focus** 6:23
**focused** 44:22
**Focusing** 43:8
**following** 8:3 26:10 26:20 68:9
**follows** 4:6 72:4
**forget** 72:9
**form** 3:12 25:23 26:8 27:18 28:5,16 30:9 32:8 33:6 34:24 35:13,21 36:10 37:5 37:24 38:5 41:3 44:7,17 46:2,21 47:19 48:8 49:17 51:9,24 52:12,18 54:9,17,24 55:12,18 56:4,9,15,20 57:3,9 58:11 60:18,23 61:14 62:3,10,19 65:16,23 66:18 67:10,19 68:17 69:23 70:16 72:20 73:20
**Formally** 18:17
**format** 73:8
**forth** 59:21 79:12
**forward** 48:16
**forwarded** 48:10
**four** 21:14
**fourth** 40:8,11
**frame** 14:16
**Fran** 4:9 72:14
**FRANCES** 2:5
**frances@goddardl...** 2:5
**front** 63:16
**full** 12:6 74:2,5
**full-time** 15:23
**fumble** 71:4
**function** 24:10 66:23
**functions** 64:22 65:5
**further** 3:7,11 72:4 79:16

**G**

**gained** 14:10
**Gamble** 26:13
**general** 16:20
**generated** 28:3,10,15
**gentleman** 21:18
**geographic** 22:10
**Georgia** 4:5
**getting** 14:20 36:23 47:9 66:25 67:6,9
**give** 18:11 25:12 39:17 43:16 67:5 71:6
**given** 5:14 66:21 79:14
**global** 16:7
**go** 4:15 6:14,21 15:6 16:25 54:2 67:21,23 74:2 75:10 76:2
**GODDARD** 2:3
**going** 4:11,23 29:17 29:20 34:19 36:25 37:7,8,11 39:7,12 39:14 40:4 43:16,18 43:20 49:7 70:2 71:11
**good** 4:9 76:9
**graduated** 12:7
**graphic** 28:3
**graphics** 10:24 11:5 11:9,17,19 19:12,13 19:17 20:7,11,12,25 21:17,17,22 22:4,7 22:9,19,21,25 23:11 23:13,21,25 24:3,6

24:13,17,21 25:21 26:3,7,14,15 27:12 27:17,22 28:2 29:7 29:11,14,24 31:14 32:3,6,13,19,25 34:15 35:11 36:15 38:11,18 41:24,24 43:6,12 44:22,23 47:6 49:6 51:5,7,14 51:22 52:4,5 53:3 53:22 54:4,14 58:25 73:9 75:16
**Great** 77:9
**greatest** 26:2
**green** 74:24
**Greenwich** 2:8
**group** 7:14,16 9:14 28:25 29:18 33:13 34:2 58:25
**groups** 20:18
**grow** 25:2
**guess** 32:23
**guidance** 67:6 68:4
**guy** 21:2

**H**

**H** 78:10
**half** 74:17
**halfway** 53:22
**hand** 79:21
**handle** 48:14
**happen** 18:22
**happened** 22:23 54:4
**happening** 6:8 67:16 67:18
**happens** 67:13
**happy** 16:25
**hassle** 71:5
**head** 13:4 28:13,18
**headquarters** 77:2,4
**health** 10:13
**heard** 36:12
**hearing** 38:7
**Heishman** 64:24
**held** 1:16,17 6:16
18:13 30:5
**helps** 9:17
**hereinbefore** 79:12
**hereto** 3:4
**hereunto** 79:20
**high** 21:16 22:9 31:3
**higher** 7:9 61:21
**highest** 6:18 25:22,25
**history** 27:14
**hold** 29:12 48:25
**home** 10:13
**hoped** 37:19
**hopefully** 17:2
**HR** 9:16 43:11 44:23
**husband** 6:7
**hypothetical** 37:6

**I**

**idea** 27:20 37:7,10,10 37:16
**Identification** 39:15 41:8 42:12 45:7 49:25 57:18 59:8 63:4 69:8 70:4 72:22
**illicit** 5:9
**immediately** 48:2
**impact** 52:25 53:5
**importance** 67:17
**important** 4:18 24:7 24:11,14,16 25:6,8 25:17,20 33:24 34:3 34:4,6,12,16,20 35:6,8 36:4,6 43:21 49:20 53:20 67:21
**improve** 66:9
**improvement** 39:4 75:20
**incentive** 28:22,25 51:12,19,23 53:2,6 53:9,10,11,13,23 54:2 61:16 62:15 73:11,13,16 74:16
**incident** 56:23
**include** 54:3
**including** 10:12
**income** 30:5 54:8,15 54:22 55:10,17 56:25
**increased** 46:14
**increasing** 14:2 60:4
**individual** 35:8 48:25
**individuals** 49:12
**industrial** 10:12
**influence** 5:8
**inform** 37:2
**instances** 55:24
**interchangeably** 32:3 32:14
**interested** 79:19
**intern** 12:4,6
**internally** 22:8
**International** 6:25
**interrupt** 4:21
**involve** 14:25
**involved** 20:3,6 58:25
**issue** 58:10
**issues** 15:2 47:17
**items** 29:9

