# In the Matter of

Case No. 23-Civ-6252 (JPC)

## KRIMSKY

v.

## WESTROCK COMPANY, et al.

---

## Examination of Tammy M. Siracusa

*Tuesday, July 30, 2024*

---

## CONDENSED



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

**2**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
MARSHALL KRIMSKY,

     Plaintiff,

                Case No.
                23-Civ-6252 (JPC)

    -against-

WESTROCK COMPANY and WESTROCK SERVICES, LLC,

     Defendants.
- - - - - - - - - - - - - - - - - - - - x

July 30, 2024
9:33 a.m.

   REMOTE EXAMINATION BEFORE TRIAL VIA
VIDEOCONFERENCE of the Defendants herein, by a
Witness, TAMMY M. SIRACUSA, taken by
FRANCES CODD SLUSARZ, in the above-entitled
action, held at the above time, pursuant to
Notice, taken before DEVORA HACKNER, a
Stenographic Reporter and Notary Public within
and for the State of New York.

1
2  A P P E A R A N C E S:
3  GODDARD LAW PLLC
      Attorneys for Plaintiff
4      39 Broadway
      Suite 1540
5      New York, New York 10006
      646-964-1178
6  BY:  FRANCES CODD SLUSARZ, ESQ.
      frances@goddardlawnyc.com
7
8
    COZEN O'CONNOR
9      Attorneys for Defendants
      175 Greenwich Street
10     55th Floor
     New York, New York 10007
11   212-453-3978
   BY:  JANICE SUED AGRESTI, ESQ.
12     jagresti@cozen.com
13
14  ALSO PRESENT:
15  ANISSA FLOYD, ESQ.
     WestRock Company
16
    MARSHALL KRIMSKY
17
18
19
20
21
22
23
24
25

**3**

1
2    F E D E R A L   S T I P U L A T I O N S
3
4      IT IS HEREBY STIPULATED AND AGREED by
5  and between the attorneys for the respective
6  parties herein, that filing and sealing be and
7  the same are hereby waived.
8
9      IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form of
11  the question, shall be reserved to the time of
12  the trial.
13
14     IT IS FURTHER STIPULATED AND AGREED
15  that the within deposition may be signed and
16  sworn to before any officer authorized to
17  administer an oath, with the same force and
18  effect as if signed and sworn to before the
19  Court.
20
21
22
23
24
25

**4**

1       T. M. SIRACUSA
2     THE STENOGRAPHER:  Will you
3  be ordering a copy of the
4  transcript?
5     MS. AGRESTI:  I will be,
6  yes.
7     THE STENOGRAPHER:  Good
8  morning.  My name is Devora
9  Hackner.  I am your remote
10  stenographic reporter.
11    The parties are present via
12  videoconference to take the
13  deposition of Ms. Tammy M.
14  Siracusa in the matter of
15  Marshall Krimsky against WestRock
16  Company and WestRock Services,
17  LLC.
18    Today's date is July 30,
19  2024 and the time is 9:33 a.m.
20    This deposition is being
21  taken by means of
22  videoconference, and the oath
23  will be administered remotely by
24  me pursuant to Federal Rule of
25  Civil Practice 30(b)(4) and upon

1 (Pages 1 to 4)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

5

T. M. SIRACUSA
1
2  agreement and stipulation of all
3  counsel.
4      It's important that everyone
5  speak one at a time, as delays do
6  occur in transmission.
7      If there is no objection to
8  this remote proceeding, will the
9  parties please state their name,
10  beginning with the taking
11  attorney, and who they represent.
12      MS. SLUSARZ:  My name is
13  Frances Slusarz.  I consent.  And
14  I represent the plaintiff,
15  Marshall Krimsky.
16      MS. AGRESTI:  My name is
17  Janice Sued Agresti, from the law
18  firm of Cozen O'Connor.  I
19  represent the defendants in this
20  matter.  And we consent to this
21  deposition.
22  T A M M Y  M.  S I R A C U S A, the
23  witness herein, having been first duly
24  sworn by a Notary Public of the State of
25  New York, was examined and testified as

6

T. M. SIRACUSA
1
2  follows:
3      THE STENOGRAPHER:  State
4  your name for the record, please.
5      THE WITNESS:  Tammy M.
6  Siracusa.
7      THE STENOGRAPHER:  State
8  your address for the record,
9  please.
10      THE WITNESS:  XXXXXXXXXXX
11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12  XXXXX.
13      MS. AGRESTI:  Please mark
14  that confidential for the record.
15      THE STENOGRAPHER:  Okay.
16  And are you in Georgia right
17  now?
18      THE WITNESS:  Yes.
19      THE STENOGRAPHER:  Counsel,
20  do we agree that I could take the
21  oath even she is out of the state
22  of New York?
23      MS. SLUSARZ:  Yes.  For
24  plaintiff.
25      MS. AGRESTI:  Yes.

7

T. M. SIRACUSA
1
2      And just to confirm, just
3  'cause I didn't seek
4  confirmation, it's marked
5  confidential for the record, the
6  address?
7      THE STENOGRAPHER:  Yes.  Do
8  you want it redacted?
9      MS. AGRESTI:  Redact it,
10  please.
11      MS. SLUSARZ:  And I consent
12  to it being marked confidential.
13      Before we start, do we want
14  to agree to stipulations that
15  we'll only object as to the form
16  of the question and that your
17  client will read and sign?
18      MS. AGRESTI:  Yes.  We'll
19  reserve all objections except for
20  form.  And then yes, read and
21  sign.  Thank you.
22      MS. SLUSARZ:  Okay.
23  EXAMINATION
24  BY MS. SLUSARZ:
25      Q. Good morning, Ms. Siracusa.  My

8

T. M. SIRACUSA
1
2  name is Fran Slusarz.  I'm an attorney
3  with Goddard Law PLLC.  And we
4  represent Marshall Krimsky in a lawsuit
5  we brought against WestRock Company and
6  WestRock Services.
7      I'm going to ask you some
8  questions today about your experience
9  both with WestRock and with
10  Mr. Krimsky.  And so just a couple of
11  things, some of the them that
12  Ms. Hackner has already mentioned.  One
13  is that since she's taking down
14  everything we each say, it's important
15  that only one of us speaks at a time.
16  So please wait until I finish a
17  question before you answer it.  And
18  I'll do my best not to cut you off.
19      It's also important that you
20  respond with words instead of like
21  gestures or uh-uhs or uh-huhs because
22  that also doesn't really translate into
23  a transcript.  And if you don't
24  understand a question I ask, please ask
25  me to rephrase it.  If you answer a

The Little Reporting Company
646.650.5055 | www.littlereporting.com

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

9

T. M. SIRACUSA

1 question, I'm going to assume that you
2 understood what I was asking.
3
4       Now, do you have any medical
5 conditions that affect your ability to
6 recall and relay facts today?
7       A. No.
8       Q. Are you on any medication that
9 affects your ability to recall and
10 relay facts?
11      A. No.
12      Q. Are you currently under the
13 influence of any illicit drugs or
14 alcohol?
15      A. No.
16      Q. Do you know what it means to
17 give testimony under oath?
18      A. Yes.
19      Q. And what is your understanding?
20      A. I have to answer the questions
21 truthfully.
22      Q. Do you have any -- have you been
23 convicted of any crimes?
24      A. No.
25      Q. Have you ever been party to a

10

T. M. SIRACUSA

1 lawsuit?
2
3       A. No.
4       Q. Have you ever filed a -- you
5 know, complained about discrimination
6 at work?
7       A. No.
8       Q. Did you discuss today's
9 deposition with anybody?
10      A. My attorneys.  The attorneys
11 here.
12      Q. And anyone else?
13      A. No.
14      Q. Did you review any documents to
15 prepare for today's deposition?
16      A. Yes.
17      Q. And what document did you
18 review?
19      A. It was a brief statement of some
20 of the concerns that were brought up
21 before.
22      Q. Who prepared the brief
23 statement?
24      A. The attorneys.
25      Q. What is the highest level of

11

T. M. SIRACUSA

1 education that you have completed?
2
3       A. A bachelor's degree.
4       Q. And where did you get your
5 bachelor's?
6       A. At Le Moyne College.
7       Q. Where is that located?
8       A. Syracuse, New York.
9       Q. And what was the -- what did you
10 major in?
11      A. Business administration.
12      Q. Do you have any professional
13 licenses?
14      A. No.
15      Q. And what about any professional
16 certifications, like a trade group
17 certification?
18      A. No.
19      Q. What is your marital status?
20      A. I'm married.
21      Q. Do you have any children?
22      A. Yes.
23      Q. What are their ages?
24      A. Twenty-three and nineteen.
25      Q. What is your date of birth?

12

T. M. SIRACUSA

1                - - -
2       (Begin confidential
3 portion.)
4                - - -
5       PII/Confidential 1967.
6                - - -
7       (End confidential portion.)
8                - - -
9       MS. AGRESTI:  Please mark
10 that confidential for the record.
11 Except for the year -- can I just
12 have 30 seconds here?  Off the
13 record a minute.
14               - - -
15      (Whereupon, an
16 off-the-record discussion was
17 held at this time.)
18               - - -
19      MS. AGRESTI:  We'll do the
20 separate page marked
21 confidential, please.  Thank you.
22      Q. Okay.  Ms. Siracusa, who is your
23 current employer?
24      A. Smurfit Westrock.

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

---

13

T. M. SIRACUSA

1
2    Q. And what is your job title?
3    A. Senior vice president of
4    merchandising displays and graphic
5    solutions.
6    Q. When did you become senior vice
7    president of merchandising displays and
8    graphic solutions?
9    A. December 2022.
10   Q. When did you first join Smurfit
11   Westrock or one of its predecessors?
12   A. 1993.
13   Q. Okay.  Before you were senior
14   vice president of merchandising
15   displays and graphic solutions, what
16   was your title?
17   A. Senior vice president of east
18   region.
19   Q. And during what time frame were
20   you the senior vice president of the
21   east region?
22   A. From 2019 -- it might have been
23   2018.  September of 2018 through
24   December of 2022.
25   Q. Who did you report to when you

---

14

T. M. SIRACUSA

1
2    were the senior vice president of the
3    east region?
4    A. Pete Durette.
5    Q. And who do you report to now?
6    A. Don Sparaco.
7    Q. And what is Mr. Sparaco's title?
8    A. President of the corrugate
9    division.
10   Q. I realize I didn't ask this
11   before.  In what year did you get your
12   bachelor's degree?
13   A. I graduated in 1989.
14   Q. Before senior vice president of
15   the east region, what was your job
16   title?
17   A. Area vice president, southeast.
18   Q. And was this also in the
19   corrugated division?
20   A. Yes.
21   Q. And during what time frame did
22   you have that title?
23   A. 2014 to 2018.
24   Q. Are you currently in the
25   corrugated division?

---

15

T. M. SIRACUSA

1
2    A. Yes.
3    Q. Okay.  And what was your next
4    most recent role at WestRock?
5    A. Prior to the area of vice
6    president role?
7    Q. Yes.
8    A. A business unit general manager.
9    Q. And what business unit did you
10   manage?
11   A. Atlanta.
12   Q. I'm sorry, did you say
13   "Atlanta"?
14   A. Yes.
15   Q. Okay.  During what time frame
16   were you the business unit general
17   manager for Atlanta?
18   A. 2012 to 2014.
19   Q. And what were your job
20   responsibilities in that role?
21   A. I had responsibility for sales
22   and operations of foreign manufacturing
23   facilities in the Atlanta area.
24   Q. Before you were business unit
25   general manager, what was your title?

---

16

T. M. SIRACUSA

1
2    A. General manager.
3    Q. Of what department?
4    A. It was the Norcross
5    manufacturing plant in Norcross,
6    Georgia.
7    Q. During what time period were you
8    general manager of the Norcross
9    facility?
10   A. From 2006 to 2012.
11   Q. And what were your job
12   responsibilities as general manager of
13   Norcross?
14   A. I led sales and operations for
15   the single box plant.
16   Q. Before you were general manager
17   of Norcross -- the Norcross, Georgia
18   facility, what was your job title?
19   A. Director of strategic
20   initiatives.
21   Q. I'm sorry, was that director?
22   A. Yes.
23   Q. Thank you.
24   MS. SLUSARZ:  Janice, I keep
25   missing like the very beginning,

---

4  (Pages 13 to 16)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

17

T. M. SIRACUSA

1
2  like the first syllable of each
3  response.  I don't know if it's
4  an issue with the audio/visual on
5  your side or if it's an issue
6  with audio on my side.
7      Devora, are you hearing
8  everything?
9      THE STENOGRAPHER:  Yes.
10      Q. And I apologize, I know you said
11  "director," but I didn't write down the
12  rest of your title.  What was it?
13      A. Strategic initiatives.
14      Q. Strategic initiatives.  Okay.
15      And what department did you work
16  for at that time?
17      A. Corrugated.
18      Q. During what time frame were you
19  the director of strategic initiatives?
20      A. 2004 to 2006.
21      Q. And before that, what was your
22  job title?
23      A. General manager.
24      Q. And what were you general
25  manager of?

18

T. M. SIRACUSA

1
2      A. The manufacturing facility in
3  Norcross, Georgia.
4      Q. So you were general manager of
5  Norcross, Georgia on two -- for two
6  separate tenures?
7      A. Yes.
8      Q. Okay.  During what time frame
9  were you initially general manager of
10  Norcross, Georgia?
11      A. 2001 to 2004.
12      Q. Okay.  Before that, what was
13  your title?
14      A. Assistant general manager.
15      Q. Of what facility?
16      A. The Norcross, Georgia plant.
17      Q. And during what time frame were
18  you the assistant general manager?
19      A. 1998 to 2001.
20      MS. SLUSARZ:  I'm going to
21  take a -- I'd like to take a
22  quick break.  I think I may
23  understand what the sound problem
24  is.  I just want to screw with
25  something on my computer.  So it

19

T. M. SIRACUSA

1
2  should be about two minutes.
3  Maybe one minute.
4      All right.  Thanks.  We can
5  just go off the record.
6      - - -
7      (Whereupon, a recess was
8  taken at this time.)
9      - - -
10      Q. Before you were the assistant
11  general manager of the Norcross
12  facility, what was your title?
13      A. Accountant.
14      Q. And during what time frame were
15  you an accountant?
16      A. 1993 to 1998.
17      Q. And was that your first title at
18  WestRock?
19      A. Yes.
20      Q. In your current role as senior
21  vice president of merchandising
22  displays and graphic solutions, what
23  are your job responsibilities?
24      A. I lead sales and operations for
25  manufacturing plants that produce

20

T. M. SIRACUSA

1
2  displays and preprint.
3      Q. And is that across
4  United States?  I mean, does your job
5  cover the United States or --
6      A. Yes.
7      Q. -- a different geographic area?
8      A. I have plants in the
9  United States and two in Canada.
10      Q. And how many people report to
11  you directly --
12      A. Nine.
13      Q. -- in your current role?
14      And what are the titles of the
15  people who report to you?
16      A. Vice president of operations,
17  vice president of sales, senior
18  director of integrated business
19  planning, senior director of creative
20  services, executive assistant.  And
21  then I have four graphic business
22  managers.
23      Q. Who is your vice president of
24  sales?
25      A. David Sharp.