**J**

**J** 75:2,12
**Jacksonville** 68:23 69:2
**jagresti@cozen.com** 2:10
**Janice** 2:9 6:5 15:5
**Jax** 68:9,23
**Jeff** 17:15 23:18
**Jeremy** 17:19
**Jill** 64:24,25
**job** 10:7,22 33:19 36:9 43:15 44:3,15 65:13
**jobs** 66:6
**join** 12:2
**joined** 12:6 19:18
**joint** 16:20 17:23
**JPC** 1:5
**July** 1:9 13:3 19:6,7 80:4

**K**

**K** 4:2,2 72:2,2
**Katherine** 43:10,11 44:21
**Keenan** 17:19
**keep** 49:10 51:3 52:10 53:18
**keeping** 34:22 52:23
**keeps** 63:8
**Kelly** 17:17
**kept** 49:15,21 52:16 52:20,20
**kind** 21:20 57:7 73:22
**Kloet** 11:25 20:22 29:7 30:4 31:13 47:7,17
**Kloet's** 29:25
**knew** 4:24 29:16 62:22
**know** 5:11 18:9 19:10 19:18 26:5 27:21,24 28:13 29:2 30:3,4,6 30:11,21,23 31:7,11 35:3,15,23 36:12,13 36:18 38:14,23 40:8 40:19 42:8,18 44:9 44:19 45:14 46:25 54:11 55:20 57:6 60:15 61:16,19 62:11 63:9 64:19 65:21 66:21,25 68:20 69:4 75:12 76:7
**knowledge** 5:12 18:6 32:17,19 33:3 42:5 66:16,20 69:3 70:21 70:24
**Kocher** 18:2
**Krimsky** 1:3 2:13 4:10,14 19:8,10,15 19:23 20:7 27:14,21 31:14,18 33:18

35:10 37:15 38:4 39:4 42:6 43:14 44:6 49:15 54:8,15 54:20 58:14 59:2 60:15,21 61:12 62:17 65:21 70:9 73:16 75:20 76:14 80:4
**Krimsky's** 23:20 29:4 36:9,17,18 37:23 45:21,24 46:18 47:18 52:9,16 58:10 60:9 63:23 68:16 75:23
**Krimsky00087** 57:17
**Krimsky00087-90** 78:15
**Krimsky32** 72:21 78:18
**Krimsky39** 70:3 78:17
**Krimsky91** 59:7
**Krimsky91-93** 78:16

**L**

**laminating** 11:21
**laptop** 15:7
**large** 26:18 27:3
**largest** 26:12
**LAW** 2:3
**lawsuit** 4:10 5:19
**leader** 11:18 14:3 16:22,25 19:19 20:13,14,16,17,21 22:2 25:6 28:14 38:10,10,12,20,22 43:11 54:19
**leaders** 53:17
**learn** 30:7
**learned** 68:10
**learning** 9:17
**leave** 55:7 76:22
**leaving** 29:10
**led** 64:20,21
**left** 36:15 38:14
56:18,23
**let's** 44:25 71:16 73:19 74:5 76:6
**letter** 43:16
**level** 6:18 31:3 75:7
**licenses** 7:12
**line** 47:4 48:25 58:17 59:24 66:7
**LINE(S)** 80:5
**liquid** 13:13,16,17,21 13:23,25 14:6,9,12
**liquids** 13:15
**litho** 11:21 65:2,4 74:10,13
**little** 39:9
**Liz** 64:20
**LLC** 1:7
**location** 22:11
**logic** 35:5
**long** 11:2 30:4,11,25 53:18 71:13
**long-term** 53:10,11 53:13
**longer** 18:25 48:24
**look** 24:12 26:15 39:17 40:10 42:21 50:3 54:3 55:21 57:20 64:3 69:18 74:2 75:8
**looked** 6:11,11
**looking** 14:18 23:2,4 23:5 24:25 39:21 41:18 59:11 64:7 70:11
**looks** 40:19 42:25 45:19 47:23 48:10 50:8 55:22 58:7 59:17 61:18 64:11 64:18 73:24 74:3,4 74:7,9,13 75:5
**lose** 36:7
**lost** 30:25 36:12,13 36:14
**lot** 30:22 36:7 37:20 64:22
**luck** 77:11
**lunch** 25:16 71:10
**Luncheon** 71:21
**lunchtime** 71:11