5 (Pages 17 to 20)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

---

21

T. M. SIRACUSA

1
2      Q. And what are his
3  responsibilities?
4      A. He leads the salespeople for
5  merchandising displays.
6      Q. And who are the graphics
7  business managers?
8      A. Richard Shue, Patty Metelko,
9  Tony Paterini and Chip Schiffenhaus.
10     Q. What are the job
11  responsibilities of a graphics business
12  manager?
13     A. To maintain and grow graphic
14  packaging -- graphic packaging sales.
15     Q. And how do the graphics business
16  managers affect sales?
17     A. They help grow sales, so
18  increase sales.
19     Q. Okay.  What do they do to
20  increase sales?
21     A. They meet with customers and
22  discuss graphic solutions.
23     Q. Are they assigned customers?
24     A. Sometimes.
25     Q. When you are assigned customers,

---

22

T. M. SIRACUSA

1
2  how is it determined who will get the
3  customer to work on?
4         MS. AGRESTI:  Objection.
5  Form.
6         You may answer.
7      A. So some of the graphic business
8  managers work for a particular region,
9  so if it's a customer in that region.
10     Q. Okay.  What region does -- does
11  Rick Shue work for a specific region?
12     A. Yes.
13     Q. And what region does he cover?
14     A. The North Atlantic.
15     Q. Does Patty Metelko work for a
16  specific region?
17     A. Yes.
18     Q. And what region is that?
19     A. Southeast.
20     Q. Does Tony Paterini cover a
21  specific region?
22     A. Yes.
23     Q. And what region does he cover?
24     A. The Midwest.
25     Q. And does Chip Schiffenhaus cover

---

23

T. M. SIRACUSA

1
2  a specific region?
3      A. No -- well, all the
4  United States.
5      Q. Does the corrugated group have
6  sales representatives that bring
7  customers to the graphics business
8  managers?
9         MS. AGRESTI:  Objection.
10  Form.
11         You may answer.
12     A. Yes.
13     Q. You mentioned that Chip
14  Schiffenhaus does not have a region.
15  Does he have salespeople who bring
16  business opportunities to him?
17         MS. AGRESTI:  Objection.
18  Form.
19         You may answer.
20     A. Can you repeat the question,
21  please?
22     Q. Does Chip Schiffenhaus,
23  specifically, have salespeople who
24  bring business opportunities to him?
25     A. No.

---

24

T. M. SIRACUSA

1
2      Q. When did Chip Schiffenhaus
3  become a graphic business manager?
4      A. I don't know.
5      Q. Was it within the last three
6  months?
7         MS. AGRESTI:  Objection.
8  Form.
9         You may answer.
10     A. No.
11     Q. Well, am I correct that Marshall
12  Krimsky used to be a graphics business
13  manager in your department?
14     A. Yes, he was.
15     Q. And has he been replaced?
16     A. No.
17     Q. Do you have plans to replace
18  him?
19     A. I haven't decided yet.
20     Q. Does Patty Metelko have
21  salespeople who bring business
22  opportunities to her?
23     A. Yes.
24     Q. And are those the salespeople in
25  the Southeast region?

---

6 (Pages 21 to 24)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

25

T. M. SIRACUSA
1
2    A. Yes.
3    Q. Similarly, Tony Paterini, does
4  he have salespeople who bring business
5  opportunities to him?
6    A. Yes.
7    Q. And I guess those are
8  salespeople in the Midwest region?
9    A. Yes.
10    Q. The salespeople who develop
11  these business opportunities, are they
12  paid on a commission or on a salary or
13  how are they paid?
14        MS. AGRESTI:  Objection.
15  Form.
16        You may answer.
17    A. I don't know.
18    Q. Who would know?
19    A. I would assume our HR team or
20  their direct managers.
21    Q. So am I correct that the
22  salespeople are not in your reporting
23  line?
24    A. No, they are not.
25    Q. Are they part of the corrugated

26

T. M. SIRACUSA
1
2  division?
3    A. Yes.
4    Q. And who is in charge of the
5  sales reps for the corrugated division?
6    A. There's multiple sales leaders.
7    Q. Okay.  Is there one person who
8  is the head of sales?
9    A. Nickie Parker is somewhat in
10  that role.  I'm not sure if everyone is
11  reporting up to her.
12    Q. Did you ever prepare a
13  performance evaluation of Mr. Krimsky?
14    A. Yes.
15    Q. And when did you do that?
16    A. Either December 2023 or
17  January 2024.
18    Q. And what was your assessment of
19  Mr. Krimsky's performance?
20    A. I rated him an inconsistent.
21        MS. SLUSARZ:  I'd like to
22    mark a document.  This is
23    Exhibit 1 and it's Bates stamped
24    KRIMSKY 58 through KRIMSKY 63.
25        - - -

27

T. M. SIRACUSA
1
2    (Whereupon, Plaintiff's
3  Exhibit 1, a six-page document,
4  was marked for identification.)
5        - - -
6        MS. SLUSARZ:  I've just
7    placed Exhibit 1 in the chat.
8    Janice, are you able to access
9    it?  Do you need me to share it?
10        MS. AGRESTI:  I am
11    downloading it now.  I'll let you
12    know in a minute.
13        MS. SLUSARZ:  Okay.
14        MS. AGRESTI:  Let me just
15    make a note here for the witness.
16        So there will be documents
17    that will be shared with you
18    today.  At the bottom, they
19    either say WestRock and numbers
20    and Krimsky or numbers.  What
21    that means is that the party who
22    provided those documents in
23    discovery, that's their stamp.
24    So the documents you are looking
25    at say Krimsky, so Mr. Krimsky

28

T. M. SIRACUSA
1
2  provided these documents.
3        If they say WestRock at the
4    bottom, we provided those
5    documents in this litigation.
6        All right.  The document is
7    open and I have it here.  I'm
8    going to show it to the witness.
9        MS. SLUSARZ:  Okay.
10        MS. AGRESTI:  Just scroll
11    through the document and look at
12    what you need to look at.
13        She's looking through the
14    document now.
15        MS. SLUSARZ:  Sure.
16    A. Okay.
17    Q. Okay.  Do you recognize this
18  document?
19    A. Yes.
20    Q. And what is this document?
21    A. It was a performance evaluation
22  for Marshall Krimsky for 2023.
23    Q. Okay.  Is this the entire
24  document?
25    A. This would have been just my

7  (Pages 25 to 28)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

29

T. M. SIRACUSA

1  manager assessment.  There's a
2  self-evaluation that goes with it as
3  well.
4    Q. Okay.  What was your -- what
5  were your main areas for concern with
6  Mr. Krimsky's performance?
7    MS. AGRESTI:  Objection.
8  Form.
9    You may answer.
10   A. The lack of effort to grow new
11 business.  The professionalism that he
12 displayed with his customer and with
13 meetings with me.  His inability to use
14 company tools such as Outlook, e-mail,
15 calendar.  His inability to use the
16 computer in general and use
17 salesforce.com, which is our CRM
18 system.
19   Q. Did Mr. Krimsky ever receive
20 training on the company tools and
21 computer systems?
22   A. Yes, he did.
23   Q. Were you involved at all in the
24 decision to move Mr. Krimsky into the

30

T. M. SIRACUSA

1  graphics business manager position?
2    A. No.
3    Q. Were you aware of Mr. Krimsky's
4  history with the company as being a
5  sales rep rather than -- an outside
6  sales rep?
7    A. Yes, I'm aware.
8    Q. Okay.  So I'm looking at the
9  second to the last page of this
10 document.  You talked about
11 Mr. Krimsky's professionalism in
12 meetings.  Was the problem that he --
13   MS. AGRESTI:  One second.
14 We're just trying to get to the
15 portion of the document that you
16 are referring to.
17   Are you all looking at
18 page 5, KRIMSKY 62?
19   MS. SLUSARZ:  It's Bates
20 stamped KRIMSKY 62.
21   MS. AGRESTI:  Okay.
22   MS. SLUSARZ:  So yes, I
23 think that is 5.
24   MS. AGRESTI:  Okay.  Okay.

31

T. M. SIRACUSA

1  It's open.
2    Q. What were the issues with
3  Mr. Krimsky's professionalism in
4  meetings?
5    MS. AGRESTI:  I'm sorry.
6  Hold on.  Are you referring to
7  "Marshall needs to improve
8  communication skills to a more
9  professional level"?  I just want
10 to make sure we're all on the
11 same page.
12   MS. SLUSARZ:  Yes.
13   MS. AGRESTI:  Okay.  Okay.
14   A. So a few things.  One, he would
15 come to meetings unprepared.  He would
16 use inappropriate language when having
17 conversations with me.
18   Q. Can you give an example of the
19 inappropriate language he's used?
20   A. Yes.  So I was having a call one
21 time with him and he was talking about
22 the fucking bee that was swirling
23 around his head and -- so I had to
24 listen to a few minutes of him chasing

32

T. M. SIRACUSA

1  the fucking bee repeatedly.
2    Q. And what was your -- actually,
3  let me reword that.
4    In the previous page, one of the
5  bullet points is that he has to have
6  more effective communication to the
7  customer.  What was your observation
8  concerning his communications with the
9  customer?
10   A. So both verbal and written.  So
11 from a verbal standpoint, I didn't feel
12 like he was prepared in his
13 communications with customers.  And
14 then his verbal communication, his
15 e-mails would be written
16 unprofessionally.  So it would be a
17 sentence with an exclamation point, a
18 short sentence with an exclamation
19 point.  So I didn't feel like it was
20 very clear and business oriented.
21   Q. Mr. Krimsky was fairly effective
22 as a sales representative; am I
23 correct?
24   MS. AGRESTI:  Objection.

8  (Pages 29 to 32)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

33

```
 1              T. M. SIRACUSA
 2      Form.
 3          You may answer.
 4          A. I didn't work with him closely
 5      when he was a sales manager -- oh, I'm
 6      sorry, a sales representative, so I
 7      can't really speak to that.
 8              - - -
 9          (Begin confidential
10      portion.)
11              - - -
12      Confidential
18          (End confidential portion.)
19              - - -
20          Q. And is that a -- would you
21      consider that to be a good sales volume
22      for a sales rep?
23          MS. AGRESTI:  Objection.
24      Form.
25          You may answer.
```

34

```
 1              T. M. SIRACUSA
 2          A. I would say average.
 3          Q. Do you have direct knowledge of
 4      the average sales of the sales reps at
 5      WestRock?
 6          MS. AGRESTI:  Objection.
 7      Form.
 8          You may answer.
 9          A. I don't necessarily see that
10      information.
11          Q. Does anyone in your department
12      receive a commission based on their
13      sales?  And I mean as opposed to a
14      bonus --
15          A. Yes.
16          Q. -- I mean a direct commission.
17          MS. AGRESTI:  Objection.
18      Form.
19          You may answer.
20          A. Yes.
21          Q. And who receives commissions in
22      your department?
23          A. So none of my direct reports,
24      but sales reps who sell for
25      merchandising displays receive
```

35

```
 1              T. M. SIRACUSA
 2      commission.
 3          Q. Okay.  So there are sales reps
 4      in your reporting line?
 5          A. Yes.
 6          Q. And whom do they report to?
 7          A. David Sharp.  They report to
 8      managers who report to David Sharp.
 9          Q. Okay.  To your knowledge, did
10      anyone in your reporting line receive a
11      commission for sales to Pepperidge
12      Farms?
13          MS. AGRESTI:  Objection.
14      Form.
15          You may answer.
16          A. No.
17          MS. SLUSARZ:  I'd like to
18      mark another document.
19          Okay.  This is Exhibit
20      No. 2, which is Bates stamped
21      KRIMSKY 39.
22              - - -
23          (Whereupon, Plaintiff's
24      Exhibit 2, a document, was marked
25      for identification.)
```

36

```
 1              T. M. SIRACUSA
 2              - - -
 3          MS. AGRESTI:  Downloading it
 4      now.
 5          MS. SLUSARZ:  Yeah.
 6          Q. Please take a look at this
 7      document.
 8          MS. AGRESTI:  Okay.  The
 9      document is open.
10          MS. SLUSARZ:  Okay.
11          MS. AGRESTI:  Feel free to
12      scroll through it, if you need
13      to.
14          THE WITNESS:  Okay.
15          MS. AGRESTI:  We just
16      reviewed the document.
17          Q. Okay.  Ms. Siracusa, have you
18      seen this form of a document before?
19          A. No.
20          Q. Okay.  And you haven't seen this
21      specific document before either?
22          A. Never.
23          Q. Okay.  And just to confirm, you
24      are not aware of anyone receiving a two
25      percent commission -- I'm sorry, who
```

9  (Pages 33 to 36)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

---

37

T. M. SIRACUSA

1  received a two percent commission on
2  Pepperidge Farm sales; is that correct?
3      A. That's correct.
4      Q. Okay.  Going back to Exhibit 1.
5  Do you have it up?
6          MS. AGRESTI:  Yes, it's up.
7      Q. Okay.  I'm looking at the second
8  page, which is Bates stamped KRIMSKY
9  59, and the bullet point there starts,
10  "As the representative for Pepperidge
11  Farms, a key account plan and quarterly
12  business reviews organized by Marshall
13  with the customer and WestRock team
14  would have been beneficial in
15  identifying service gaps and
16  strengthening the relationship with the
17  customer.  Neither of these have been
18  completed for Pepperidge Farms."
19      Do you see this?  Do you see
20  where it says that?
21      A. Yes.
22      Q. How would a key account plan and
23  quarterly business review have helped
24  identify service gaps with Pepperidge

---

38

T. M. SIRACUSA

1  Farm?
2      A. So to start, a key account plan
3  is an overview of the account in
4  general.  So it has key contacts, who
5  is responsibly for what, potential
6  opportunities within the account, level
7  of relationships with different people.
8  So we would typically set that up for
9  all our key accounts so that that is a
10  record that we store in salesforce.com.
11  And then a quarterly business review is
12  an organized meeting that we have with
13  large customers each quarter and there
14  is a specific agenda to that.
15      So you would go over, you know,
16  business forecasts with the customer,
17  how plans are performing, whether it's
18  on-time delivery or any quality issues.
19  You would talk about potential
20  opportunities to work with the
21  customer, sustainability, continuous
22  improvement efforts with them.  It's a
23  standard process that we do with large
24  accounts.

---

39

T. M. SIRACUSA

1      Q. Okay.  So Pepperidge Farm is a
2  large account?
3      A. Yes.
4      Q. Just earlier you described
5  Mr. Krimsky's sales to Pepperidge Farm
6  as -- I don't know if I have it down,
7  but it seemed like you thought it was,
8  you know, adequate -- average was the
9  word you used.
10          MS. AGRESTI:  Objection.
11  Form.  Objection.  Form.
12      Q. Okay.  Were key account plans
13  always used in the global -- sorry,
14  merchandising display and graphic
15  solutions department?
16      A. It's a common practice in our
17  company.
18      Q. Do you know if they were used in
19  the merchandising display and graphic
20  solution department before you became
21  the senior vice president?
22      A. Yes, they were.
23      Q. Did Mr. Krimsky meet his budget
24  for sales to Pepperidge Farms in 2023?

---

40

T. M. SIRACUSA

1      A. Yes.
2          - - -
3      (Begin confidential
4  portion.)
5          - - -
6      **Confidential**
7
8
9
10          - - -
11      (End confidential portion.)
12          - - -
13      Q. Did Mr. Krimsky have sales
14  representatives who reported
15  opportunities up to him?
16      A. Not that I am aware of.
17      Q. Okay.  So he didn't cover a
18  specific geographic area?
19      A. No.
20      Q. Were the graphic business
21  managers who covered a specific area,
22  were they expected to go out and
23  develop their own sales leads?
24      A. That's part of what they do.