**M**

**main** 66:6
**maintain** 34:23
**makeup** 51:19
**making** 35:18 60:25 67:14
**manage** 9:14 66:3 67:3,4
**managed** 11:21 24:17 65:2
**manager** 11:23 14:14 14:17 16:20 18:3 24:2,4 29:14 31:15 32:3,13 35:11 43:24 47:7,10 55:15,25 67:6 75:7
**managers** 16:21 17:25 19:24 21:22 22:4,20,21,25 23:11 29:24 32:7 73:9
**manages** 9:15,16
**managing** 12:23,25 13:5 23:3 40:20
**manufacturers** 11:11
**March** 11:4 12:6 42:5
**mark** 8:6 11:25 17:13 20:22 26:22 29:7,15 29:19,25 30:4 39:6 39:12 41:6 42:10 47:7 49:22 57:15 59:5 63:2,7,10 69:5 70:2 72:18
**marked** 39:15 41:8 42:12 45:7,14 49:25 57:18 59:8 63:4 64:3 69:8 70:4 72:22
**market** 11:12
**marketing** 9:11
16:18 17:18
**marking** 45:5
**marriage** 79:18
**married** 7:17
**Marshall** 1:3 2:13 4:10 19:8 20:15,20 21:3 23:20 25:2,12 29:11 31:12 35:10 44:9 45:21 47:24 49:6 50:13,15 51:2 58:8 59:18 65:14 66:13 67:2 68:21
**Marshall's** 73:7
**master's** 6:20,24
**mathematically** 63:19,21,24
**matter** 25:5 47:8 66:24 69:21 79:19
**max** 61:22 62:6,13,23
**maximum** 61:8,19,21 61:24 62:7,16,24
**MBA** 12:8
**McBride** 41:22
**McCall** 17:22
**MeadWestvaco** 13:10,12
**mean** 9:13 21:6 25:25
**means** 4:18 28:8
**meant** 4:24
**medical** 4:25
**medication** 5:5
**meeting** 51:14 76:16
**meetings** 37:13 68:8
**mentioned** 31:23
**merchandising** 10:24 11:3,8 12:13,20 20:11 23:12,22 27:13,23,25 32:18 38:18 43:5,12 51:13 54:13 75:15
**mergers** 34:10
**messages** 15:7
**met** 41:2 61:20 74:13 76:14
**Metalco** 23:16

**middle** 48:13
**midsize** 27:6
**midwest** 16:16 17:14
**mill** 14:15
**million** 74:13
**million-dollar** 26:14 26:16
**mind** 58:16
**minus** 74:11
**minute** 15:6 39:17 71:6
**minutes** 45:2 71:15 71:16 76:4
**mismarked** 71:2
**moments** 41:14 42:17 57:20
**Monday** 19:7
**money** 37:20 52:11 52:17
**months** 47:9 56:13
**morning** 4:9 77:10
**motivate** 55:11
**move** 29:17 49:5 55:11
**moved** 29:22,25 42:8 42:9 54:5
**moving** 29:13 33:25

**N**

**N** 2:2 4:1,2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,2 73:1 74:1 75:1 76:1 77:1 78:1,2 79:2
**name** 4:9 11:23,25 13:8 23:14,15,17,18 42:4 44:13,19 80:4 80:5
**named** 21:2
**Natalia** 42:3
**native** 72:20
**necessarily** 63:12,24
**necessary** 75:11
**need** 5:11 15:6 46:24 48:23 64:15 66:9 68:6,7 70:5 71:14 76:8
**needed** 29:16 67:3
**needs** 68:11
**never** 37:15,16 65:14 65:19
**new** 1:1,19 2:4,4,9,9 4:4 15:3 19:2 23:3,4 23:5 25:2,7 29:22 43:24 44:16 54:5 59:21 61:7 66:21 67:23 73:23 74:8,12 74:14 79:4,10
**Newark** 20:4
**Nickie** 1:16 47:20 59:11 77:21 78:5 80:5,18
**Nicole** 23:16
**north** 16:17 17:16
**Notary** 1:18 3:5 4:3 77:25 79:9 80:20
**note** 47:21,23 53:21 63:13,23
**noted** 77:17
**notes** 76:2
**Notice** 1:17
**noticed** 24:22 25:2,11
**number** 26:17 45:6 47:2 57:16 59:7
**numbers** 26:22 61:3 74:25,25 75:10

**O**

**O** 75:3,13 79:2
**o'clock** 76:7
**O'CONNOR** 2:7
**oath** 5:15
**object** 73:20
**objection** 25:23 26:8 27:18 28:5,16 30:9 32:8 33:6 34:24 35:13,21 36:10 37:5 37:24 38:5 41:3 44:7,17 46:2,21 47:19 48:8 49:17 51:9,24 52:12,18 54:9,17,24 55:12,18 56:4,9,15,20 57:3,9 58:11 60:18,23 61:14 62:3,10,19 63:7 65:16,23 66:18 67:10,19 68:17 69:23
**objections** 3:12 72:13
**objective** 51:16
**objectives** 51:15,18
**October** 10:6 12:19 18:23 29:5,21 40:15 58:16 59:25 60:5 61:7 64:16 68:15 73:24 75:16
**off-the-record** 6:16 18:13
**official** 19:7
**Officially** 19:6
**okay** 6:13 15:9 22:18 39:24 40:23 42:23 45:3,17 50:6 57:25 58:3 59:12,13 64:8 69:14 70:11,12,21 71:16 72:14 73:3,19 74:15 75:12
**old** 36:20
**oldest** 27:16
**once** 19:18
**ones** 75:5
**open** 17:6,8 29:9 39:8 50:2 59:10 64:6 69:12 70:9
**operational** 36:2 51:18
**operations** 11:14 15:4 20:13
**opportunities** 22:21 23:3,3,5 24:25 25:2
**orders** 22:14
**Ordinarily** 17:5
**organization** 18:21 21:23 23:9
**organizational** 33:25 38:23
**organized** 20:12 22:10,12
**Originally** 31:7
**outcome** 79:19
**outside** 31:22 32:20 32:22,24 33:2,4,11 33:12
**overall** 28:20 52:3 53:4,6
**overlap** 29:8
**override** 28:3,7
**oversight** 25:10