10  (Pages 37 to 40)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

41

T. M. SIRACUSA
1
2   Q. Is that a measurable -- is that
3   a measured part of their performance
4   evaluation, developing sales leads
5   independently?
6       A. Not specifically, but new
7   business would be part of their
8   incentive plan.
9       Q. But for the graphics business
10  managers who represented -- who covered
11  a specific territory, new business also
12  included new sales leads from the sales
13  representatives, correct?
14      A. Yes.
15          MS. AGRESTI:  Objection.
16  Form.
17          You may answer.
18      A. Yes.
19      Q. How are quality issues handled,
20  you know, customer quality issues
21  handled at WestRock?
22      A. So typically, a quality issue
23  would be communicated to either a sales
24  representative or sometimes customer
25  service, and then they were logged into

42

T. M. SIRACUSA
1
2   a customer complaint system.
3       Q. Could a sales rep call a factory
4   and say -- and, you know, stop
5   production if there were quality issues
6   from that --
7           MS. AGRESTI:  You went out a
8   little bit and then you came
9   back --
10          MS. SLUSARZ:  That's okay.
11  It was a painful question anyway.
12          MS. AGRESTI:  The audio went
13  out and in, so we didn't hear the
14  whole question.
15          MS. SLUSARZ:  Just as well.
16      Q. If a graphics -- well, do
17  graphics business managers visit the
18  production sites?
19      A. Sometimes, yes.
20      Q. Okay. And if they saw a quality
21  issue, were they able to, you know,
22  stop production right away to have that
23  addressed?
24      A. They wouldn't necessarily stop
25  production because that item might not

43

T. M. SIRACUSA
1
2   be running in our facility.  Your
3   question is not very clear or maybe
4   relevant to what we do.
5       Q. Are you aware that there were
6   quality issues that -- well, there were
7   massive quality issues concerning the
8   Pepperidge Farms products that were
9   being produced?
10      A. Yes.
11          MS. AGRESTI:  Objection.
12  Form.
13          You may answer.
14      A. Yes.
15      Q. And what were the problems?
16      A. A majority of our problems were
17  with warp.
18      Q. Were there any other problems?
19      A. I don't know the specifics of
20  other problems, if there were more.
21      Q. Okay.  And the warping, that
22  made it impossible to use the products
23  in Pepperidge Farm's machines; is that
24  correct?
25          MS. AGRESTI:  Objection.

44

T. M. SIRACUSA
1
2   Form.
3           You may answer.
4       A. Not impossible, but difficult.
5       Q. How long was Pepperidge --
6   sorry, strike that.
7           How long was WestRock aware of
8   the warping issues with Pepperidge Farm
9   products?
10      A. So I became aware in March of
11  last year when Marshall started
12  reporting to me. I'm not -- I don't
13  know prior to that how long they were
14  aware.
15          MS. SLUSARZ:  Okay. I'd
16  like to take a ten-minute break
17  at this time.  So if we could
18  reconvene at 10:40.
19          MS. AGRESTI:  Okay.
20          MS. SLUSARZ:  Thanks.
21          - - -
22          (Whereupon, a recess was
23  taken at this time.)
24          - - -
25          MS. AGRESTI:  Could you read

11  (Pages 41 to 44)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

45

T. M. SIRACUSA
1  back my last question, please.
2
3           - - -
4       (Whereupon, the referred-to
5  question was read back by the
6  stenographer.)
7           - - -
8       Q. Okay.  So in March 2023, you
9  became aware of the warping issue.  Was
10 it ever resolved?
11      MS. AGRESTI:  Objection.
12 Form.
13      You may answer.
14      A. So the warping issue at the time
15 at the Willard facility, we lost the
16 business.
17      Q. How would having more meetings
18 with Pepperidge Farms have resolved the
19 warping issue with the Willard
20 facility?
21      A. So typically what would happen
22 is the account manager would be
23 visiting the facility regularly, like
24 Pepperidge Farms facility regularly, to
25 understand and watch and see some of

46

T. M. SIRACUSA
1  the issues.  And then their
2  responsibility would be to communicate
3  that back to the operations facility.
4  And then they would work together on a
5  corrective action.
6       Q. Do you know if Mr. Krimsky made
7  visits to Pepperidge Farms
8  headquarters?
9       A. He would tell me that he went to
10 Pepperidge Farms headquarters, but not
11 the manufacturing facilities.
12      Q. Do you think he received
13 different information because he went
14 to headquarters instead of the
15 manufacturing facility?
16      MS. AGRESTI:  Objection.
17 Form.
18      You may answer.
19      A. I don't know.
20      Q. When did you first begin to
21 consider terminating Mr. Krimsky's
22 employment?
23      A. Last summer.
24      Q. Was there anything in particular

47

T. M. SIRACUSA
1  that led you to begin considering
2  termination?
3       A. So one, we had been notified of
4  the loss of Pepperidge Farms.  And I
5  had been talking to Marshall about
6  growing new business and he had shown
7  no activity around growing any new
8  business.  And again, to what I said
9  previously, his unprofessionalism and
10 dealing with the customer as well as --
11 as me and in other meetings, I did not
12 see the ability for him to continue to
13 grow with WestRock.
14      Q. What was the lack of
15 professionalism with his customers,
16 what did that entail?
17      A. Not coming to a meeting
18 prepared.  We had a meeting with the
19 Pepperidge Farm main buyer and Marshall
20 didn't even know the plant manager's
21 name at Willard.  So he just didn't
22 have an attention to detail or come
23 prepared to those meetings.
24      Q. Approximately how old is Rick

48

T. M. SIRACUSA
1  Shue?
2       MS. AGRESTI:  Objection.
3  Form.
4       A. I don't know.
5       Q. Do you believe he's in his 30s?
6       MS. AGRESTI:  Objection.
7  Form.
8       You may answer.
9       A. I would say no.
10      Q. His 40s?
11      A. Maybe.
12      Q. And what about Patty Metelko,
13 approximately how old is she?
14      MS. AGRESTI:  Objection.
15 Form.
16      You may answer.
17      A. Maybe in her 50s.
18      Q. And Tony Paterini, approximately
19 how old is he, do you think?
20      MS. AGRESTI:  Objection.
21 Form.
22      You may answer.
23      A. Maybe 50s or 60s.
24      Q. And Chip Schiffenhaus,

12  (Pages 45 to 48)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

---

49

T. M. SIRACUSA

1   approximately how old do you think he
2   is?
3
4          MS. AGRESTI:  Objection.
5      Form.
6          You may answer.
7      A. 60s, maybe older, maybe 70s.
8      Q. And how old do you believe
9   Mr. Krimsky is?
10         MS. AGRESTI:  Objection.
11     Form.
12         You may answer.
13     A. I don't know how old he is.  I'd
14  say maybe in his 60s.
15     Q. Did you ever comment to
16  Mr. Krimsky about his age?
17     A. No.
18     Q. Are you aware of anyone else
19  making comments about Mr. Krimsky's
20  age?
21     A. I'm not aware of that.
22     Q. Are you aware of anyone asking
23  Mr. Krimsky when he's going to retire?
24     A. I'm not aware of that.
25     Q. Are you aware that Mr. Krimsky

---

50

T. M. SIRACUSA

1   had pancreatic cancer?
2      A. I'm not aware of that.
3          MS. SLUSARZ:  I'm going to
4   mark another document.  And this
5   is -- just give me a second.
6          Okay.  It's KRIMSKY 32.
7   Exhibit 3.
8          - - -
9          (Whereupon, Plaintiff's
10     Exhibit 3, a spreadsheet, was
11     marked for identification.)
12         - - -
13         MS. SLUSARZ:  Give me a
14  second.
15         All right.  I have dropped
16  it in the chat.
17         MS. AGRESTI:  We're
18  downloading the document.
19         MS. SLUSARZ:  Sure.
20         MS. AGRESTI:  Feel free to
21  scroll.
22     Q. Do you have the document up?
23     A. Yes.
24     Q. Okay.  So before we turn to

---

51

T. M. SIRACUSA

1   this, am I correct that both Rick Shue
2   and Mr. Krimsky worked on the
3   Pepperidge Farm account?
4      A. Yes.
5      Q. And how was responsibility for
6   Pepperidge Farm divided between them?
7      A. You mean as far as the financial
8   side or process?  I'm not clear on your
9   question.
10     Q. Okay.  Well, did they -- who
11  performed what tasks concerning
12  Pepperidge Farm account?
13     A. So Rick Shue would enter any
14  quote requests, he would manage the
15  preprint forecast and give that
16  information to the preprint team.  I
17  don't know what he did beyond that.
18     Q. Okay.  And from a financial
19  perspective, how was Pepperidge Farm
20  divided between the two of them?
21     A. I don't know honestly.  I don't
22  know exactly.
23     Q. Did Mr. Shue have monthly
24  meetings with Pepperidge Farm?

---

52

T. M. SIRACUSA

1      A. I know he had regular meetings
2   with someone at Pepperidge Farms to
3   review forecasts.
4      Q. Okay.  Did he do quarterly
5   business reviews with Pepperidge Farm?
6      A. I'm not aware that he did those.
7      Q. Okay.  Was he at all responsible
8   for the quality issues in the Willard
9   facility --
10     A. No.
11     Q. -- where Pepperidge Farm is
12  concerned?
13     A. No.
14     Q. All right.  Let's take a look at
15  Exhibit 3.  Have you seen this document
16  before?
17     A. Yes.
18     Q. And what is this document?  It's
19  a spreadsheet.  What is this
20  spreadsheet telling us?
21     A. It tracks actual sales compared
22  to budget and where that is from an
23  incentive payout -- an annual incentive
24  payout.

13  (Pages 49 to 52)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

53

T. M. SIRACUSA

1
2    Q. Okay.  And as of -- I mean this
3    doesn't have information in the final
4    column for -- I mean it has some
5    information, but not a monetary
6    information for the actual Pepperidge
7    Farm sales in September 2023.  But does
8    this show that Mr. Krimsky exceeded the
9    budget for Pepperidge Farm sales in the
10   2023 fiscal year?
11        MS. AGRESTI:  Objection.
12   Form.
13        You may answer.
14       A. So it does not show that he
15   exceeded the budget for the preprint
16   rolls.  It does show that he exceeded
17   budget for Pepperidge on the litho
18   packaging.
19       Q. Okay.  Do you know if by the end
20   of the year he met the budget for the
21   preprint rolls?
22       A. I don't recall off the top of my
23   head.  I would have to look at the
24   report for September.
25       Q. Well, looking down at

54

T. M. SIRACUSA

1
2    lithography, am I correct that the
3    total amount budgeted -- the total
4    sales budgeted for Mr. Krimsky was
5    2,525,000?
6        A. Yes.
7        Q. And that his actual sales for 11
8    of the 12 months of the fiscal year was
9    7,615,000?
10       A. Yes.
11       Q. So while he didn't generate the
12   new business that was expected, he
13   developed -- he generated more than was
14   budgeted for his total lithography
15   sales, correct?
16        MS. AGRESTI:  Objection.
17   Form.
18        You may answer.
19       A. Yes.  But he did not develop new
20   business, which was part of his goals.
21       Q. Are you aware that as a
22   commission salesperson, Mr. Krimsky
23   regularly earned greater than $500,000
24   a year?
25        MS. AGRESTI:  Objection.

55

T. M. SIRACUSA

1
2    Form.
3        You may answer.
4        A. I -- Marshall did not report to
5    me when he was at that level.
6        Q. Okay.  I'm just asking if you
7    are aware of that fact?
8        A. I was aware, yes.
9        Q. Okay.  And am I correct that
10   with the change over to being a
11   graphics business manager, the most he
12   could hope to receive -- the most he
13   could hope to earn was 145,000 in
14   salary and $58,000 in a target bonus?
15        MS. AGRESTI:  Objection.
16   Form.
17        You may answer.
18       A. Yes, that's correct.
19       Q. Okay.  So with the job change,
20   his income decreased by at least
21   $300,000 --
22        MS. AGRESTI:  Objection.
23   Form.
24       Q. -- per year?
25        MS. AGRESTI:  Objection.

56

T. M. SIRACUSA

1
2    Form.
3        You may answer.
4        A. I have not seen those numbers.
5        Q. Okay.  But based on your --
6    sorry.  Never mind.
7        Who is David Steel?
8        A. He used to work for Smurfit
9    Westrock.
10       Q. Okay.  And what was his job
11   responsibilities?
12       A. The graphic business managers
13   reported to him.
14       Q. Okay.  The graphics business
15   managers report directly to you now,
16   correct?
17       A. Yes.
18       Q. Okay.  When did Mr. Steel leave
19   WestRock?
20       A. March of 2023.
21       Q. And why did he leave?
22       A. His position was eliminated.
23       Q. Why was it eliminated?
24       A. We had an SG&A reduction
25   companywide, and when I looked at the

14  (Pages 53 to 56)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

57

T. M. SIRACUSA
1  positions that I had, I didn't feel
2  that it was adding value.
3  Q. What does SG&A reduction mean?
4  A. We reduce the number of people
5  that we have working for the company.
6  Q. Okay. Was it -- did -- does -- do the
7  initials SG&A stand for something?
8  A. Selling, general and
9  administration.
10  MS. SLUSARZ: I'd like to
11  mark a document. I guess we're
12  up to Exhibit 4.
13  --- 
14  (Whereupon, Plaintiff's
15  Exhibit 4, a three-page document,
16  was marked for identification.)
17  ---
18  Q. Please take a look at what's
19  been marked as Exhibit 4. It is Bates
20  stamped KRIMSKY 52 through 54.
21  MS. AGRESTI: We just got
22  the document in the chat. I'm
23  downloading it now.
24  The document is in front of
25

58

T. M. SIRACUSA
1  her, but she's going to look
2  through it first.
3  MS. SLUSARZ: Sure.
4  MS. AGRESTI: Feel free to
5  zoom in here.
6  A. Okay. I've reviewed.
7  Q. Okay. Have you seen this
8  document before?
9  A. No.
10  Q. Okay. So you don't know who
11  prepared it or the circumstances of
12  this?
13  A. I don't know who prepared it.
14  Q. Okay. Do you know what it is?
15  A. It looks like a document on how
16  the process for handling customer
17  issues at Pepperidge Farms in Denver,
18  Pennsylvania.
19  Q. Okay.
20  MS. AGRESTI: I just note
21  for the record that the witness
22  has testified she's never seen
23  this document before, so to the
24  extent that she is explaining
25

59

T. M. SIRACUSA
1  what it is, it would only be
2  based on what is presented to her
3  on face value for this document
4  as she has no personal knowledge
5  of this document.
6  MS. SLUSARZ: Understood.
7  I'm going to mark another
8  exhibit. Exhibit 5, which is
9  Bates stamped KRIMSKY 101 through
10  109 -- sorry, 110.
11  ---
12  (Whereupon, Plaintiff's
13  Exhibit 5, a ten-page document,
14  was marked for identification.)
15  ---
16  MS. SLUSARZ: Okay. It is
17  in the chat now.
18  MS. AGRESTI: We're
19  downloading it now.
20  All right. It's ten pages'
21  worth of documents, so just give
22  us a few minutes. She'll go
23  through the document now.
24  MS. SLUSARZ: Okay.
25

60

T. M. SIRACUSA
1  A. Okay. I've reviewed.
2  Q. Okay. Turning to the second to
3  the last page, it's page 8, Bates
4  stamped KRIMSKY 108. It says, "On
5  Monday, 10/30, Chris, Lisa and myself
6  visited the Pepperidge Farm Denver, PA
7  facility. We met with the Pepperidge
8  Farm team, Matt, Patrick and Bronwyn.
9  Bronwyn will be phasing out of the
10  quality roll and Patrick will be taking
11  over."
12  Do you see that?
13  A. Yes.
14  Q. Okay. So Rick Shue did visit
15  the Pepperidge Farm manufacturing
16  facilities, correct?
17  MS. AGRESTI: Objection.
18  Form.
19  You may answer.
20  A. He did.
21  Q. Okay. Who is Davin Carr?
22  A. He's the quality manager.
23  Q. Okay. Is he in your reporting
24  line?
25

15 (Pages 57 to 60)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

61

                    T. M. SIRACUSA
1
2    A. Yes.
3         MS. AGRESTI:  Objection as
4    to the term "reporting line."
5         But you may answer.
6    A. Yes, he's in my reporting line.
7    Q. Okay.  Who is Jessica
8    Mastronicola?
9    A. I don't know exactly what her
10   role is.
11   Q. Okay.  Do you know who Chris
12   Schroll is?
13   A. I do not know who -- I do not
14   know what his role is.  I've heard the
15   name.
16   Q. What about Lisa Shuey?
17   A. Yeah, she is an account manager
18   in my reporting line.
19   Q. Is an account manager different
20   from a graphics business manager?
21   A. Yes.
22   Q. What do account managers do?
23   A. More of a support role.  So they
24   support salespeople or accounts in
25   doing some of, you know, administrative

62

                    T. M. SIRACUSA
1
2    work, work on different projects.
3    Q. And did she report to you or did
4    she report to someone else?
5    A. She reports to someone else.
6    Q. Okay.  To whom does she report?
7    A. I don't know exactly.
8    Q. Okay.  And who is Tom Rossi?
9    A. He's vice president of
10   operations.
11   Q. Does he report to you?
12   A. Yes.
13   Q. If you notice in the third
14   paragraph, it says, "The main topic of
15   discussion was about the NC's."
16       Do you know what NC stands for?
17   A. Nonconformance.
18   Q. Okay.  So those are quality
19   issues?
20   A. Yes.
21   Q. How did the -- well, based on
22   this document, how well did the meeting
23   at the Denver, Pennsylvania facility
24   go?
25       MS. AGRESTI:  Objection.