**P**

**P** 2:2,2 4:2 72:2
**P&G** 26:13
**p.m** 71:21,23 77:17
**Pacific** 12:24 13:2
**packages** 13:15
**packaging** 9:11 10:13 10:14 11:22 13:14 13:15,21,23,25 14:6 14:9,12 16:2 33:10 33:12 35:3 65:2,4
**packing** 10:13
**page** 40:22 43:9 46:9 48:13 49:24 58:18 59:15,24 64:14 65:8 65:9 68:3,4 74:15

74:17,20 78:7,11 80:5
**paid** 18:6 30:5 42:6,9 47:9 57:12
**Pam** 44:12,14
**paper** 14:15 33:14
**paragraph** 46:8 47:3 60:3 61:4
**Parker** 1:16 4:1,9 5:1 6:1,18 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1,18 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,14 42:1,17 43:1 44:1 45:1,13 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,5 59:1 60:1 61:1 62:1 63:1 64:1 64:9 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,6 74:1 75:1 76:1,13 77:1,9 77:21 78:1,5 80:5 80:18
**part** 7:15 11:5 19:12 19:17 21:7 22:24 23:10 24:6,9,16 25:3,18,19 29:18 31:20 33:17 34:2,14 34:19 35:9,24 41:24 43:25 48:10 51:22 53:7,11,13 64:20,25 67:25
**particular** 6:23 47:21
**parties** 3:4 79:17
**partner** 44:23
**party** 5:19
**pass** 29:9
**Patarinni** 23:16
**path** 48:16
**Patty** 23:15
**pay** 47:12 51:23 57:7 57:11,14
**payments** 74:16
**payout** 73:13,16
**people** 17:9 32:23 33:16 35:2,4 55:3 59:2
**Pepperidge** 27:3 34:22 35:12,12,16 35:19 36:8 37:3 40:20 46:12 52:11 52:17,21 70:22 73:23 74:11
**percent** 46:10,20 54:8,16,23 55:10,17 55:21,23 56:8,25 57:2,6 63:8,11 70:22
**percentage** 56:3 63:13
**performance** 18:15 28:25 39:4,21 40:2 40:13,18,24 67:24 67:25 75:20
**performed** 18:16
**period** 37:2 40:14
**person** 34:17 41:2,23 56:23
**perusing** 39:20 41:12 42:20 45:16 50:5 58:2 59:9 64:5 69:13 73:2
**place** 58:15 69:3 75:20
**placing** 39:3
**Plaintiff** 1:4 2:3
**Plaintiff's** 39:14,15 41:8 42:12 45:7 49:25 57:18 59:8 63:4 69:8 70:4 72:22
**plan** 28:22,25 29:14 39:4 40:24 49:16,21 51:19 53:19,23 59:22 61:16,23 62:6 62:12 66:9 73:11,14 75:20
**planned** 43:14
**plans** 48:22,24,25 49:2 62:22
**plants** 10:10 22:8
**play** 39:3 75:19,22
**playing** 16:22
**please** 4:19 8:7 26:23 41:14 42:17 45:13 51:3 57:20 64:3
**PLLC** 2:3
**plus** 28:19,21 62:8,14 62:18,23
**point** 11:10,12 17:2 17:10 40:20 54:6 58:13 66:8 68:21 74:12
**portion** 51:12 52:3
**position** 17:7,8 24:20 31:2
**positions** 31:17
**positive** 46:15
**possible** 68:5 70:10
**possibly** 61:12
**potential** 74:25
**predecessor** 12:3
**predecessors** 12:15 15:18
**prepare** 6:9
**prepared** 40:6
**preprint** 11:20 64:23 73:22 74:10
**present** 2:12 37:22 38:3
**president** 9:19,24 10:2,4,8,20,23 11:8 12:12,16,17,21 13:13 15:25 16:6,14 16:16,17,18,19 17:6 17:11,18,20 20:10 38:17 75:15
**previous** 47:13
**previously** 5:14 72:3
**price** 66:21
**pricing** 9:15
**printed** 21:9,12,17,19
**prior** 60:13
**probably** 23:14 26:13 29:8 70:5 71:5
**problem** 71:7
**problems** 24:19
**Proctor** 26:13
**produced** 70:8 72:20
**products** 15:3
**professional** 7:12 19:21,22
**profitability** 51:7,21 52:5 53:3
**program** 6:24 58:19
**pronoun** 49:10
**provided** 25:4 26:23
**Public** 1:19 3:5 4:3 77:25 79:9 80:20
**pull** 63:5
**pulling** 41:16
**purchase** 11:11,12
**purchasing** 77:14
**purpose** 67:8
**pursuant** 1:16
**pushback** 67:2,5,6,9
**put** 41:10 42:14

**Q**

**quality** 14:14,17 15:2
**quarter** 40:8,11 65:8
**QUEENS** 79:6
**question** 4:20,22,23 22:17 35:23 45:9,10
**questions** 3:12 4:12 76:12 77:6,7
**quickly** 72:10
**quite** 14:6 26:18 30:25
**quotes** 66:22