63

                    T. M. SIRACUSA
1
2    Form.
3         You may answer.
4    A. So I was not there, but I heard
5    that the meeting went well, that we
6    helped them identify issues.
7    Q. What were the issues we helped
8    -- you helped them to identify?
9         MS. AGRESTI:  Objection.
10   Form.
11        You may answer.
12   A. So I wasn't there, but what was
13   identified were reasons for warp or
14   reasons why they were having that
15   problem.
16   Q. Okay.  At the very beginning of
17   the document, there's an e-mail from
18   David Sharp to Marshall Krimsky, Rich
19   Shue, Davin Carr and Tom Rossi --
20        MS. AGRESTI:  Hold on.  When
21   you say the beginning of the
22   document, do you mean
23   chronologically or do you mean
24   the top of the -- like page 1 of
25   the document?

64

                    T. M. SIRACUSA
1
2         MS. SLUSARZ:  Page 1.
3         MS. AGRESTI:  All right.
4    Hold on.  She's getting there.
5         Okay.  Is it the bottom of
6    page 1?
7         MS. SLUSARZ:  Yes.
8         MS. AGRESTI:  You said an
9    e-mail from David Sharp?  Is that
10   the one, December 18, 2023, 8:12
11   p.m.?
12        MS. SLUSARZ:  Yes.
13        MS. AGRESTI:  Okay.  We're
14   there now.
15   Q. Okay.  It says, "Marshall, we
16   can certainly have QA add your name to
17   the file they are currently updating."
18       Do you know what file he's
19   referring to?
20   A. I do not.  I do not.
21   Q. Okay.  Is there any reason why
22   Mr. Krimsky's name would not be
23   included on a file that relates to the
24   Pepperidge Farm business?
25        MS. AGRESTI:  Objection.

                              16  (Pages 61 to 64)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

65

T. M. SIRACUSA

1          T. M. SIRACUSA
2    Form.
3        You may answer.
4        A. I don't know specifically why
5    they didn't put his name on that
6    report, but he usually wasn't very
7    responsive on those issues, so I would
8    assume that they excluded him for that,
9    but I don't know the exact reason.
10       Q. You testified earlier that
11   WestRock lost the business in the
12   Willard facility.  I believe that's
13   what you said; was that -- am I
14   correct?
15       A. That's correct.
16       Q. And what was the business in the
17   Willard facility?
18       A. It was a packaging business.
19       Q. Okay.  Was it any specific
20   packaging for Pepperidge Farm?
21       A. I don't know specifically what
22   product they made at Willard.
23       Q. Did WestRock make products for
24   Pepperidge Farm in other facilities?
25       A. Yes -- wait, repeat that

66

T. M. SIRACUSA

1          T. M. SIRACUSA
2    question.
3        Q. Did WestRock make products for
4    Pepperidge Farms in facilities other
5    than Willard?
6        A. For Pepperidge Farms?
7        Q. Yeah.
8        A. Yes.
9        Q. Does Pepperidge Farm currently
10   do business with WestRock?
11       A. Yes.
12       Q. And to the extent you know, what
13   are their sales to date from the end of
14   the last fiscal year to date?
15              ---
16       (Begin confidential
17   portion.)
18              ---
19       Confidential
20
21
22              ---
23       (End confidential portion.)
24              ---
25       MS. AGRESTI:  I'll just ask

67

T. M. SIRACUSA

1          T. M. SIRACUSA
2    that those numbers be marked
3    confidential.  Further, I believe
4    earlier there was testimony about
5    approximate numbers as well
6    related to Pepperidge Farm, and
7    we ask that any client financials
8    be marked confidential in the
9    file throughout.
10       MS. SLUSARZ:  I have no
11   objection.
12       MS. AGRESTI:  Thank you.
13       Q. And just so we're clear, the
14   fiscal year began on October 1, 2023,
15   correct?
16       A. Yes.
17       Q. Do you believe that Mr. Krimsky
18   was well-suited for the position of
19   graphics business manager?
20       MS. AGRESTI:  Objection.
21   Form.
22       You may answer.
23       A. No.
24       Q. And why not?
25       A. Again, I go back to what I have

68

T. M. SIRACUSA

1          T. M. SIRACUSA
2    said in the past, just his willingness
3    and ability to grow the business, learn
4    salesforce.com, learn WestRock's tools
5    to be able to sell, his use of
6    technology and how he communicates with
7    customers, I didn't feel was aligned
8    with how we do business.
9        Q. Was he a bit of a dinosaur?
10       MS. AGRESTI:  Objection.
11   Form.  What do you mean by that,
12   Counsel?
13       MS. SLUSARZ:  It's a
14   metaphor.
15       MS. AGRESTI:  No.  No.
16   That's not an answer.  So we're
17   not answering that.  We need that
18   to be -- what does a metaphor
19   mean?
20       MS. SLUSARZ:  No, no.  A
21   metaphor.  A dinosaur is a
22   metaphor.
23       MS. AGRESTI:  Objection to
24   form.
25       You may answer.

17  (Pages 65 to 68)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

69

T. M. SIRACUSA
1
2     A. I'm not clear on that question.
3     Q. Well, do you believe that
4  Mr. Krimsky was too old to learn the
5  technology needed to be a successful
6  graphics business manager?
7     A. No.
8     Q. What were the reasons you placed
9  Mr. Krimsky on a performance
10  improvement plan?
11     A. Because he didn't show the
12  willingness or the ability to do the
13  role.
14     Q. Okay.  And was Rick Shue placed
15  on any performance improvement plan for
16  the loss of the Pepperidge Farm
17  business?
18        MS. AGRESTI:  Objection.
19  Form.
20        You may answer.
21     A. No.
22     Q. Did he receive any kind of
23  discipline for the loss of the
24  Pepperidge Farm business?
25        MS. AGRESTI:  Objection.

70

T. M. SIRACUSA
1
2  Form.
3        You may answer.
4     A. No.  But neither did Marshall.
5     Q. Okay.  Did he suffer any, you
6  know, adverse ramifications for the
7  loss of the Pepperidge Farm business?
8        MS. AGRESTI:  Objection.  To
9        the extent that that's calling
10        for a legal conclusion, she will
11        not answer.  I don't know if you
12        want to rephrase.
13     Q. Did he suffer any harm from
14  the -- sorry.
15     Did Mr. Shue suffer any harm
16  from the loss of the Pepperidge Farm
17  business?
18        MS. AGRESTI:  Objection.
19  Form.
20        You may answer.
21     A. It would have impacted his
22  financial incentive.
23        MS. SLUSARZ:  Okay.  I'd
24        like to mark a document.  And
25        this is Exhibit 6 --

71

T. M. SIRACUSA
1
2        MS. AGRESTI:  Can we just
3  take a five-minute break --
4        MS. SLUSARZ:  Sure.
5        MS. AGRESTI:  -- I just need
6  to use the ladies' room.
7        Okay.
8        MS. SLUSARZ:  Absolutely.
9        MS. AGRESTI:  Thank you.
10        MS. SLUSARZ:  Let's just
11  reconvene at 11:30.
12        MS. AGRESTI:  Okay.  Sounds
13  good.  Thank you.
14        - - -
15        (Whereupon, a recess was
16  taken at this time.)
17        - - -
18        MS. SLUSARZ:  I'll mark it
19  Exhibit 6.
20        - - -
21        (Whereupon, Plaintiff's
22  Exhibit 6, a three-page document,
23  was marked for identification.)
24        - - -
25     Q. Okay.  So Exhibit 6, I just

72

T. M. SIRACUSA
1
2  placed in the chat.  It is Bates
3  stamped KRIMSKY 55 through KRIMSKY 57.
4        MS. AGRESTI:  We're
5  downloading it now.
6        Feel free to scroll through
7        it and then just let them know
8        when you are ready.
9     A. Okay.  I've reviewed.
10     Q. Okay.  Have you seen this
11  document before?
12     A. Yes.
13     Q. And what is this document?
14     A. It's a performance improvement
15  plan that was presented to Marshall.
16     Q. And did you present this to him
17  on or about January 15, 2024?
18     A. Yes.
19     Q. What were the -- what are the
20  actions that Mr. Krimsky was required
21  to take under this performance
22  improvement plan?
23     A. So he had to complete a key
24  account plan for Campbell's.  He had to
25  achieve sales --

18  (Pages 69 to 72)

Case 1:23-cv-06252-MMG    Document 46-11    Filed 03/07/25    Page 20 of 37

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

73

T. M. SIRACUSA
1
2    Q. Sorry.  I was just going to say
3    Campbell's is the parent company for
4    Pepperidge Farm, correct?
5    A. Yes.
6    Q. Okay.  I'm sorry.  Would you
7    please continue.
8    A. Achieve sales revenue of at
9    least $10 million in fiscal year '24 by
10   qualified three new accounts to
11   generate sales for WestRock.  Also, he
12   had to submit a detailed written plan
13   to achieve the $10 million.  He had to
14   coordinate a monthly meeting with the
15   operations team to review the
16   Campbell's account.  And so have a
17   regular cadence to review new items,
18   forecast, quality issues.  Create an
19   agenda for that meeting and set that
20   meeting up via Teams.
21      He had to complete training for
22   Microsoft Outlook and Teams.  So the
23   ability to use -- utilize Outlook and
24   utilize Teams for meetings and
25   presentations.  He had to complete

74

T. M. SIRACUSA
1
2    Salesforce training so that he could
3    enter new opportunities and information
4    into Salesforce.  And then maintain an
5    active pipeline in Salesforce.
6    Q. Were these action items feasible
7    in a 60-day period?
8       MS. AGRESTI:  Objection.
9    Form.
10      You may answer.
11   A. Absolutely, yes.
12   Q. Okay.  What about achieving
13   $10 million in sales for the remainder
14   of fiscal year 2024 --
15      MS. AGRESTI:  Objection.
16   Form.
17      You may answer.
18   Q. -- was that feasible?
19      MS. AGRESTI:  Objection.
20   Form.
21      You may answer.
22   A. Yes.
23   Q. And how was Mr. Krimsky expected
24   to go out and generate this $10 million
25   in sales?

75

T. M. SIRACUSA
1
2       MS. AGRESTI:  Objection.
3    Form.
4       You may answer.
5    A. So that would start -- he would
6    prospect new accounts.  He would reach
7    out to those new accounts and use his
8    sales ability to sell new accounts.
9    Q. Were you planning to terminate
10   Mr. Krimsky's employment when you
11   issued this performance improvement
12   plan to him?
13   A. No, not if he could meet the
14   requirements of the performance
15   improvement plan.
16   Q. But had you had any discussions
17   with anyone about the possibility of
18   terminating Mr. Krimsky's employment by
19   the time you issued this performance
20   improvement plan?
21   A. I had conversations with our
22   legal counsel.
23   Q. Anyone else?
24      MS. AGRESTI:  I'm sorry.  I
25   just want to get something on the

76

T. M. SIRACUSA
1
2    record.  I think previously you
3    asked about if $10 million sales
4    is feasible in a 60-day period.
5    I think that's a
6    misrepresentation of the document
7    here.  It says that in a 60-day
8    period --
9       MS. SLUSARZ:  Well --
10      MS. AGRESTI:  -- a 60-day
11   period and there was a March 1st
12   deadline for a task, but that was
13   not necessarily what was -- how
14   the question was framed.  It was
15   framed as if it was $10 million
16   in sales in a 60-day period.
17      MS. SLUSARZ:  Are you
18   testifying, Counselor?
19      MS. AGRESTI:  No, I'm
20   basically correcting what you
21   testified, which was, again,
22   inaccurate.
23      MS. SLUSARZ:  No, you are
24   correcting a question that was
25   answered and trying to testify as

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

| 77 |
| --- |

T. M. SIRACUSA

1   to what the question was asking.
2   I mean, my question either made
3   sense or it didn't. I'm not too
4   worried about it.
5       MS. AGRESTI: I understand
6   you are not too worried about it,
7   but I needed to clarify that the
8   question that you asked was not
9   based on what the document said.
10      MS. SLUSARZ: So you're
11  interpreting the document?
12      MS. AGRESTI: No, you were.
13      MS. SLUSARZ: Anyway.
14  Q. Did you have conversations with
15  anyone other than legal concerning the
16  termination of Mr. Krimsky's
17  employment?
18  A. The HR manager.
19  Q. And who is the HR manager?
20  A. Carrie Robards.
21  Q. What did you discuss with
22  Ms. Robards?
23  A. Marshall's deficiencies and how
24  he was not meeting the requirements of

| 78 |
| --- |

T. M. SIRACUSA

1   the role.
2   Q. When did you first have
3   discussions with Ms. Robards about
4   terminating Mr. Krimsky's employment?
5       MS. AGRESTI: Objection.
6   Form.
7       You may answer.
8   A. I don't recall exactly.
9   Q. Was it in -- do you recall if it
10  was in 2023?
11  A. Yes, it would have been, because
12  I rated him inconsistent on his
13  performance review, so I would have had
14  those conversations with her.
15  Q. And did Ms. Robards have any
16  suggestions for you about how to
17  proceed?
18  A. No.
19  Q. Did she say anything to you in
20  your discussions about terminating
21  Mr. Krimsky's employment?
22  A. She just guided me to document
23  on his performance review.
24  Q. Did you have any discussion with

| 79 |
| --- |

T. M. SIRACUSA

1   Ms. Robards about the performance
2   improvement plan that's Exhibit 6?
3   A. Yes.
4   Q. And what are the nature of those
5   discussions?
6       MS. AGRESTI: Objection.
7       To the extent that any of
8   those conversations were had with
9   legal counsel present, you are
10  not to testify about the contents
11  of those conversations, only
12  conversations that were not with
13  legal present.
14      THE WITNESS: Okay.
15  A. They would have been with legal
16  counsel present.
17      MS. SLUSARZ: Okay. I'd
18  like to mark another exhibit.
19  One second.
20          - - -
21      (Whereupon, Plaintiff's
22  Exhibit 7, a five-page document,
23  was marked for identification.)
24          - - -

| 80 |
| --- |

T. M. SIRACUSA

1       MS. SLUSARZ: All right.
2   Exhibit 7 is in the chat. It is
3   Bates stamped KRIMSKY 65 through
4   KRIMSKY 69.
5       MS. AGRESTI: We're opening
6   up the document now.
7       Okay. The witness has the
8   document, but she's going to look
9   through it first.
10  A. Okay. I've reviewed.
11  Q. All right. Have you seen this
12  document before?
13  A. Yes.
14  Q. And what is this document?
15  A. It's an update on Marshall's
16  performance improvement plan and an
17  extension of it.
18  Q. Okay. And it was extended for
19  30 days?
20  A. Yes.
21  Q. Well, let's take a look at the
22  action items.
23      Did Mr. Krimsky complete a key
24  account plan for Campbell's?