**R**

**R** 2:2 4:2,2 72:2,2 79:2
**ramifications** 52:9
**rating** 40:25
**reaction** 45:24 54:22 67:15,18
**read** 45:10 73:19
**reading** 39:10 47:24 48:6 63:15,22
**ready** 36:23 42:18
**really** 26:18 56:11,22 72:10
**reason** 55:4 80:5
**recall** 5:2,6 20:2 22:14 32:13 38:7 41:21 46:6 51:17,18 51:21 56:6,7,11,17 56:18 59:3 60:11,11 60:12,20,21,25 61:19,22 62:21 69:19,25 76:19,21 76:23
**recast** 54:3
**receive** 12:8 28:2,9 28:14 70:22
**received** 47:13,16,20 48:5,7
**recess** 15:10 30:16 45:4 71:21 76:10
**recognize** 42:4
**recollection** 46:5 52:23 67:14
**recommend** 68:9
**reconvene** 71:17 76:6
**record** 4:17 6:14 8:7 15:6 18:12 47:20,22 63:7,10,14 72:17 79:14
**reducing** 61:6
**reference** 63:7
**referred** 45:10
**referring** 49:11
**reflection** 57:8
**related** 79:17
**relationship** 19:14,20 19:22
**relay** 5:2,6
**remained** 56:13
**remember** 13:6 21:14 22:12 23:15 23:19,23,24 27:5,8 29:2 33:23 39:25 44:13,19 46:23 50:20,23 51:2 56:22 61:3 62:5,12 67:13 73:7,18 76:16,17
**rep** 15:20 19:16 35:5 67:7
**rephrase** 4:22
**replacing** 17:3
**report** 15:24,25 17:9 20:21 34:17 44:2
**reported** 21:3 31:24
**reporter** 1:18 4:18 45:11 77:13 79:8
**reporting** 17:10 18:4 20:15,18,20 68:8
**reports** 16:9,24 17:4 25:9,12,15
**represent** 4:10
**representative** 14:24 15:13 21:4,5,8 32:2
**representatives** 20:24 21:3 22:15,20 31:24 32:6 66:2
**reps** 21:11 23:8 33:11 33:12,15
**reserve** 72:12
**reserved** 3:13
**respective** 3:3
**respond** 44:11
**response** 44:5 48:19
**responsibilities** 10:7 11:7 14:13 22:5 65:13
**responsibility** 9:10 10:9,11 11:5,13 14:3,10 19:11 20:15 29:6 53:21
**responsible** 16:7 31:5 31:9
**rest** 24:20 29:24 58:20
**result** 53:4
**results** 28:20
**resume** 14:18
**resumed** 72:2
**retained** 78:20
**retire** 36:23,25 37:7,9 37:11
**retired** 11:24
**retirement** 38:4
**retiring** 11:18 29:7 37:18 38:8
**revenue** 52:4,21,24
**review** 6:9 41:15 42:18 45:13,15 72:13
**reviewed** 45:17
**reviews** 46:15
**Richard** 23:17
**rid** 54:7,15,20
**Rigdon** 64:19
**right** 14:19,20 16:11 17:8 23:19 24:22 25:11 38:24 40:16 55:5 66:22 69:11 74:16 76:24
**Rikkard** 17:13
**road** 4:5 67:13
**Robards** 43:2 44:20 69:17
**role** 9:21 11:2,16 12:14,19,22 13:8,12 13:19,21,24 15:12 15:15,21,22,23 16:6 16:22,23,24 17:3,4 17:9 22:24 23:10 24:5 25:5 33:24 34:22 39:3 57:13,14 66:23 67:15 75:19 75:22
**roll** 21:9
**rolls** 11:21 21:5,6,12 21:18,20 74:4
**room** 6:4
**Ruthayn** 1:18 4:3 45:8 79:8,25

**S**

**S** 2:2 78:10
**salaries** 55:24 56:2 56:12
**salary** 18:7 28:19 29:12 53:25 55:20 56:19,24 57:5 60:5 60:6,9 61:2,11 62:7 62:14,14,24 73:13
**sale** 32:6
**sales** 9:11,15,16 10:9 11:11,14 13:4 14:23 15:13,20 16:21 17:25 18:3 19:16 20:14,16,17,21,24 21:2,4,4,11 22:2,15 22:20 23:8 24:7 25:19,22,25 26:2 27:8 28:2,3,7,10,14 28:14,18 31:20,22 31:23 32:2 33:11,12 33:15 34:19 35:5,9 38:9,10,12,20,22 46:14 66:23 67:7 70:23 73:9 75:7
**Salesforce.com** 24:25 25:3
**salespeople** 18:4 26:3 32:4,15,16,20,22,24 33:2,5
**salesperson** 15:14,18 27:16 31:19 34:6 66:6
**save** 71:5
**saved** 37:19
**saying** 55:9 62:13,23 63:21
**says** 41:5 46:9 47:4 47:14,15 48:20 59:25 61:4,18,21 65:18