20  (Pages 77 to 80)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

81

T. M. SIRACUSA

1
2    A. Yes, with some help.
3    Q. Okay.  Did he prepare a detailed
4    plan to achieve $10 million in sales in
5    fiscal year 2024?
6    A. He prepared a plan.  I would not
7    consider it detailed.  It was not
8    well-done and unprofessional.
9    Q. Did you provide him with a form
10   of what the business plan should look
11   like?
12   A. So I provided him the
13   opportunity to meet with my sales
14   leader, David Sharp, which he did.  And
15   David gave him specific commentary and
16   feedback on how to prepare that.
17   Q. To your knowledge, did Mr. Sharp
18   give him a form that he could use or a
19   template for the business plan?
20   A. I don't know if he provided him
21   anything in writing, but David,
22   afterwards, sent me an outline of what
23   they discussed.
24   Q. Did he send that via e-mail?
25   A. Yes.

82

T. M. SIRACUSA

1
2    Q. Do you know if legal counsel was
3    copied on that e-mail?
4    A. I do not know.
5    Q. Okay.  Did Mr. Krimsky set up a
6    regular cadence for Teams meetings with
7    the WestRock operation team?
8    A. No.
9    Q. Did he have any meetings with
10   the WestRock operations team during
11   that --
12   A. No.
13   Q. -- period between January 15,
14   2024 and April 26, 2024?
15   A. He did not set up any meetings
16   with the operations team.
17   Q. Okay.  He did complete his
18   training with Microsoft Office and
19   Teams, though, correct?
20   A. Yes.
21   Q. And he did complete his training
22   for Salesforce, correct?
23   A. He says he did.  There's no way
24   for me to verify that.
25   Q. What about maintaining an active

83

T. M. SIRACUSA

1
2    pipeline in Salesforce?
3    A. He did not do that.
4    Q. Okay.  When did you make the
5    decision to terminate Mr. Krimsky's
6    employment?
7    A. At the end of this 30-day
8    extension.
9    Q. So that was around May 26th?
10   MS. AGRESTI:  Objection.
11   Form.
12   You may answer.
13   A. Somewhere around that time
14   frame.
15   Q. When did you inform Mr. Krimsky
16   that his employment was terminated?
17   A. I don't recall the exact date.
18   Q. How did you terminate
19   Mr. Krimsky's employment?  How did you
20   communicate it to him that his
21   employment was terminated?
22   A. What did I say?
23   Q. No.  I mean, was it a
24   face-to-face meeting?  Was it a Teams
25   meeting?  Was it by telephone?

84

T. M. SIRACUSA

1
2    A. It was a Teams meeting with
3    Marshall and our HR manager.
4    Q. Was that Carrie Robards?
5    A. Yes.
6    Q. And what did you say to
7    Mr. Krimsky?
8    A. I don't remember the exact
9    words, but it would have been somewhere
10   along the lines of because he didn't
11   meet the requirements of the
12   performance improvement plan, that we
13   are going to terminate his employment
14   with WestRock.
15   Q. And what did Mr. Krimsky say in
16   response?
17   A. Okay.
18   Q. Anything else?
19   A. He asked about severance.
20   Q. Okay.  And was he offered a
21   severance package?
22   A. Yes.
23   Q. What facility do you work out
24   of?
25   A. Atlanta.  Our corporate office.

21  (Pages 81 to 84)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

85

T. M. SIRACUSA
1
2     MS. SLUSARZ:  I'd like to
3  take a short break 'cause I need
4  to print out a document.  I'm
5  getting close to the end, so I
6  don't think it makes sense for us
7  to break for lunch right now, but
8  if we can break until 11:55, I'll
9  have the document and I can
10  quickly go through it.
11     MS. AGRESTI:  Sounds good.
12          - - -
13     (Whereupon, a recess was
14  taken at this time.)
15          - - -
16  Q. Okay.  I just have a few
17  questions.
18     Ms. Siracusa, why was
19  Mr. Krimsky moved to the position of
20  graphics business manager instead of
21  remaining a sales representative in the
22  corrugated division?
23     A. I don't know exactly the
24  reasoning why, but at the time the
25  plant that he sold for was closed.

86

T. M. SIRACUSA
1  Like WestRock made the decision to
2  close that plant and so there wasn't
3  like a local plant for him to sell for.
4
5  Q. Okay.  Under Mr. Krimsky's
6  compensation plan that started, I
7  guess, October 1, 2022, I believe you
8  testified earlier that he earned less
9  than he earned when he was being paid a
10  commission; is that correct?
11     MS. AGRESTI:  Objection.
12  Form.
13     You may answer.
14  A. Yes.
15  Q. Okay.  Is your compensation or
16  was your compensation in fiscal year
17  2023 at all tied to the profitability
18  of the merchandising display and
19  graphics solutions business?
20     MS. AGRESTI:  Objection.
21  Form.
22     You may answer.
23  A. No.  It's tied to the
24  profitability of the company.
25  Q. Okay.  Was any aspect of it

87

T. M. SIRACUSA
1
2  affected by the company paying -- by
3  the company keeping more of the revenue
4  from Pepperidge Farm?
5     MS. AGRESTI:  Objection.
6  Form.
7     You may answer.
8  A. Can you repeat the question,
9  please?
10  Q. Was your compensation affected
11  in any way by the fact that the company
12  kept more of its revenue from
13  Pepperidge Farm?
14     MS. AGRESTI:  Objection.
15  Form.
16     You may answer.
17  A. I don't know.  I don't know
18  exactly how everything is calculated.
19     MS. SLUSARZ:  Okay.  I don't
20  have any further questions.
21     MS. AGRESTI:  We'll take a
22  five-minute break here and see if
23  we have any follow-up.
24     MS. SLUSARZ:  Okay.
25          - - -

88

T. M. SIRACUSA
1
2     (Whereupon, a recess was
3  taken at this time.)
4          - - -
5     MS. AGRESTI:  Defendants do
6  not have any questions.
7     MS. SLUSARZ:  Okay.
8     Ms. Siracusa, thank you very
9  much for your time this morning.
10  I hope you have a good rest of
11  your day.
12     THE WITNESS:  Thank you.
13     (Time noted:  12:03 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

22  (Pages 85 to 88)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa --- July 30, 2024

89

T. M. SIRACUSA
INSTRUCTIONS TO WITNESS

1
2
3
4        Please read your deposition over
5    carefully and make any necessary
6    corrections.  You should state the
7    reason in the appropriate space on the
8    errata sheet for any corrections that
9    are made.
10        After doing so, please sign the
11    errata sheet and date it.
12        You are signing same subject to
13    the changes you have noted on the errata
14    sheet, which will be attached to your
15    deposition.
16        It is imperative that you return
17    the original errata sheet to the
18    deposing attorney within thirty (30)
19    days of receipt of the deposition
20    transcript by you.  If you fail to do
21    so, the deposition transcript may be
22    deemed to be accurate and may be used in
23    court.
24
25

90

T. M. SIRACUSA
- - - - - -
E R R A T A
- - - - - -
PAGE  LINE  CHANGE

1
2
3
4
5    _____  ____  _____
6    _____  ____  _____
7    _____  ____  _____
8    _____  ____  _____
9    _____  ____  _____
10    _____  ____  _____
11    _____  ____  _____
12    _____  ____  _____
13    _____  ____  _____
14    _____  ____  _____
15    _____  ____  _____
16    _____  ____  _____
17    _____  ____  _____
18    _____  ____  _____
19    _____  ____  _____
20    _____  ____  _____
21    _____  ____  _____
22    _____  ____  _____
23    _____  ____  _____
24    _____  ____  _____
25    _____  ____  _____

91

1
2        A C K N O W L E D G E M E N T
3    STATE OF NEW YORK)
4                   :SS
5    COUNTY OF _____)
6        I, TAMMY M. SIRACUSA, hereby certify that I
7    have read the transcript of my testimony taken
8    under oath on July 30, 2024, that the
9    transcript is a true, complete and correct
10    record of what was asked, answered and said
11    during my testimony under oath, and that the
12    answers on the record as given by me are true
13    and correct, except for the corrections or
14    changes in form or substance, if any, noted in
15    the attached Errata Sheet.
16
17    _____
18    TAMMY M. SIRACUSA
19
20    Signed and subscribed to
21    before me, this _____ day
22    of _____, _____.
23
24    _____
25    Notary Public

92

1
2        I N D E X   O F   W I T N E S S E S
3    WITNESS:   TAMMY M. SIRACUSA
4    EXAMINATION BY                        PAGE
5    MS. SLUSARZ                            7
6
7        I N D E X   O F   E X H I B I T S
8    EXHIBIT      DESCRIPTION              PAGE
9    1            Six-page document         27
     2            Document                  35
10   3            Spreadsheet               50
     4            Three-page document       57
11   5            Ten-page document         59
     6            Three-page document       71
12   7            Five-page document        79
13    (*Indicates exhibit(s) retained by counsel)
14
15     I N D E X   O F   C O N F I D E N T I A L
                  S E C T I O N S
16
     PAGE          LINE
17
     12            6
18   33            16
     40            9
19   66            19
20
21
22
23
24
25

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa --- July 30, 2024

93

```
 1
 2              C E R T I F I C A T E
 3      I, DEVORA HACKNER, a stenographic reporter
 4  and Notary Public within and for the State of
 5  New York, do hereby certify:
 6      That the witness(es) whose testimony is
 7  hereinbefore set forth was duly sworn by me,
 8  and the foregoing transcript is a true record
 9  of the testimony given by such witness(es).
10      I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage, and that I am in no way interested
13  in the outcome of this matter.
14
15
16
17
18
19
20
21
22              DEVORA HACKNER
                Dated:  July 30, 2024
23
24
25
```

94

```
 1
 2                  LAWYER'S NOTES
    PAGE/LINE   NOTE
 3  _____  _____
 4  _____  _____
 5  _____  _____
 6  _____  _____
 7  _____  _____
 8  _____  _____
 9  _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  _____  _____
22  _____  _____
23  _____  _____
24  _____  _____
25  _____  _____
```

24 (Pages 93 to 94)

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa    ---   July 30, 2024

95

**A**

**a.m** 1:13 4:19
**ability** 9:5,9 47:13
  68:3 69:12 73:23
  75:8
**able** 27:8 42:21 68:5
**above-entitled** 1:18
**Absolutely** 71:8
  74:11
**access** 27:8
**account** 37:12,23
  38:3,4,7 39:3,13
  45:22 51:4,13 61:17
  61:19,22 72:24
  73:16 80:25
**accountant** 19:13,15
**accounts** 38:10,25
  61:24 73:10 75:6,7
  75:8
**accurate** 89:22
**achieve** 72:25 73:8
  73:13 81:4
**achieving** 74:12
**action** 1:19 46:6 74:6
  80:23 93:11
**actions** 72:20
**active** 74:5 82:25
**activity** 47:8
**actual** 52:22 53:6
  54:7
**add** 64:16
**adding** 57:3
**address** 6:8 7:6
**addressed** 42:23
**adequate** 39:9
**administer** 3:17
**administered** 4:23
**administration** 11:11
  57:10
**administrative** 61:25
**adverse** 70:6
**affect** 9:5 21:16
**against-** 1:8
**age** 49:16,20
**agenda** 38:15 73:19

**ages** 11:23
**agree** 6:20 7:14
**AGREED** 3:4,9,14
**agreement** 5:2
**Agresti** 2:11 4:5 5:16
  5:17 6:13,25 7:9,18
  12:10,20 22:4 23:9
  23:17 24:7 25:14
  27:10,14 28:10 29:8
  30:14,22,25 31:6,14
  32:25 33:23 34:6,17
  35:13 36:3,8,11,15
  37:7 39:11 41:15
  42:7,12 43:11,25
  44:19,25 45:11
  46:17 48:3,7,15,21
  49:4,10 50:18,21
  53:11 54:16,25
  55:15,22,25 57:22
  58:5,21 59:19 60:18
  61:3 62:25 63:9,20
  64:3,8,13,25 66:25
  67:12,20 68:10,15
  68:23 69:18,25 70:8
  70:18 71:2,5,9,12
  72:4 74:8,15,19
  75:2,24 76:10,19
  77:6,13 78:6 79:7
  80:6 83:10 85:11
  86:11,20 87:5,14,21
  88:5
**alcohol** 9:14
**aligned** 68:7
**amount** 54:3
**ANISSA** 2:15
**annual** 52:24
**answer** 8:17,25 9:20
  22:6 23:11,19 24:9
  25:16 29:10 33:3,25
  34:8,19 35:15 41:17
  43:13 44:3 45:13
  46:19 48:9,17,23
  49:6,12 53:13 54:18
  55:3,17 56:3 60:20
  61:5 63:3,11 65:3

**67:22** 68:16,25
  69:20 70:3,11,20
  74:10,17,21 75:4
  78:8 83:12 86:13,22
  87:7,16
**answered** 76:25
  91:10
**answering** 68:17
**answers** 91:12
**anybody** 10:9
**anyway** 42:11 77:14
**apologize** 17:10
**appropriate** 89:7
**approximate** 67:5
**approximately** 40:10
  47:25 48:14,19 49:2
**April** 82:14
**area** 14:17 15:5,23
  20:7 40:19,22
**areas** 29:6
**asked** 76:3 77:9
  84:19 91:10
**asking** 9:3 49:22 55:6
  77:2
**aspect** 86:25
**assessment** 26:18
  29:2
**assigned** 21:23,25
**assistant** 18:14,18
  19:10 20:20
**assume** 9:2 25:19
  65:8
**Atlanta** 15:11,13,17
  15:23 84:25
**Atlantic** 22:14
**attached** 89:14 91:15
**attention** 47:23
**attorney** 5:11 8:2
  89:18
**attorneys** 2:3,9 3:5
  10:10,10,24
**audio** 17:6 42:12
**audio/visual** 17:4
**authorized** 3:16
**average** 34:2,4 39:9

**B**

**B** 92:7
**bachelor's** 11:3,5
  14:12
**back** 37:5 42:9 45:2,5
  46:4 67:25
**based** 34:12 56:5
  59:3 62:21 77:10
**basically** 76:20
**Bates** 26:23 30:20
  35:20 37:9 57:20
  59:10 60:4 72:2
  80:4
**bee** 31:23 32:2
**began** 67:14
**beginning** 5:10 16:25
  63:16,21
**believe** 48:6 49:8
  65:12 67:3,17 69:3
  86:7
**beneficial** 37:15
**best** 8:18
**beyond** 51:18
**birth** 11:25
**bit** 42:8 68:9
**blood** 93:11
**bonus** 34:14 55:14
**bottom** 27:18 28:4
  64:5
**box** 16:15
**break** 18:22 44:16
  71:3 85:3,7,8 87:22
**brief** 10:19,22
**bring** 23:6,15,24
  24:21 25:4
**Broadway** 2:4
**Bronwyn** 60:9,10
**brought** 8:5 10:20
**budget** 39:24 52:23

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

53:9,15,17,20
**budgeted** 54:3,4,14
**bullet** 32:6 37:10
**business** 11:11 15:8,9
    15:16,24 20:18,21
    21:7,11,15 22:7
    23:7,16,24 24:3,12
    24:21 25:4,11 29:12
    30:2 32:21 37:13,24
    38:12,17 40:21 41:7
    41:9,11 42:17 45:16
    47:7,9 52:6 54:12
    54:20 55:11 56:12
    56:14 61:20 64:24
    65:11,16,18 66:10
    67:19 68:3,8 69:6
    69:17,24 70:7,17
    81:10,19 85:20
    86:19
**buyer** 47:20

_____

**C**

**C** 2:2 5:22 91:2 92:15
    92:15 93:2,2
**cadence** 73:17 82:6
**calculated** 87:18
**calendar** 29:16
**call** 31:21 42:3
**calling** 70:9
**Campbell's** 72:24
    73:3,16 80:25
**Canada** 20:9
**cancer** 50:2
**carefully** 89:5
**Carr** 60:22 63:19
**Carrie** 77:21 84:4
**Case** 1:7
**cause** 7:3 85:3
**certainly** 64:16
**certification** 11:17
**certifications** 11:16
**certify** 91:6 93:5,10
**change** 55:10,19 90:4
**changes** 89:13 91:14
**charge** 26:4