**scheduling** 64:21 65:3 66:3
**school** 6:21
**scope** 24:12
**screen** 39:9 70:6 74:19
**sealing** 3:8
**second** 6:15 18:11 40:22 41:17 47:4 58:18 64:12 65:9
**second-to-last** 59:24
**secured** 46:12
**securing** 31:5,9
**see** 37:14,16 43:21 46:8,16,17 47:14,15 48:17,18,18 55:6 57:14 58:17,22 60:7 61:9,10 66:10,11,14 66:15 68:13 70:18 73:19 74:6
**seeing** 41:21 73:7
**seen** 37:15 39:24 41:19 42:24 44:13 45:18 50:7 58:5 59:16 64:9 69:16 70:14,16,19 73:5
**segment** 48:23
**segments** 10:12
**sell** 10:16,18 11:21 21:7 22:8
**seller** 24:23 25:5 65:25
**sellers** 21:13,15 26:17 29:18 65:6,19
**selling** 24:8
**send** 68:10
**senior** 9:19,24 10:2,4 10:8,20,23 11:8 12:12 14:3 16:5,14 16:15,17 17:5,11 20:10 38:17 53:17 75:15
**Sent** 50:10
**sentence** 47:5 66:12
**separate** 11:17 35:6
**separately** 34:17
**September** 18:23 27:9 40:15 45:20 50:10 58:8,9,15 59:18 74:5
**series** 48:6
**service** 14:23 15:13 15:20 35:25 64:21 65:3 66:2
**SERVICES** 1:7
**session** 71:23
**set** 16:23 68:7 79:12 79:21
**setting** 59:21
**settled** 58:13,16
**Shalom** 1:18 4:3 79:8 79:25
**Shanghai** 13:3,7,11
**share** 39:9 74:19
**Shaw** 17:24
**sheet** 10:14,15,18 18:10 80:2
**sheets** 10:16
**short** 15:10 30:16 36:25 45:4 75:25 76:10
**short-term** 28:22,24 51:11,19,22 53:2,6 53:9 54:2 55:22
**shorthand** 1:18
**Shu** 23:17
**sign** 72:13
**Simon** 17:24
**single** 35:5
**Siracusa** 38:19,25
**situation** 55:16
**situations** 68:6
**six** 56:13
**size** 27:5
**Slusarz** 2:5 4:8,10 6:14,17 8:8 9:2 15:9 15:11 18:11,14 26:24 27:2 30:12,17 39:16,23 41:6,9,13 42:10,13,16 44:25 45:5,8,12 49:22 50:4 57:15,19,22,25 58:4 59:5,12,14 63:2,5,15,18 64:2 69:5,9,15 70:2,5,13 70:25 71:8,13,16 72:6,15,18,24 73:4 74:21,22 75:4,25 76:6,11 77:5,9 78:8 78:20
**small** 51:12 53:5 70:7
**Smith** 43:10,11 44:21
**Smurfit** 2:14 9:6,7 19:2,5 77:2
**sold** 21:5,6,8,11,12 21:16,18,20
**solutions** 10:24 11:5 11:9,17,20 19:12,13 20:7,11,12,25 21:17 23:13,21 24:18,21 25:21 26:3,7,14,16 27:13,17,22 28:2 32:19 38:11,18 41:25 43:6,12 44:22 44:24 51:6,7,14,22 53:3 54:14 58:25 75:16
**solutions'** 52:5
**somebody** 10:17
**someone's** 37:14
**soon** 43:22
**sorry** 15:5 49:13 52:14
**Sounds** 76:9
**south** 10:3,5,8,10,21 16:22,25 17:3,6
**SOUTHERN** 1:1
**span** 24:12
**speak** 4:19 5:11 50:15 68:19
**specific** 49:11 52:7 54:12 56:22 68:5
**specifically** 52:2 53:3 73:8
**specifics** 61:23 62:5 62:12,21
**speed** 39:10
**spent** 12:5
**Sperico** 16:4
**spreadsheet** 72:19
**ss** 79:5
**standpoint** 35:16,16 35:17 37:14
**stands** 68:23
**start** 4:16 59:25 66:13
**started** 11:3 13:20 14:7,8,9,12 19:17
**starts** 61:5 65:7
**State** 1:19 4:4 79:4,9
**statements** 36:16 47:8
**States** 1:1 16:7,8
**stating** 4:4 68:10
**stay** 38:9
**Steele** 21:2,13,16,24 21:25 22:2 31:24 38:9 43:2,9,19 44:2 45:20 47:24 48:3,7 48:12 49:4 50:9 55:5 58:8,18 64:15 65:9,12 66:7,16 69:18,21
**Steele's** 21:11 22:15 29:17,23 31:20 32:10 34:2,5
**stick** 49:8
**stip** 28:19,21
**STIPULATED** 3:2,7 3:11
**stipulations** 72:8,11
**stock** 53:19
**stopped** 75:14
**strategy** 9:18
**Street** 2:8
**structure** 38:24
**study** 7:4
**subject** 50:24 69:21
**subjective** 53:16
**subordinate's** 55:17

**Subscribed** 77:23 80:19
**subsequent** 50:23,24
**substance** 33:21
**substantially** 60:22
**subtract** 74:5
**success** 14:9
**successful** 35:11 36:4
**successfully** 41:2
**successor** 38:25
**SUED** 2:9
**suggest** 71:9
**suggested** 25:15
**suggesting** 36:22
**suggests** 59:4
**Suite** 2:4
**summarizing** 31:25
**summary** 74:16
**summer** 12:4,5,6
**summers** 12:5
**supply** 20:16 64:22 64:25
**support** 48:24 65:5
**sure** 8:8 11:10 28:7 43:24 50:4 55:4 67:4 71:8 72:17 74:21 75:9
**surprise** 30:7 66:4
**SVP** 9:8
**sworn** 3:5 4:3 72:3 77:23 79:12 80:19
**system** 25:3