**chasing** 31:25
**chat** 27:7 50:17 57:23
    59:18 72:2 80:3
**children** 11:21
**Chip** 21:9 22:25
    23:13,22 24:2 48:25
**Chris** 60:6 61:11
**chronologically**
    63:23
**circumstances** 58:12
**Civil** 4:25
**clarify** 77:8
**clear** 32:21 43:3 51:9
    67:13 69:2
**client** 7:17 67:7
**close** 85:5 86:3
**closed** 85:25
**closely** 33:4
**CODD** 1:18 2:6
**College** 11:6
**column** 53:4
**come** 31:16 47:23
**coming** 47:18
**comment** 49:15
**commentary** 81:15
**comments** 49:19
**commission** 25:12
    34:12,16 35:2,11
    36:25 37:2 54:22
    86:10
**commissions** 34:21
**common** 39:17
**communicate** 46:3
    83:20
**communicated** 41:23
**communicates** 68:6
**communication** 31:9
    32:7,15
**communications**
    32:9,14
**company** 1:9 2:15
    4:16 8:5 29:15,21
    30:5 39:18 57:6
    73:3 86:24 87:2,3
    87:11

**companywide** 56:25
**compared** 52:22
**compensation** 86:6
    86:15,16 87:10
**complained** 10:5
**complaint** 42:2
**complete** 72:23 73:21
    73:25 80:24 82:17
    82:21 91:9
**completed** 11:2 37:19
**computer** 18:25
    29:17,22
**concern** 29:6
**concerned** 52:13
**concerning** 32:9 43:7
    51:12 77:16
**concerns** 10:20
**conclusion** 70:10
**conditions** 9:5
**confidential** 6:14 7:5
    7:12 12:3,8,11,22
    33:9,18 40:4,12
    66:16,23 67:3,8
**confirm** 7:2 36:23
**confirmation** 7:4
**consent** 5:13,20 7:11
**consider** 33:21 46:22
    81:7
**considering** 47:2
**contacts** 38:5
**contents** 79:11
**continue** 47:13 73:7
**continuous** 38:22
**conversations** 31:18
    75:21 77:15 78:15
    79:9,12,13
**convicted** 9:23
**coordinate** 73:14
**copied** 82:3
**copy** 4:3
**corporate** 84:25
**correct** 24:11 25:21
    32:24 33:12 37:3,4
    41:13 43:24 51:2
    54:2,15 55:9,18

56:16 60:17 65:14
    65:15 67:15 73:4
    82:19,22 86:10 91:9
    91:13
**correcting** 76:20,24
**corrections** 89:6,8
    91:13
**corrective** 46:6
**corrugate** 14:8
**corrugated** 14:19,25
    17:17 23:5 25:25
    26:5 85:22
**counsel** 5:3 6:19
    68:12 75:22 79:10
    79:17 82:2 92:13
**Counselor** 76:18
**COUNTY** 91:5
**couple** 8:10
**court** 1:2 3:19 89:23
**cover** 20:5 22:13,20
    22:23,25 40:18
**covered** 40:22 41:10
**Cozen** 2:8 5:18
**Create** 73:18
**creative** 20:19
**crimes** 9:23
**CRM** 29:18
**current** 12:24 19:20
    20:13
**currently** 9:12 14:24
    64:17 66:9
**customer** 22:3,9
    29:13 32:8,10 37:14
    37:18 38:17,22
    41:20,24 42:2 47:11
    58:17
**customers** 21:21,23
    21:25 23:7 32:14
    38:14 47:16 68:7
**cut** 8:18

_____

**D**

**D** 3:2 91:2 92:2,7,15
    92:15
**date** 4:18 11:25 66:13

Case 1:23-cv-06252-MMG    Document 46-11    Filed 03/07/25    Page 28 of 37

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa   ---   July 30, 2024

97

66:14 83:17 89:11
**Dated** 93:22
**David** 20:25 35:7,8
  56:7 63:18 64:9
  81:14,15,21
**Davin** 60:22 63:19
**day** 88:11 91:21
**days** 80:20 89:19
**deadline** 76:12
**dealing** 47:11
**December** 13:9,24
  26:16 64:10
**decided** 24:19
**decision** 29:25 83:5
  86:2
**decreased** 55:20
**deemed** 89:22
**defendants** 1:10,16
  2:9 5:19 88:5
**deficiencies** 77:24
**degree** 11:3 14:12
**delays** 5:5
**delivery** 38:19
**Denver** 58:18 60:7
  62:23
**department** 16:3
  17:15 24:13 34:11
  34:22 39:16,21
**deposing** 89:18
**deposition** 3:15 4:13
  4:20 5:21 10:9,15
  89:4,15,19,21
**described** 39:5
**DESCRIPTION** 92:8
**detail** 47:23
**detailed** 73:12 81:3,7
**determined** 22:2
**develop** 25:10 40:24
  54:19
**developed** 54:13
**developing** 41:4
**Devora** 1:20 4:8 17:7
  93:3,22
**different** 20:7 38:8
  46:14 61:19 62:2

**difficult** 44:4
**dinosaur** 68:9,21
**direct** 25:20 34:3,16
  34:23
**directly** 20:11 56:15
**director** 16:19,21
  17:11,19 20:18,19
**discipline** 69:23
**discovery** 27:23
**discrimination** 10:5
**discuss** 10:8 21:22
  77:22
**discussed** 81:23
**discussion** 12:17
  62:15 78:25
**discussions** 75:16
  78:4,21 79:6
**display** 39:15,20
  86:18
**displayed** 29:13
**displays** 13:4,7,15
  19:22 20:2 21:5
  34:25
**DISTRICT** 1:2,3
**divided** 51:7,21
**division** 14:9,19,25
  26:2,5 85:22
**document** 10:17
  26:22 27:3 28:6,11
  28:14,18,20,24
  30:11,16 35:18,24
  36:7,9,16,18,21
  50:5,19,23 52:16,19
  57:12,16,23,25 58:9
  58:16,24 59:4,6,14
  59:24 62:22 63:17
  63:22,25 70:24
  71:22 72:11,13 76:6
  77:10,12 78:23
  79:23 80:7,9,13,15
  85:4,9 92:9,9,10,11
  92:11,12
**documents** 10:14
  27:16,22,24 28:2,5
  59:22

**doing** 61:25 89:10
**Don** 14:6
**downloading** 27:11
  36:3 50:19 57:24
  59:20 72:5
**dropped** 50:16
**drugs** 9:13
**duly** 5:23 93:7
**Durette** 14:4

─────────

**E**

**E** 2:2,2 3:2,2 90:2
  91:2,2,2 92:2,2,2,7
  92:7,15,15,15 93:2
  93:2
**e-mail** 29:15 63:17
  64:9 81:24 82:3
**e-mails** 32:16
**earlier** 39:5 65:10
  67:4 86:8
**earn** 55:13
**earned** 54:23 86:8,9
**east** 13:17,21 14:3,15
**education** 11:2
**effect** 3:18
**effective** 32:7,22
**effort** 29:11
**efforts** 38:23
**either** 26:16 27:19
  36:21 41:23 77:3
**eliminated** 56:22,23
**employer** 12:24
**employment** 46:23
  75:10,18 77:18 78:5
  78:22 83:6,16,19,21
  84:13
**entail** 47:17
**enter** 51:14 74:3
**entire** 28:23
**errata** 89:8,11,13,17
  91:15
**ESQ** 2:6,11,15
**evaluation** 26:13
  28:21 41:4
**exact** 65:9 83:17 84:8

**exactly** 51:23 61:9
  62:7 78:9 85:23
  87:18
**EXAMINATION**
  1:15 7:23 92:4
**examined** 5:25
**example** 31:19
**exceeded** 53:8,15,16
**exclamation** 32:18,19
**excluded** 65:8
**executive** 20:20
**exhibit** 26:23 27:3,7
  35:19,24 37:5 50:8
  50:11 52:16 57:13
  57:16,20 59:9,9,14
  70:25 71:19,22,25
  79:3,19,23 80:3
  92:8
**exhibit(s)** 92:13
**expected** 40:23 54:12
  74:23
**experience** 8:8
**explaining** 58:25
**extended** 80:19
**extension** 80:18 83:8
**extent** 58:25 66:12
  70:9 79:8

─────────

**F**

**F** 3:2 92:2,7,15,15
  93:2
**face** 59:4
**face-to-face** 83:24
**facilities** 15:23 46:12
  60:17 65:24 66:4
**facility** 16:9,18 18:2
  18:15 19:12 43:2
  45:15,20,23,24 46:4
  46:16 52:10 60:8
  62:23 65:12,17
  84:23
**fact** 55:7 87:11
**factory** 42:3
**facts** 9:6,10
**fail** 89:20

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa   ---   July 30, 2024

**fairly** 32:22
**far** 51:8
**Farm** 33:13 37:3
  38:2 39:2,6 44:8
  45:18 47:20 51:4,7
  51:13,20,25 52:6,12
  53:7,9 60:7,9,16
  64:24 65:20,24 66:4
  66:9 67:6 69:16,24
  70:7,16 73:4 87:4
  87:13
**Farm's** 43:23
**Farms** 35:12 37:12
  37:19 39:25 40:8
  43:8 45:24 46:8,11
  47:5 52:3 58:18
  66:6
**feasible** 74:6,18 76:4
**Federal** 4:24
**feedback** 81:16
**feel** 32:12,20 36:11
  50:21 57:2 58:5
  68:7 72:6
**file** 64:17,18,23 67:9
**filed** 10:4
**filing** 3:6
**final** 53:3
**financial** 51:8,19
  70:22
**financials** 67:7
**finish** 8:16
**firm** 5:18
**first** 5:23 13:10 17:2
  19:17 46:21 58:3
  78:3 80:10
**fiscal** 33:14 53:10
  54:8 66:14 67:14
  73:9 74:14 81:5
  86:16
**five-minute** 71:3
  87:22
**five-page** 79:23 92:12
**Floor** 2:10
**FLOYD** 2:15
**follow-up** 87:23

**follows** 6:2
**force** 3:17
**forecast** 51:16 73:18
**forecasts** 38:17 52:4
**foregoing** 93:8
**foreign** 15:22
**form** 3:10 7:15,20
  22:5 23:10,18 24:8
  25:15 29:9 33:2,24
  34:7,18 35:14 36:18
  39:12,12 41:16
  43:12 44:2 45:12
  46:18 48:4,8,16,22
  49:5,11 53:12 54:17
  55:2,16,23 56:2
  60:19 63:2,10 65:2
  67:21 68:11,24
  69:19 70:2,19 74:9
  74:16,20 75:3 78:7
  81:9,18 83:11 86:12
  86:21 87:6,15 91:14
**forth** 93:7
**four** 20:21
**frame** 13:19 14:21
  15:15 17:18 18:8,17
  19:14 83:14
**framed** 76:14,15
**Fran** 8:2
**Frances** 1:18 2:6
  5:13
**frances@goddardl...**
  2:6
**free** 36:11 50:21 58:5
  72:6
**front** 40:9 57:25
**fucking** 31:23 32:2
**further** 3:9,14 67:3
  87:20 93:10

**G**

**G** 91:2
**gaps** 37:16,25
**general** 15:8,16,25
  16:2,8,12,16 17:23
  17:24 18:4,9,14,18

  19:11 29:17 38:5
  57:9
**generate** 54:11 73:11
  74:24
**generated** 54:13
**geographic** 20:7
  40:19
**Georgia** 6:16 16:6,17
  18:3,5,10,16
**gestures** 8:21
**getting** 64:4 85:5
**give** 9:17 31:19 50:6
  50:14 51:16 59:22
  81:18
**given** 91:12 93:9
**global** 39:14
**go** 19:5 38:16 40:23
  59:23 62:24 67:25
  74:24 85:10
**goals** 54:20
**Goddard** 2:3 8:3
**goes** 29:3
**going** 8:7 9:2 18:20
  28:8 37:5 49:23
  50:4 58:2 59:8
  66:20 73:2 80:9
  84:13
**good** 4:7 7:25 33:21
  71:13 85:11 88:10
**graduated** 14:13
**graphic** 13:4,8,15
  19:22 20:21 21:13
  21:14,22 22:7 24:3
  39:15,20 40:21
  56:12
**graphics** 21:6,11,15
  23:7 24:12 30:2
  41:9 42:16,17 55:11
  56:14 61:20 67:19
  69:6 85:20 86:19
**greater** 54:23
**Greenwich** 2:9
**group** 11:16 23:5
**grow** 21:13,17 29:11
  47:14 68:3

**growing** 47:7,8
**guess** 25:7 57:12 86:7
**guided** 78:23

**H**

**H** 92:7
**Hackner** 1:20 4:9
  8:12 93:3,22
**handled** 41:19,21
**handling** 58:17
**happen** 45:21
**harm** 70:13,15
**head** 26:8 31:24
  53:23 66:20
**headquarters** 46:9
  46:11,15
**hear** 42:13
**heard** 61:14 63:4
**hearing** 17:7
**held** 1:19 12:18
**help** 21:17 81:2
**helped** 37:24 63:6,7,8
**hereinbefore** 93:7
**highest** 10:25
**history** 30:5
**Hold** 31:7 63:20 64:4
**honestly** 51:22
**hope** 55:12,13 88:10
**HR** 25:19 77:19,20
  84:3

**I**

**identification** 27:4
  35:25 50:12 57:17
  59:15 71:23 79:24
**identified** 63:13
**identify** 37:25 63:6,8
**identifying** 37:16
**illicit** 9:13
**impacted** 70:21
**imperative** 89:16
**important** 5:4 8:14
  8:19
**impossible** 43:22
  44:4

Case 1:23-cv-06252-MMG    Document 46-11    Filed 03/07/25    Page 30 of 37

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

99

improve 31:8
improvement 38:23
  69:10,15 72:14,22
  75:11,15,20 79:3
  80:17 84:12
inability 29:14,16
inaccurate 76:22
inappropriate 31:17
  31:20
incentive 41:8 52:24
  52:24 70:22
included 41:12 64:23
income 55:20
inconsistent 26:20
  78:13
increase 21:18,20
independently 41:5
Indicates 92:13
influence 9:13
inform 83:15
information 34:10
  46:14 51:17 53:3,5
  53:6 74:3
initially 18:9
initials 57:8
initiatives 16:20
  17:13,14,19
INSTRUCTIONS
  89:2
integrated 20:18
interested 93:12
interpreting 77:12
involved 29:24
issue 17:4,5 41:22
  42:21 45:9,14,19
issued 75:11,19
issues 31:3 38:19
  41:19,20 42:5 43:6
  43:7 44:8 46:2 52:9
  58:18 62:19 63:6,7
  65:7 73:18
item 42:25
items 73:17 74:6
  80:23

### J

jagresti@cozen.com
  2:12
Janice 2:11 5:17
  16:24 27:8
January 26:17 72:17
  82:13
Jessica 61:7
job 13:2 14:15 15:19
  16:11,18 17:22
  19:23 20:4 21:10
  55:19 56:10
join 13:10
JPC 1:7
July 1:12 4:18 12:6
  91:8 93:22

### K

K 91:2
keep 16:24
keeping 87:3
kept 87:12
key 37:12,23 38:3,5
  38:10 39:13 72:23
  80:24
kind 69:22
know 9:16 10:5 17:3
  17:10 24:4 25:17,18
  27:12 38:16 39:7,9
  39:19 41:20 42:4,21
  43:19 44:13 46:7,20
  47:21 48:5 49:13
  51:18,22,23 52:2
  53:19 58:11,14,15
  61:9,11,13,14,25
  62:7,16 64:18 65:4
  65:9,21 66:12,19
  70:6,11 72:7 81:20
  82:2,4 85:23 87:17
  87:17
knowledge 34:3 35:9
  59:5 81:17
Krimsky 1:5 2:16
  4:15 5:15 8:4,10
  24:12 26:13,24,24