**T**

**T** 78:10 79:2,2
**take** 30:12 41:14 42:17 44:25 57:20 64:3 69:3 70:25 75:25 76:3
**taken** 4:17 15:10 29:16 30:16 45:4 76:10
**talk** 33:18 37:15 42:19 73:22
**talked** 53:9 55:5
**talking** 15:12 49:14 65:13 74:18
**Tammie** 38:19 40:9
**target** 61:20,21 62:6 74:3,8 75:5
**tasks** 65:22
**team** 9:15 20:17,23 21:13,15 22:16 24:7 24:9,17 25:19 28:4 29:19,23,25 31:20 31:20 32:10,25 33:8 33:10,12,16,17 34:2 34:5,12,15,19 35:3 35:9 36:2 43:25 49:6 58:20 64:21 65:2
**teams** 15:7 33:4,9 37:13 66:3,22
**technical** 14:23 15:13 15:20
**tell** 37:19 40:3,10,17 41:22 43:14,17
**telling** 33:23 50:21 74:24 75:9,13 76:21
**tells** 70:19
**ten** 76:4
**ten-minute** 30:13 71:2
**tense** 19:20
**term** 53:18
**terminate** 75:23
**terminating** 68:16,21
**terms** 32:14
**testified** 4:6 7:17 72:4 76:13
**testimony** 5:14 8:3 26:10,20 31:25 79:14
**Texas** 7:8 14:15
**thank** 8:9 26:25 72:16,17 76:9 77:9 77:12
**Thanks** 9:23 48:20 71:18
**things** 4:15 24:22 25:9,11,16 31:22 65:4,20 66:5
**think** 6:7,12 13:20 16:11 20:17 21:21 23:17,18 24:13,16 25:8 26:17 29:21 34:8,11,18 35:24 36:5 37:5,21 42:7 47:20 49:20 53:20 54:21 55:10 57:7 67:21
**third** 64:13 66:7
**Thirty** 71:15
**thought** 43:21 55:3
**three** 9:21 29:8 30:8
**tied** 28:25
**tiers** 61:17,19 62:11 62:22,22
**Tim** 17:17 18:2
**time** 4:21 12:6,25 13:5,9 14:16 18:19 18:20 20:19 22:13 29:10,21 30:25 32:17 36:15 37:2 38:15 43:6,12 51:17 51:20 55:2,25 71:10 77:10,17
**timeframe** 12:17 13:18
**times** 14:21 76:19
**timing** 36:13 40:7
**title** 9:7,25 23:20 32:12 33:19 66:24
**titles** 16:13
**today** 4:12 5:12 61:5
**today's** 5:24 6:10
**told** 6:7 29:10,12,19 47:10
**Tony** 23:16
**top** 26:6 40:5 68:3 74:15
**total** 26:15 61:22 73:24
**toxic** 66:8
**tracking** 24:25
**trade** 2:8 7:14,15
**traditional** 32:20,22
**training** 9:17 25:3 64:16 68:8,9 69:2
**transcript** 77:14 79:13
**transfer** 20:7
**transferred** 47:5
**traveling** 25:15
**treated** 19:24
**trial** 3:13
**true** 79:14
**truthfully** 5:12
**try** 4:20 23:15
**trying** 22:8 49:3 53:17 54:7,14,20 70:10,18 74:23 75:8
**Tulane** 6:22
**turn** 21:19 40:21
**turned** 9:3
**Turner** 17:15
**twice** 76:14
**two** 11:19 16:21 21:11 29:8 31:2 32:14 47:9 76:19
**typically** 75:6

**U**

**U.S** 77:4
**undergrad** 7:4
**understand** 4:22 22:17 28:7 31:3 37:17 58:19 63:22 74:23 76:24
**understanding** 22:6 22:19 25:13
**Understood** 63:17
**unfair** 46:13
**United** 1:1 16:7,8
**universal** 35:18
**University** 6:22 7:8
**unsettled** 58:10
**update** 48:21
**upset** 46:7 55:3
**use** 32:2,14 49:13

**usually** 49:13 51:20

**V**

**v** 80:4
**value** 22:9
**valued** 57:14
**values** 57:8,12
**van** 11:25 20:22 29:7 29:25 30:4 31:12 47:7,17
**venture** 16:20
**ventures** 17:23
**versus** 57:14 61:20
**vice** 9:19,24 10:2,4,8 10:20,23 11:8 12:12 12:16,17,21 13:13 16:6,14,15,17,18,19 17:5,11,18,20 20:10 38:17 75:15
**vis-a-vis** 35:11
**visiting** 25:14
**visits** 25:9
**volume** 26:2 27:8 28:10