27:20,25,25 28:22
  29:20,25 30:19,21
  32:22 35:21 37:9
  39:24 40:14 46:7
  49:9,16,23,25 50:7
  51:3 53:8 54:4,22
  57:21 59:10 60:5
  63:18 67:17 69:4,9
  72:3,3,20 74:23
  80:4,5,24 82:5
  83:15 84:7,15 85:19
Krimsky's 26:19
  29:7 30:4,12 31:4
  39:6 46:22 49:19
  64:22 75:10,18
  77:17 78:5,22 83:5
  83:19 86:5

### L

L 3:2,2 91:2 92:15
lack 29:11 47:15
ladies' 71:6
language 31:17,20
large 38:14,24 39:3
law 2:3 5:17 8:3
lawsuit 8:4 10:2
LAWYER'S 94:2
Le 11:6
lead 19:24
leader 81:14
leaders 26:6
leads 21:4 40:24 41:4
  41:12
learn 68:3,4 69:4
leave 56:18,21
led 16:14 47:2
legal 70:10 75:22
  77:16 79:10,14,16
  82:2
let's 52:15 71:10
  80:22
level 10:25 31:10
  38:7 55:5
licenses 11:13
line 25:23 35:4,10

60:25 61:4,6,18
  90:4 92:16
lines 84:10
Lisa 60:6 61:16
listen 31:25
litho 53:17
lithography 54:2,14
litigation 28:5
little 42:8
LLC 1:9 4:17
local 86:4
located 11:7
logged 41:25
long 44:5,7,13
look 28:11,12 36:6
  52:15 53:23 57:19
  58:2 80:9,22 81:10
looked 56:25
looking 27:24 28:13
  30:9,18 37:8 53:25
looks 58:16
loss 47:5 69:16,23
  70:7,16
lost 45:15 65:11
lunch 85:7

### M

M 1:17 4:1,13 5:1,22
  5:22,22 6:1,5 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1

Case 1:23-cv-06252-MMG    Document 46-11    Filed 03/07/25    Page 31 of 37

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

100

72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:2
91:6,18 92:3
**machines** 43:23
**main** 29:6 47:20
62:14
**maintain** 21:13 74:4
**maintaining** 82:25
**major** 11:10
**majority** 43:16
**making** 49:19
**manage** 15:10 51:15
**manager** 15:8,17,25
16:2,8,12,16 17:23
17:25 18:4,9,14,18
19:11 21:12 24:3,13
29:2 30:2 33:5
45:22 55:11 60:23
61:17,19,20 67:19
69:6 77:19,20 84:3
85:20
**manager's** 47:21
**managers** 20:22 21:7
21:16 22:8 23:8
25:20 35:8 40:22
41:10 42:17 56:12
56:15 61:22
**manufacturing** 15:22
16:5 18:2 19:25
46:12,16 60:16
**March** 44:10 45:8
56:20 76:11
**marital** 11:19
**mark** 6:13 12:10
26:22 35:18 50:5
57:12 59:8 70:24
71:18 79:19
**marked** 7:4,12 12:21
27:4 35:24 50:12
57:17,20 59:15 67:2
67:8 71:23 79:24
**marriage** 93:12

**married** 11:20
**Marshall** 1:5 2:16
4:15 5:15 8:4 24:11
28:22 31:8 37:13
44:11 47:6,20 55:4
63:18 64:15 70:4
72:15 84:3
**Marshall's** 77:24
80:16
**massive** 43:7
**Mastronicola** 61:8
**Matt** 60:9
**matter** 4:14 5:20
93:13
**mean** 20:4 34:13,16
51:8 53:2,4 57:4
63:22,23 68:11,19
77:3 83:23
**means** 4:21 9:16
77:21
**measurable** 41:2
**measured** 41:3
**medical** 9:4
**medication** 9:8
**meet** 21:21 39:24
75:13 81:13 84:11
**meeting** 38:13 47:18
47:19 62:22 63:5
73:14,19,20 77:25
83:24,25 84:2
**meetings** 29:14 30:13
31:5,16 45:17 47:12
47:24 51:25 52:2
73:24 82:6,9,15
**mentioned** 8:12
23:13
**merchandising** 13:4
13:7,14 19:21 21:5
34:25 39:15,20
86:18
**met** 53:20 60:8
**metaphor** 68:14,18
68:21,22
**Metelko** 21:8 22:15
24:20 48:13

**Microsoft** 73:22
82:18
**Midwest** 22:24 25:8
**million** 33:15 40:10
66:21 73:9,13 74:13
74:24 76:3,15 81:4
**mind** 56:6
**minute** 12:14 19:3
27:12
**minutes** 19:2 31:25
59:23
**misrepresentation**
76:6
**missing** 16:25
**Monday** 60:6
**monetary** 53:5
**monthly** 51:24 73:14
**months** 24:6 54:8
**morning** 4:8 7:25
88:9
**move** 29:25
**moved** 85:19
**Moyne** 11:6
**multiple** 26:6

_____

**N**

**N** 2:2 3:2 91:2,2 92:2
92:2,7,15,15,15,15
**name** 4:8 5:9,12,16
6:4 8:2 47:22 61:15
64:16,22 65:5
**nature** 79:5
**NC** 62:16
**NC's** 62:15
**necessarily** 34:9
42:24 76:13
**necessary** 89:5
**need** 27:9 28:12
36:12 68:17 71:5
85:3
**needed** 69:5 77:8
**needs** 31:8
**neither** 37:18 70:4
**never** 36:22 56:6
58:23

**new** 1:3,22 2:5,5,10
2:10 5:25 6:22 11:8
29:11 41:6,11,12
47:7,8 54:12,19
73:10,17 74:3 75:6
75:7,8 91:3 93:5
**Nickie** 26:9
**Nine** 20:12
**nineteen** 11:24
**Nonconformance**
62:17
**Norcross** 16:4,5,8,13
16:17,17 18:3,5,10
18:16 19:11
**North** 22:14
**Notary** 1:21 5:24
91:25 93:4
**note** 27:15 58:21 94:2
**noted** 88:13 89:13
91:14
**NOTES** 94:2
**notice** 1:20 62:13
**notified** 47:4
**number** 57:5
**numbers** 27:19,20
56:4 67:2,5

_____

**O**

**O** 3:2 91:2 92:2,7,15
92:15,15
**O'Connor** 2:8 5:18
**oath** 3:17 4:22 6:21
9:17 91:8,11
**object** 7:15
**objection** 5:7 22:4
23:9,17 24:7 25:14
29:8 32:25 33:23
34:6,17 35:13 39:11
39:12 41:15 43:11
43:25 45:11 46:17
48:3,7,15,21 49:4
49:10 53:11 54:16
54:25 55:15,22,25
60:18 61:3 62:25
63:9 64:25 67:11,20

Case 1:23-cv-06252-MMG    Document 46-11    Filed 03/07/25    Page 32 of 37

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa   ---   July 30, 2024

101

68:10,23 69:18,25
70:8,18 74:8,15,19
75:2 78:6 79:7
83:10 86:11,20 87:5
87:14
**objections** 3:10 7:19
**observation** 32:8
**occur** 5:6
**October** 67:14 86:7
**off-the-record** 12:17
**offered** 84:20
**office** 82:18 84:25
**officer** 3:16
**oh** 33:5
**okay** 6:15 7:22 12:23
13:13 15:3,15 17:14
18:8,12 21:19 22:10
26:7 27:13 28:9,16
28:17,23 29:5 30:9
30:22,25,25 31:14
31:14 33:12 35:3,9
35:19 36:8,10,14,17
36:20,23 37:5,8
39:2,13 40:18 42:10
42:20 43:21 44:15
44:19 45:8 50:7,25
51:11,19 52:5,8
53:2,19 55:6,9,19
56:5,10,14,18 57:7
58:7,8,11,15,20
59:17,25 60:2,3,15
60:22,24 61:7,11
62:6,8,18 63:16
64:5,13,15,21 65:19
69:14 70:5,23 71:7
71:12,25 72:9,10
73:6 74:12 79:15,18
80:8,11,19 81:3
82:5,17 83:4 84:17
84:20 85:16 86:5,15
86:25 87:19,24 88:7
**old** 47:25 48:14,20
49:2,8,13 69:4
**older** 49:7
**on-time** 38:19

**open** 28:7 31:2 36:9
**opening** 80:6
**operation** 82:7
**operations** 15:22
16:14 19:24 20:16
46:4 62:10 73:15
82:10,16
**opportunities** 23:16
23:24 24:22 25:5,11
38:7,21 40:16 74:3
**opportunity** 81:13
**opposed** 34:13
**ordering** 4:3
**organized** 37:13
38:13
**oriented** 32:21
**original** 89:17
**outcome** 93:13
**outline** 81:22
**Outlook** 29:15 73:22
73:23
**outside** 30:6
**overview** 38:4

**P**

**P** 2:2,2 3:2
**p.m** 64:11 88:13
**PA** 60:7
**package** 84:21
**packaging** 21:14,14
53:18 65:18,20
**page** 12:21 30:10,19
31:12 32:5 37:9
60:4,4 63:24 64:2,6
90:4 92:4,8,16
**PAGE/LINE** 94:2
**pages'** 59:21
**paid** 25:12,13 86:9
**painful** 42:11
**pancreatic** 50:2
**paragraph** 62:14
**parent** 73:3
**Parker** 26:9
**part** 25:25 40:25 41:3
41:7 54:20

**particular** 22:8 46:25
**parties** 3:6 4:11 5:9
93:11
**party** 9:25 27:21
**Paterini** 21:9 22:20
25:3 48:19
**Patrick** 60:9,11
**Patty** 21:8 22:15
24:20 48:13
**paying** 87:2
**payout** 52:24,25
**Pennsylvania** 58:19
62:23
**people** 20:10,15 38:8
57:5
**Pepperidge** 33:13
35:11 37:3,11,19,25
39:2,6,25 40:8 43:8
43:23 44:5,8 45:18
45:24 46:8,11 47:5
47:20 51:4,7,13,20
51:25 52:3,6,12
53:6,9,17 58:18
60:7,8,16 64:24
65:20,24 66:4,6,9
67:6 69:16,24 70:7
70:16 73:4 87:4,13
**percent** 36:25 37:2
**performance** 26:13
26:19 28:21 29:7
41:3 69:9,15 72:14
72:21 75:11,14,19
78:14,24 79:2 80:17
84:12
**performed** 51:12
**performing** 38:18
**period** 16:7 74:7 76:4
76:8,11,16 82:13
**person** 26:7
**personal** 59:5
**perspective** 51:20
**Pete** 14:4
**phasing** 60:10
**pipeline** 74:5 83:2
**placed** 27:7 69:8,14

72:2
**plaintiff** 1:6 2:3 5:14
6:24
**Plaintiff's** 27:2 35:23
50:10 57:15 59:13
71:21 79:22
**plan** 37:12,23 38:3
41:8 69:10,15 72:15
72:22,24 73:12
75:12,15,20 79:3
80:17,25 81:4,6,10
81:19 84:12 86:6
**planning** 20:19 75:9
**plans** 24:17 38:18
39:13
**plant** 16:5,15 18:16
47:21 85:25 86:3,4
**plants** 19:25 20:8
**please** 5:9 6:4,9,13
7:10 8:16,24 12:10
12:22 23:21 36:6
45:2 57:19 73:7
87:9 89:4,10
**PLLC** 2:3 8:3
**point** 32:18,20 37:10
**points** 32:6
**portion** 12:4,8 30:16
33:10,18 40:5,12
66:17,23
**position** 30:2 56:22
67:18 85:19
**positions** 57:2
**possibility** 75:17
**potential** 38:6,20
**practice** 4:25 39:17
**predecessors** 13:11
**prepare** 10:15 26:12
81:3,16
**prepared** 10:22
32:13 47:19,24
58:12,14 81:6
**preprint** 20:2 51:16
51:17 53:15,21
**present** 2:14 4:11
72:16 79:10,14,17

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

102

**presentations** 73:25
**presented** 59:3 72:15
**president** 13:3,7,14
  13:17,20 14:2,8,14
  14:17 15:6 19:21
  20:16,17,23 39:22
  62:9
**previous** 32:5
**previously** 47:10
  76:2
**print** 85:4
**prior** 15:5 44:13
**problem** 18:23 30:13
  63:15
**problems** 43:15,16
  43:18,20
**proceed** 78:18
**proceeding** 5:8
**process** 38:24 51:9
  58:17
**produce** 19:25
**produced** 43:9
**product** 65:22
**production** 42:5,18
  42:22,25
**products** 43:8,22
  44:9 65:23 66:3
**professional** 11:12,15
  31:10
**professionalism**
  29:12 30:12 31:4
  47:16
**profitability** 86:17,24
**projects** 62:2
**prospect** 75:6
**provide** 81:9
**provided** 27:22 28:2
  28:4 81:12,20
**Public** 1:21 5:24
  91:25 93:4
**pursuant** 1:19 4:24
**put** 65:5

**Q**

**QA** 64:16

**qualified** 73:10
**quality** 38:19 41:19
  41:20,22 42:5,20
  43:6,7 52:9 60:11
  60:23 62:18 73:18
**quarter** 38:14
**quarterly** 37:12,24
  38:12 52:5
**question** 3:11 7:16
  8:17,24 9:2 23:20
  42:11,14 43:3 45:2
  45:5 51:10 66:2
  69:2 76:14,24 77:2
  77:3,9 87:8
**questions** 8:8 9:20
  85:17 87:20 88:6
**quick** 18:22
**quickly** 85:10
**quote** 51:15

**R**

**R** 2:2 3:2 5:22 90:2,2
  93:2
**ramifications** 70:6
**range** 66:21
**rated** 26:20 78:13
**reach** 75:6
**read** 7:17,20 44:25
  45:5 89:4 91:7
**ready** 72:8
**realize** 14:10
**really** 8:22 33:7
**reason** 64:21 65:9
  89:7
**reasoning** 85:24
**reasons** 63:13,14
  69:8
**recall** 9:6,9 53:22
  78:9,10 83:17
**receipt** 89:19
**receive** 29:20 34:12
  34:25 35:10 55:12
  69:22
**received** 37:2 46:13
**receives** 34:21

**receiving** 36:24
**recess** 19:7 44:22
  71:15 85:13 88:2
**recognize** 28:17
**reconvene** 44:18
  71:11
**record** 6:4,8,14 7:5
  12:11,14 19:5 38:11
  58:22 76:2 91:10,12
  93:8
**Redact** 7:9
**redacted** 7:8
**reduce** 57:5
**reduction** 56:24 57:4
**referred-to** 45:4
**referring** 30:17 31:7
  64:19
**region** 13:18,21 14:3
  14:15 22:8,9,10,11
  22:13,16,18,21,23
  23:2,14 24:25 25:8
**regular** 52:2 73:17
  82:6
**regularly** 45:23,24
  54:23
**related** 67:6 93:10
**relates** 64:23
**relationship** 37:17
**relationships** 38:8
**relay** 9:6,10
**relevant** 43:4
**remainder** 74:13
**remaining** 85:21
**remember** 84:8
**remote** 1:15 4:9 5:8
**remotely** 4:23
**rep** 30:6,7 33:22 42:3
**repeat** 23:20 65:25
  87:8
**repeatedly** 32:2
**rephrase** 8:25 70:12
**replace** 24:17
**replaced** 24:15
**report** 13:25 14:5
  20:10,15 35:6,7,8

  53:24 55:4 56:15
  62:3,4,6,11 65:6
**reported** 40:15 56:13
**reporter** 1:21 4:10
  93:3
**reporting** 25:22
  26:11 35:4,10 44:12
  60:24 61:4,6,18
**reports** 34:23 62:5
**represent** 5:11,14,19
  8:4
**representative** 32:23
  33:6 37:11 41:24
  85:21
**representatives** 23:6
  40:15 41:13
**represented** 41:10
**reps** 26:5 34:4,24
  35:3
**requests** 51:15
**required** 72:20
**requirements** 75:14
  77:25 84:11
**reserve** 7:19
**reserved** 3:11
**resolved** 45:10,18
**respective** 3:5
**respond** 8:20
**response** 17:3 84:16
**responsibilities** 15:20
  16:12 19:23 21:3,11
  56:11
**responsibility** 15:21
  46:3 51:6
**responsible** 52:8
**responsibly** 38:6
**responsive** 65:7
**rest** 17:12 88:10
**retained** 92:13
**retire** 49:23
**return** 89:16
**revenue** 73:8 87:3,12
**review** 10:14,18
  37:24 38:12 52:4
  73:15,17 78:14,24