**W**

**wait** 71:3
**waived** 3:9
**Walker** 23:18
**want** 48:14 55:6 63:6 63:10,13,23 72:9
**wanted** 43:23 47:21 50:15 55:4,8 72:16
**wasn't** 20:20 25:13 64:17
**way** 14:20 21:21 22:23 28:7 36:3,6 51:3 52:6 65:8 66:22 67:3 79:18
**we're** 4:16 41:16 63:20
**we've** 36:14
**weeks** 9:21 29:8
**welcome** 43:24
**went** 13:3,4,7,11
**weren't** 49:8
**west** 16:15 17:12
**WestRock** 1:6,6 2:14 4:11,13 9:6,7 10:22 12:2,14 15:18 18:16 19:2,4,5,25 24:24 25:4 28:20 30:19 31:6 32:19 33:4,8 34:8 35:17 36:7 37:4 49:11 52:10,16 52:20,20 53:18 54:7 54:11 55:7 60:4 61:5 68:15,19,20 77:3 80:4
**Westrock0223** 39:13
**Westrock0223-25** 78:13
**Westrock0255** 45:6
**Westrock0255-0256** 78:14
**Westrock0265** 49:24 78:15
**Westrock0288** 42:15
**Westrock0288-69** 78:14
**Westrock254** 41:10 78:13
**Westrock257** 63:3 64:4 78:16
**Westrock263** 69:6
**Westrock263-264** 78:17
**WHEREOF** 79:20
**Whoever's** 40:21,24
**witness** 39:19,20,21 41:12 42:20 45:16 50:5 58:2 59:9,13 64:5 69:13,14 70:11 73:2,3 77:12 78:4 79:11,15,20
**word** 4:17,17 32:2 49:13
**work** 23:8 36:3 57:8 65:25 66:22 71:12
**worked** 15:2,3 21:24 21:24 22:7,8 32:15 35:4,19 44:21
**working** 4:13,13 23:2 35:24 50:22
**workplace** 5:22
**works** 34:12 71:13
**World** 2:8
**wouldn't** 17:3 34:22 52:2,5,6 53:2
**write** 68:4
**writes** 48:13 58:19 66:8
**written** 31:8 47:6
**wrong** 22:18

**X**

**X** 1:2,8 78:2,10

**Y**

**year** 11:16 12:8 18:23,24,25 19:3 27:9 29:13,21,22 37:12 40:11 44:16 47:13 51:20 53:23 53:23 54:5 60:13,16 60:22 61:8,13,25 62:2,18 67:22,23,24 73:12 74:3,5,6 75:18
**yearly** 18:17 28:23
**years** 14:2,11,19 30:8 31:2 33:16 34:9 46:14 55:15 67:12 67:22
**York** 1:1,19 2:4,4,9,9 4:4 79:4,10

**Z**

**zero** 74:9,14
**zoom** 1:17 70:10

**0**

**0256** 45:6

**1**

**1** 29:5 39:14,14,15 40:15 59:25 60:5 61:7 78:13
**1,028** 74:7
**1,032** 74:4
**1:02** 77:17
**10** 56:8 70:4 78:17
**10:20** 30:13
**10:30** 30:14
**100** 26:14
**1000** 4:5
**10006** 2:4
**10007** 2:9
**101** 73:23
**11** 72:19,22,23 78:18
**111** 74:14
**111,111** 74:12
**12:02** 71:21
**12:12** 71:4
**12:35** 71:17
**12:40** 71:23
**122** 73:24
**125,000** 74:11
**12th** 64:16 79:21
**13,000** 74:12
**145,000** 60:6,22 62:8 62:18
**15** 45:2
**1540** 2:4
**157** 73:25
**16** 50:10
**175** 2:8
**1974** 8:5
**1997** 12:11
**1998** 12:7
**1st** 29:21 58:16

**2**

**2** 41:8,9 70:22 78:13
**2,200,000** 74:11
**2003** 14:19
**2004** 14:8,19
**2005** 14:19
**2011** 12:9 13:21,22 14:7
**2013** 13:3,3

**2016** 12:19 13:4
**2019** 20:4 30:2
**2021** 11:4 40:15
**2022** 10:6 11:6 27:10 29:5 40:5,12,14,15 42:5 43:3 45:20 50:10 58:8,9 59:19 59:20,25 60:5 61:7 68:15 75:16
**2023** 61:8,25 62:18 70:23 73:11,17 75:18
**2024** 1:9 77:24 79:21 80:4,20
**203,000** 61:13 62:2
**20th** 59:18
**21** 73:24
**23:Civ-6252** 1:5
**25** 39:13
**264** 69:7
**273** 74:9
**29** 1:9 80:4

**3**

**3** 2:8 42:12,13,14 78:14
**30** 27:9 40:15 71:16
**30%** 46:14
**30328** 4:5
**33** 10:10
**350** 26:16
**39** 2:4 78:13
**3rd** 8:5

**4**

**4** 45:6,7,14 78:8,14
**41** 78:13
**42** 78:14
**45** 78:14

**5**

**5** 49:23,25 57:21 78:15
**50** 9:3 78:15
**500,000** 60:16
**55th** 2:8
**57** 78:15
**58,000** 61:8,18 62:8 62:16,18
**59** 78:16
**5th** 19:6

**6**

**6** 57:16,18,22 78:15
**60s** 27:22
**63** 78:16
**69** 42:15 78:17

**7**

**7** 59:6,8 78:16
**7.6** 74:13
**70** 78:17
**72** 78:18
**75** 46:10,20 54:8,16 54:23 55:10,17,21 55:23 56:25 57:2,6 63:8,11

**8**

**8** 63:4 64:4 78:16
**8th** 19:7

**9**

**9** 69:6,8 78:17
**9:36** 1:10
**90** 57:17
**929** 74:7
**93** 12:5 59:7