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

reviewed 36:16 58:7
  60:2 72:9 80:11
reviews 37:13 52:6
reword 32:4
Rich 63:18
Richard 21:8
Rick 22:11 47:25
  51:2,14 60:15 69:14
right 6:16 19:4 28:6
  40:9 42:22 50:16
  52:15 59:21 64:3
  80:2,12 85:7
Robards 77:21,23
  78:4,16 79:2 84:4
role 15:4,6,20 19:20
  20:13 26:10 61:10
  61:14,23 69:13 78:2
roll 60:11
rolls 53:16,21
room 71:6
Rossi 62:8 63:19
Rule 4:24
running 43:2

——————————————
          S
——————————————
S 2:2 3:2,2 5:22,22
  92:2,2,2,7,15,15
salary 25:12 55:14
sales 15:21 16:14
  19:24 20:17,24
  21:14,16,17,18,20
  23:6 26:5,6,8 30:6,7
  32:23 33:5,6,13,21
  33:22 34:4,4,13,24
  35:3,11 37:3 39:6
  39:25 40:7,14,24
  41:4,12,12,23 42:3
  52:22 53:7,9 54:4,7
  54:15 66:13 72:25
  73:8,11 74:13,25
  75:8 76:3,16 81:4
  81:13 85:21
Salesforce 74:2,4,5
  82:22 83:2
salesforce.com 29:18

38:11 68:4
salespeople 21:4
  23:15,23 24:21,24
  25:4,8,10,22 61:24
salesperson 54:22
saw 42:20
says 37:21 60:5 62:14
  64:15 76:7 82:23
Schiffenhaus 21:9
  22:25 23:14,22 24:2
  48:25
Schroll 61:12
screw 18:24
scroll 28:10 36:12
  50:22 72:6
sealing 3:6
second 30:10,14 37:8
  50:6,15 60:3 79:20
seconds 12:13
see 34:9 37:20,20
  45:25 47:13 60:13
  87:22
seek 7:3
seen 36:18,20 52:16
  56:4 58:8,23 72:10
  80:12
self-evaluation 29:3
sell 34:24 68:5 75:8
  86:4
Selling 57:9
send 81:24
senior 13:3,6,13,17
  13:20 14:2,14 19:20
  20:17,19 39:22
sense 77:4 85:6
sent 81:22
sentence 32:18,19
separate 12:21 18:6
September 13:23
  33:14 53:7,24
service 37:16,25
  41:25
services 1:9 4:16 8:6
  20:20
set 38:9 73:19 82:5

82:15 93:7
severance 84:19,21
SG&A 56:24 57:4,8
share 27:9
shared 27:17
Sharp 20:25 35:7,8
  63:18 64:9 81:14,17
She'll 59:23
sheet 89:8,11,14,17
  91:15
short 32:19 85:3
show 28:8 53:8,14,16
  69:11
shown 47:7
Shue 21:8 22:11 48:2
  51:2,14,24 60:15
  63:19 69:14 70:15
Shuey 61:16
side 17:5,6 51:9
sign 7:17,21 89:10
signed 3:15,18 91:20
signing 89:12
Similarly 25:3
single 16:15
Siracusa 1:17 4:1,14
  5:1 6:1,6 7:1,25 8:1
  9:1 10:1 11:1 12:1
  12:23 13:1 14:1
  15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1
  35:1 36:1,17 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1
  54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1
  70:1 71:1 72:1 73:1
  74:1 75:1 76:1 77:1
  78:1 79:1 80:1 81:1

82:1 83:1 84:1 85:1
  85:18 86:1 87:1
  88:1,8 89:1 90:1
  91:6,18 92:3
sites 42:18
six-page 27:3 92:9
skills 31:9
Slusarz 1:18 2:6 5:12
  5:13 6:23 7:11,22
  7:24 8:2 16:24
  18:20 26:21 27:6,13
  28:9,15 30:20,23
  31:13 35:17 36:5,10
  42:10,15 44:15,20
  50:4,14,20 57:11
  58:4 59:7,17,25
  64:2,7,12 67:10
  68:13,20 70:23 71:4
  71:8,10,18 76:9,17
  76:23 77:11,14
  79:18 80:2 85:2
  87:19,24 88:7 92:5
Smurfit 12:25 13:10
  56:8
sold 85:25
solution 39:21
solutions 13:5,8,15
  19:22 21:22 39:16
  86:19
somewhat 26:9
sorry 15:12 16:21
  31:6 33:6 36:25
  39:14 44:6 56:6
  59:11 70:14 73:2,6
  75:24
sound 18:23
Sounds 71:12 85:11
southeast 14:17
  22:19 24:25
SOUTHERN 1:3
space 89:7
Sparaco 14:6
Sparaco's 14:7
speak 5:5 33:7
speaks 8:15

Case 1:23-cv-06252-MMG    Document 46-11    Filed 03/07/25    Page 35 of 37

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

104

specific 22:11,16,21
  23:2 36:21 38:15
  40:19,22 41:11
  65:19 81:15
specifically 23:23
  41:6 65:4,21
specifics 43:19
spreadsheet 50:11
  52:20,21 92:10
SS 91:4
stamp 27:23
stamped 26:23 30:21
  35:20 37:9 57:21
  59:10 60:5 72:3
  80:4
stand 57:8
standard 38:24
standpoint 32:12
stands 62:16
start 7:13 38:3 75:5
started 44:11 86:6
starts 37:10
state 1:22 5:9,24 6:3
  6:7,21 89:6 91:3
  93:4
statement 10:19,23
States 1:2 20:4,5,9
  23:4
status 11:19
Steel 56:7,18
stenographer 4:2,7
  6:3,7,15,19 7:7 17:9
  45:6
stenographic 1:21
  4:10 93:3
STIPULATED 3:4,9
  3:14
stipulation 5:2
stipulations 7:14
stop 42:4,22,24
store 38:11
strategic 16:19 17:13
  17:14,19
Street 2:9
strengthening 37:17

strike 44:6
subject 89:12
submit 73:12
subscribed 91:20
substance 91:14
successful 69:5
Sued 2:11 5:17
suffer 70:5,13,15
suggestions 78:17
Suite 2:4
summer 46:24
support 61:23,24
sure 26:10 28:15
  31:11 50:20 58:4
  71:4
sustainability 38:22
swirling 31:23
sworn 3:16,18 5:24
  93:7
syllable 17:2
Syracuse 11:8
system 29:19 42:2
systems 29:22

---
**T**

T 3:2,2 4:1 5:1,22 6:1
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1 14:1
  15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1
  59:1 60:1 61:1 62:1
  63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1
  71:1 72:1 73:1 74:1
  75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1

83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1
  90:2 91:2 92:2,7,15
  92:15 93:2,2
take 4:12 6:20 18:21
  18:21 36:6 44:16
  52:15 57:19 71:3
  72:21 80:22 85:3
  87:21
taken 1:17,20 4:21
  19:8 44:23 71:16
  85:14 88:3 91:7
talk 38:20
talked 30:11
talking 31:22 47:6
Tammy 1:17 4:13 6:5
  91:6,18 92:3
target 55:14
task 76:12
tasks 51:12
team 25:19 37:14
  51:17 60:9 73:15
  82:7,10,16
Teams 73:20,22,24
  82:6,19 83:24 84:2
technology 68:6 69:5
telephone 83:25
tell 46:10
telling 52:21
template 81:19
ten 59:21
ten-minute 44:16
ten-page 59:14 92:11
tenures 18:6
term 61:4
terminate 75:9 83:5
  83:18 84:13
terminated 83:16,21
terminating 46:22
  75:18 78:5,21
termination 47:3
  77:17
territory 41:11
testified 5:25 58:23
  65:10 76:21 86:8

testify 76:25 79:11
testifying 76:18
testimony 9:17 67:4
  91:7,11 93:6,9
thank 7:21 12:22
  16:23 67:12 71:9,13
  88:8,12
Thanks 19:4 44:20
things 8:11 31:15
think 18:22 30:24
  46:13 48:20 49:2
  76:2,5 85:6
third 62:13
thirty 89:18
thought 39:8
three 24:5 73:10
three-page 57:16
  71:22 92:10,11
tied 86:17,23
time 1:19 3:11 4:19
  5:5 8:15 12:18
  13:19 14:21 15:15
  16:7 17:16,18 18:8
  18:17 19:8,14 31:22
  44:17,23 45:14
  71:16 75:19 83:13
  85:14,24 88:3,9,13
title 13:2,16 14:7,16
  14:22 15:25 16:18
  17:12,22 18:13
  19:12,17
titles 20:14
today 8:8 9:6 27:18
today's 4:18 10:8,15
Tom 62:8 63:19
Tony 21:9 22:20 25:3
  48:19
tools 29:15,21 68:4
top 53:22 63:24
  66:19
topic 62:14
total 54:3,3,14
tracks 52:22
trade 11:16
training 29:21 73:21

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

105

74:2 82:18,21
**transcript** 4:4 8:23
  89:20,21 91:7,9
  93:8
**translate** 8:22
**transmission** 5:6
**trial** 1:15 3:12
**true** 91:9,12 93:8
**truthfully** 9:21
**trying** 30:15 76:25
**turn** 50:25
**Turning** 60:3
**Twenty-three** 11:24
**two** 18:5,5 19:2 20:9
  36:24 37:2 51:21
**typically** 38:9 41:22
  45:21

---

**U**

**U** 3:2 5:22
**uh-huhs** 8:21
**uh-uhs** 8:21
**understand** 8:24
  18:23 45:25 77:6
**understanding** 9:19
**understood** 9:3 59:7
**unit** 15:8,9,16,24
**United** 1:2 20:4,5,9
  23:4
**unprepared** 31:16
**unprofessional** 81:8
**unprofessionalism**
  47:10
**unprofessionally**
  32:17
**update** 80:16
**updating** 64:17
**use** 29:14,16,17 31:17
  43:22 68:5 71:6
  73:23 75:7 81:18
**usually** 65:6
**utilize** 73:23,24

---

**V**

**value** 57:3 59:4

**verbal** 32:11,12,15
**verify** 82:24
**vice** 13:3,6,14,17,20
  14:2,14,17 15:5
  19:21 20:16,17,23
  39:22 62:9
**videoconference** 1:16
  4:12,22
**visit** 42:17 60:15
**visited** 60:7
**visiting** 45:23
**visits** 46:8
**volume** 33:21

---

**W**

**W** 91:2 92:2
**wait** 8:16 65:25
**waived** 3:7
**want** 7:8,13 18:24
  31:10 70:12 75:25
**warp** 43:17 63:13
**warping** 43:21 44:8
  45:9,14,19
**wasn't** 63:12 65:6
  86:3
**watch** 45:25
**way** 82:23 87:11
  93:12
**we'll** 7:15,18 12:20
  87:21
**we're** 30:15 31:11
  50:18 57:12 59:19
  64:13 67:13 68:16
  72:4 80:6
**well-done** 81:8
**well-suited** 67:18
**went** 42:7,12 46:10
  46:14 63:5
**WestRock** 1:9,9 2:15
  4:15,16 8:5,6,9
  12:25 13:11 15:4
  19:18 27:19 28:3
  34:5 37:14 41:21
  44:7 47:14 56:9,19
  65:11,23 66:3,10

73:11 82:7,10 84:14
  86:2
**WestRock's** 68:4
**Willard** 45:15,19
  47:22 52:9 65:12,17
  65:22 66:5
**willingness** 68:2
  69:12
**witness** 1:17 5:23 6:5
  6:10,18 27:15 28:8
  36:14 58:22 79:15
  80:8 88:12 89:2
  92:3
**witness(es)** 93:6,9
**word** 39:10
**words** 8:20 84:9
**work** 10:6 17:15 22:3
  22:8,11,15 33:4
  38:21 46:5 56:8
  62:2,2 84:23
**worked** 51:3
**working** 57:6
**worried** 77:5,7
**worth** 59:22
**wouldn't** 42:24
**write** 17:11
**writing** 81:21
**written** 32:11,16
  73:12

---

**X**

**x** 1:4,11 92:2,7,7,15
**XXXXX** 6:12
**XXXXXXXXXXX**
  6:10
**XXXXXXXXXXX...**
  6:11

---

**Y**

**Y** 5:22
**Yeah** 36:5 61:17 66:7
**year** 12:12 14:11
  33:14 44:11 53:10
  53:20 54:8,24 55:24
  66:14 67:14 73:9

74:14 81:5 86:16
**York** 1:3,22 2:5,5,10
  2:10 5:25 6:22 11:8
  91:3 93:5

---

**Z**

**zoom** 58:6

---

**0**

---

**1**

**1** 26:23 27:3,7 37:5
  63:24 64:2,6 67:14
  86:7 92:9
**10** 73:9,13 74:13,24
  76:3,15 81:4
**10/30** 60:6
**10:40** 44:18
**10006** 2:5
**10007** 2:10
**101** 59:10
**108** 60:5
**109** 59:11
**11** 54:7
**11:30** 71:11
**11:55** 85:8
**110** 59:11
**12** 54:8 92:17
**12:03** 88:13
**145,000** 55:13
**15** 33:15 40:10 72:17
  82:13
**1540** 2:4
**16** 92:18
**175** 2:9
**18** 64:10
**19** 92:19
**1967** 12:6
**1989** 14:13
**1993** 13:12 19:16
**1998** 18:19 19:16
**1st** 76:11

---

**2**

**2** 35:20,24 92:9
**2,525,000** 54:5

---

KRIMSKY v. WESTROCK COMPANY, et al.
Tammy Siracusa  ---  July 30, 2024

**2001** 18:11,19
**2004** 17:20 18:11
**2006** 16:10 17:20
**2012** 15:18 16:10
**2014** 14:23 15:18
**2018** 13:23,23 14:23
**2019** 13:22
**2022** 13:9,24 33:14
  86:7
**2023** 26:16 28:22
  39:25 40:8 45:8
  53:7,10 56:20 64:10
  67:14 78:11 86:17
**2024** 1:12 4:19 26:17
  72:17 74:14 81:5
  82:14,14 91:8 93:22
**212-453-3978** 2:11
**23-Civ-6252** 1:7
**24** 73:9
**26** 82:14
**26th** 83:9
**27** 12:6 92:9

─────── **3** ───────
**3** 50:8,11 52:16 92:10
**30** 1:12 4:18 12:13
  33:14 80:20 89:18
  91:8 93:22
**30-day** 83:7
**30(b)(4)** 4:25
**300,000** 55:21
**30s** 48:6
**32** 50:7
**33** 92:18
**35** 92:9
**39** 2:4 35:21

─────── **4** ───────
**4** 57:13,16,20 92:10
**40** 92:18
**40s** 48:11

─────── **5** ───────
**5** 30:19,24 59:9,14
  66:21 92:11

**50** 92:10
**500,000** 54:23
**50s** 48:18,24
**52** 57:21
**54** 57:21
**55** 72:3
**55th** 2:10
**57** 72:3 92:10
**58** 26:24
**58,000** 55:14
**59** 37:10 92:11

─────── **6** ───────
**6** 70:25 71:19,22,25
  79:3 92:11,17
**60-day** 74:7 76:4,7,10
  76:16
**60s** 48:24 49:7,14
**62** 30:19,21
**63** 26:24
**646-964-1178** 2:5
**65** 80:4
**66** 92:19
**69** 80:5

─────── **7** ───────
**7** 79:23 80:3 92:5,12
**7,615,000** 54:9
**70s** 49:7
**71** 92:11
**79** 92:12

─────── **8** ───────
**8** 60:4
**8:12** 64:10

─────── **9** ───────
**9** 92:18
**9:33** 1:13 4:19